UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

# 09-21406

| | |
|---|---|
| TRILOGY PROPERTIES LLC, a Florida limited liability company; GAETANO SALERNO, an individual; and JOSEPH SALERNO, an individual, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) |

**CIV-JORDAN**  ⁝ McALILEY ⁝

            Plaintiffs,

vs.

SB HOTEL ASSOCIATES LLC, a Delaware
limited liability company; BAYROCK GROUP
L.L.C., a New York limited liability company;
ROY STILLMAN, an individual; DONALD J.
TRUMP, an individual; TRUMP
ORGANIZATION LLC, a New York limited
liability company; TRUMP FLORIDA
MANAGEMENT LLC, a Delaware limited
liability company; CORUS BANK, N.A., a
foreign corporation, and CHICAGO TITLE
INSURANCE COMPANY, a Nebraska
corporation,

            Defendants.

**CLASS ACTION COMPLAINT**



FILED by _____ D.C.

MAY 26 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## CLASS ACTION COMPLAINT AND
## DEMAND FOR JURY TRIAL AND INJUNCTIVE RELIEF

Plaintiffs, TRILOGY PROPERTIES LLC, GAETANO SALERNO, and JOSEPH

SALERNO (collectively, "Plaintiffs") individually and on behalf of all others similarly situated,

by and through undersigned counsel, hereby sue Defendants, SB HOTEL ASSOCIATES LLC,

BAYROCK GROUP L.L.C., ROY STILLMAN, DONALD J. TRUMP, TRUMP

ORGANIZATION LLC, TRUMP FLORIDA MANAGEMENT LLC, CORUS BANK, N.A.,

1

and CHICAGO TITLE INSURANCE COMPANY (collectively, "Defendants"), and allege the following:

**JURISDICTION AND VENUE**

1.      The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(d)(2)(A) (class action diversity).  This is a class action as defined under 28 U.S.C. § 1332(d)(1)(B); the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and at least one member of the Class is a citizen of a State different from the States of which Defendants are citizens.  The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction over related state claims).

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, and the real property that is the subject of the action is situated in this district.  Venue is also proper in this judicial district because all of the Defendants transact business in this district.

3.      The Court has personal jurisdiction over the Defendants under Florida law because, at all times relevant to the Plaintiffs' claims, Defendants have directly, or through their agents, officers, and/or representatives, operated, conducted, engaged in, and carried on a business venture in Florida, committed acts within Florida related to the allegations set forth herein, and caused injury to the Plaintiffs arising out of acts and/or omissions by Defendants which occurred in Florida.

## THE PARTIES

### The Plaintiffs

4.      Plaintiff TRILOGY PROPERTIES LLC ("Trilogy") is a Florida limited liability company.

5.      Plaintiff GAETANO SALERNO is a resident of New York and an individual, *sui juris*.

6.      Plaintiff JOSEPH SALERNO is a resident of New York and an individual, *sui juris*.

### The Class

7.      Plaintiffs bring this action on behalf of the following Class, defined as:

**The Class**

All persons and entities (excluding officers, directors, and employees of Defendants) who entered into a Purchase Agreement and paid a deposit or deposits for a condominium unit or units at the SB Fort Lauderdale Hotel & Condominium from January 1, 2005, through the conclusion of the trial in this matter (the "Class Period").

### The Defendants

8.      Defendant SB HOTEL ASSOCIATES LLC ("SB Hotel") is a Delaware limited liability company with its principal place of business in Broward County, Florida.  SB Hotel is a developer of the SB Fort Lauderdale Hotel & Condominium (the "Condominium Hotel") located in Fort Lauderdale, Florida, which is being marketed and sold under the name of "Trump International Hotel & Tower."

9.      Defendant BAYROCK GROUP L.L.C. ("Bayrock") is a New York corporation doing business in Broward County, Florida.  Bayrock is one of the developers of the Condominium Hotel.

3

10.     Defendant ROY STILLMAN ("Stillman") is a resident of New York and an individual, *sui juris*. Stillman is one of the developers of the Condominium Hotel.

11.     Defendant DONALD J. TRUMP ("Trump") is a resident of New York and an individual, *sui juris*. Trump is one of the developers of the Condominium Hotel.

12.     Defendant TRUMP ORGANIZATION LLC ("TO") is a New York limited liability company. TO is one of the developers of the Condominium Hotel.

13.     Defendant TRUMP FLORIDA MANAGEMENT LLC ("Trump Florida") is a Delaware corporation doing business in Broward County, Florida. Trump Florida is one of the developers of the Condominium Hotel.

14.     Collectively, Defendants SB Hotel, Bayrock, Stillman, Trump, TO, and Trump Florida shall be referred to as the "Developer Defendants." The Developer Defendants partnered with one another to develop the Condominium Hotel and are therefore agents of one another with respect to its development and the offering of units at the Condominium Hotel for sale to the public.

15.     Defendant CORUS BANK, N.A. ("Corus Bank") is a foreign corporation doing business within Broward County, Florida. Corus Bank is the primary construction lender for the Condominium Hotel.

16.     Defendant CHICAGO TITLE INSURANCE COMPANY ("Chicago Title") is a Nebraska corporation doing business within Broward County, Florida. Chicago Title is serving as the escrow agent for the Condominium Hotel, in possession of the buyers' deposit monies.

## FACTUAL ALLEGATIONS

17.     The SB Fort Lauderdale Hotel & Condominium is a condominium hotel planned for 298 guestrooms or "units" which is currently under construction in Fort Lauderdale, Florida.

18.     The Condominium Hotel was marketed and promoted as the "Trump International Hotel & Tower."  The most prominent component of the Condominium Hotel's marketing campaign is its promotion of the Condominium Hotel as an elite "Trump Property" being developed by the celebrity real estate mogul Donald J. Trump and his company, the Trump Organization LLC.  As Trump advises prospective buyers in one of the project's oversized advertising brochures, "It is with great pleasure that I present my latest development, Trump International Hotel & Tower, Fort Lauderdale.  This magnificent oceanfront resort offers the finest and most luxurious experience I have created."  A true copy of the relevant page from this brochure is attached as **Exhibit A**.  According to at least one real estate expert, branding the Condominium Hotel as a "Trump" property added at least $200.00 per square foot to the value of the units during the pre-construction phase.

19.     In capturing the experience to be offered at the Condominium Hotel, the developers promised through their marketing materials that,

> A hotel condominium at Trump International Hotel & Tower provides a unique opportunity for you to own an elegantly appointed hotel guestroom on Fort Lauderdale Beach.  This is a fee simple purchase of a deeded condominium unit, which may be sold or transferred at any time after closing.  When in residence, you will have full access to the five-star amenities and services of a world-class luxurious hotel.  When not occupied, ownership of your guestroom may include the opportunity to place your unit in a rental arrangement.

A true copy of the relevant page from these materials is attached hereto as **Exhibit B**.

20.     From its inception, the Condominium Hotel has been marketed to potential buyers with a strong emphasis on the project's overall investment potential, rental and management program, and the payment stream that owners could expect from the rental of their units through the hotel reservation system.  For example, sales brochures for the Condominium Hotel tout the Trump Organization's "solid management practices," assert that, "[c]ompared to other projects,

5

Trump International Hotel & Tower has a more favorable income share," and make "promises [of] significant equity" to those buying units. A true and correct copy of promotional materials containing the foregoing representations is attached hereto as **Composite Exhibit C**.

21.     Defendant also promoted, through its sales literature, that the Condominium Hotel would be completed in 2007.

22.     On or about January 20, 2006, Plaintiff JOSEPH SALERNO entered into a Purchase Agreement with Defendant for Unit No. 1406 at the Condominium Hotel at a purchase price of $737,625.00, and paid preconstruction deposits in the total amount of $147,525.00 (20 % of the purchase price) as a condition of doing so. A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit D**.

23.     On or about December 27, 2005, Plaintiff GAETANO SALERNO entered into a Purchase Agreement with Defendant for Unit No. 2309 at the Condominium Hotel at a purchase price of $799,000.00, and paid preconstruction deposits in the total amount of $159,800.00 (20% of the purchase price) as a condition of doing so. Other than the unit number and price and deposit amounts, the Purchase Agreement is substantially the same as Exhibit D hereto.

24.     On or about December 27, 2005, Plaintiff TRILOGY PROPERTIES LLC entered into a Purchase Agreement with Defendant for Unit No. 205 at the Condominium Hotel at a purchase price of $475,000.00, and paid preconstruction deposits in the total amount of $95,000.00 (20% of the purchase price) as a condition of doing so. Other than the unit number and price and deposit amounts, the Purchase Agreement is substantially the same as Exhibit D hereto.

25.     Like the other buyers of units in the Condominium Hotel, Plaintiffs paid 20% of the purchase price as preconstruction deposits. For each buyer, including Plaintiffs, half of the

deposit monies (*i.e.*, 10% of the purchase price) is believed to be in the possession of Defendant Chicago Title.

26.     Since units were first offered to members of the general public (including Plaintiffs) in 2005 and 2006 amid high hopes and expectations, the Condominium Hotel has been besieged by problems.  First, unexplained delays on the construction site pushed the completion date for the project well past the 2007 date promised to buyers, as well as through 2008 and much of 2009.

27.     Then, due to severe undercapitalization owing to a large portfolio of rapidly depreciating condominium construction loans, the Condominium Hotel's main construction lender, Chicago-based Corus Bank, faced the serious threat of bank failure.  Corus Bank was given until May 22, 2009, by federal regulators to submit a capital restoration plan.  Corus Bank has also been given a deadline of June 18, 2009, by which to raise at least $390 million or face being placed into receivership with the Federal Deposit Insurance Corporation (FDIC).  One senior banking analysis observed that Corus Bank's prospects for raising capital and avoiding receivership "appear dim."  A true copy of press coverage reporting on Corus Bank's recent troubles is attached hereto as **Exhibit E**.

28.     In approximately March 2009 – with the Condominium Hotel still not finished – buyers began to learn of the devastating impact that Corus Bank's troubles would have on the Condominium Hotel.  On March 11, 2009, developers' representative and agent Michele Conte ("Conte") sent Plaintiff Trilogy the following e-mail message:

> A new problem has arisen since I returned from Fort Lauderdale, which was the last time I saw you and John.   The media has discussed the financial condition of Corus Bank, our primary lender on the project.  Corus's stock has plunged, and their future is uncertain.
> **They may not be able to fund the final $15 million we need to open Trump International Hotel & Tower, and that may or may not mean we cannot close**

**anyone**.  At this time we are simply laying in wait for some direction, and I have been instructed to be straight with our buyers, which I just have been with you.   If you speak to an attorney, please tell him or her what I just said; it's no secret anyway that Corus is in financial difficulty.  Explore your options from every possible scenario.

But for now, no one knows what will happen, although again, we are also exploring how to proceed around the uncertain issues presented by Corus's situation.

A true copy of the e-mail message is attached hereto as **Exhibit F** (emphasis added).

29.     By letter dated May 13, 2009, buyers including Plaintiffs received another communication from the developers, this one purporting to set a "closing date" pursuant to the Purchase Agreement.  A true copy of one of the May 13 letters is attached hereto as **Exhibit G**. While the letter purportedly schedules a "closing date" for late May 2009 and gives the buyers approximately two weeks to obtain mortgage financing, it simultaneously informs them that (1) the hotel will not open if purchasers close on fewer than half of the units in the Condominium Hotel; (2) owners will not be allowed to occupy their units unless the hotel opens; and (3) the branding of the Condominium Hotel as a "Trump" property is in jeopardy, owing to an asserted default under a License Agreement with Trump.  As a result of the letter, newspaper coverage reported that "Trump condo-hotel in Fort Lauderdale might not open," and that "Trump wants name off condo project."  True copies of articles from the *South Florida Sun-Sentinel* and *Miami Herald* are attached hereto as **Composite Exhibit H**.

30.     The existence of an operational hotel, the ability of the owners to actually occupy their units, and the branding of the Condominium Hotel as a "Trump" property were each a material and indispensable basis of the bargains entered into by Plaintiffs and other buyers of units in the Condominium Hotel.  Without **any one** of these conditions in place, the value of owning a unit in the Condominium Hotel is severely diminished – if it is worth anything at all. The failure of each of these conditions is an independent and material breach of the Purchase

Agreements, in addition to the failure to the construct the Condominium Hotel in a timely manner.

31.    This is not the first time that a luxury condominium hotel project developed and promoted by Donald J. Trump has left buyers in the lurch. In February 2009, buyers of preconstruction units in the Trump Ocean Resort Baja Mexico learned that the developers abandoned the project, despite having spent some $32 million of the buyers' deposit monies. No deposits were returned by Trump or anyone else. A true copy of a newspaper report from the *Los Angeles Times* regarding the Trump Ocean Resort Baja Mexico is attached hereto as **Exhibit I**.

32.    All conditions precedent to the commencement and prosecution to final judgment of this civil action have taken place, have been performed, or have been waived or excused by Defendants.

33.    Plaintiffs have been compelled to engage the services of the undersigned attorneys and to pay them a reasonable fee.

## CLASS ACTION ALLEGATIONS

34.    Plaintiffs bring this action on their own behalf and as a class action on behalf of the Class defined herein pursuant to, and properly maintainable under Rule 23(a) and Rule 23(b)(1)-(3) of the Federal Rules of Civil Procedure.

35.    The Plaintiffs are members of the Class because they entered into Purchase Agreements and paid deposits for units at the Condominium Hotel during the Class Period.

36.    Because such information is in the exclusive control of the Defendants, Plaintiffs do not know the exact number of members of the Class. However, based on the number of units at the Condominium Hotel and reports that the building was sold out in the preconstruction phase,

Plaintiffs believe that Class members number approximately 298 and are sufficiently numerous so that joinder of all Class members is impracticable.

37.    There are questions of law and fact common to the Class, including:

a)    whether the Developer Defendants are in breach of the Purchase Agreements with Plaintiffs and the other members of the Class;

b)    whether the Developer Defendants are in breach of the License Agreement permitting use of the name "Trump" on the Condominium Hotel;

c)    whether Plaintiffs and the other members of the Class have a right to rescind the Purchase Agreements pursuant to section 718.503(1)(a)1, Florida Statutes;

d)    whether the Developer Defendants' conduct toward Plaintiffs and the other members of the Class violates the Florida Deceptive and Unfair Trade Practices Act;

e)    whether the Developer Defendants intentionally omitted or concealed material facts from Plaintiffs and the other members of the Class;

f)    whether the Developer Defendants made material misrepresentations to Plaintiffs and the other members of the Class;

g)    whether the Developer Defendants' material misrepresentations and omissions and concealments of material facts were made with the intention of inducing reliance on the part of Plaintiffs and the other members of the Class;

h)    whether the Developer Defendants' material misrepresentations and omissions and concealments of material facts were false at the time they

were made, or the Developer Defendants knew or should have known them to be false;

i)      whether the Developer Defendants' advertising and promotional materials for the Condominium Hotel as defined under section 718.506(1), Florida Statutes, as well as advertising and promotional materials published under authority from the Developer Defendants as defined under section 718.506(1), Florida Statutes, contained false and misleading material statements, information and omissions;

j)      whether Plaintiffs and other Class members have a right to rescind their Purchase Agreements under section 718.506(1), Florida Statutes;

k)      whether the Developer Defendants violated the anti-fraud provisions of the Interstate Land Sales Full Disclosure Act;

l)      whether the Developer Defendants violated the Securities Act of 1933;

m)      whether the Developer Defendants violated the Florida Securities and Investor Protection Act;

n)      whether the Developer Defendants have violated the Florida Condominium Act;

o)      whether the conduct of the Developer Defendants has caused damage to Plaintiffs and other members of the Class;

p)      whether Plaintiffs and the other members of the Class paid monies, pursuant to their respective Purchase Agreements, which have been deposited into an escrow account with Defendant Chicago Title;

q)    whether some or all of such deposit monies are still in the possession of Defendant Chicago Title;

r)    whether the Developer Defendants will be unjustly enriched at the expense of Plaintiffs and the other Class members as a result of the Developer Defendants' fraudulent conduct, if a constructive trust or equitable lien is not imposed;

s)    whether Plaintiffs and the other Class members are suffering continuing irreparable injury owing to the continued possession of their deposit monies by Chicago Title;

t)    whether Plaintiffs and the other Class members are suffering continuing irreparable injury if the Developer Defendants are not enjoined from scheduling closings on units in the Condominium Hotel and declaring buyers to be in default; and

u)    whether Plaintiffs and the other Class members have no adequate remedy at law.

38.    Plaintiffs' claims are typical of the Class members because Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

39.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs also have no interests that are antagonistic to other members of the Class and have retained counsel competent and experienced in the prosecution of class actions to represent them and the Class.

40.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

41.     The Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate declaratory and injunctive relief with respect to the Class as a whole.

42.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

43.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since individual joinder of all damaged Class members is impracticable. The Class is readily definable from records in the files of the Defendants. Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. The class action device presents fewer case management difficulties, and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court, without the duplication of effort and expense that numerous individual actions would engender.

## COUNT I

### (Breach of Purchase Agreement)
### (Against Developer Defendants)

44.     Paragraphs 1 through 43 are incorporated herein by reference.

45.     Plaintiffs and the other Class members entered into Purchase Agreements and paid 20% deposits toward the purchase of units in the Condominium Hotel.

46.     The Developer Defendants have materially breached the Purchase Agreements.

47.     Plaintiffs and the other Class members have been damaged by the Developer Defendants' breach.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the Purchase Agreements, compensatory damages, punitive damages, costs, attorneys' fees, temporary restraining order, injunctive relief, and such other relief that the Court deems necessary or proper.

## COUNT II

### (Declaratory Relief Action Regarding Purchase Agreement)
### (Against Developer Defendants)

48.     Paragraphs 1 through 43 are incorporated herein by reference.

49.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

50.     There is an actual, real, and bona fide controversy as to the rights of Plaintiffs and the other Class members under their Purchase Agreements, and whether the Developer Defendants are in breach of the Purchase Agreements.

51.     The Plaintiffs along with the other Class members and the Developer Defendants have an actual, present, adverse, and antagonistic interest in the subject matter at issue either in fact or law.

WHEREFORE, Plaintiffs and the other members of the Class seek a declaratory judgment to the effect that the Developer Defendants are in breach of the Purchase Agreements entered into with Plaintiffs and the other Class members, that Plaintiffs and the other Class

members have a right to rescind the Purchase Agreements, and for such other relief that the Court deems necessary or proper.

## COUNT III

### (Breach of License Agreement)
### (Against Developer Defendants)

52.     Paragraphs 1 through 43 are incorporated herein by reference.

53.     There exists a License Agreement which governs the right of the Condominium Hotel to be branded as a "Trump" property.

54.     It is the clear or manifest intent of the parties contracting to the License Agreement that the License Agreement primarily and directly benefits Plaintiffs and the other members of the Class.  Plaintiffs and the other members of the Class are third-party beneficiaries of the License Agreement.

55.     The Developer Defendants are in breach of their obligations under the License Agreement.

56.     Plaintiffs and the other Class members have been damaged by the Developer Defendants' breach.

WHEREFORE, Plaintiffs and the other members of the Class seek compensatory damages, punitive damages, costs, attorneys' fees, and such other relief that the Court deems necessary or proper.

## COUNT IV

### (Declaratory Relief Action Regarding License Agreement)
### (Against Developer Defendants)

57.     Paragraphs 1 through 43 and 53 through 56 are incorporated herein by reference.

58.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

59.     There is an actual, real, and bona fide controversy as to the rights of Plaintiffs and the other Class members under the License Agreement, and whether the Developer Defendants are in breach of the License Agreement.

60.     The Plaintiffs along with the other Class members and the Developer Defendants have an actual, present, adverse, and antagonistic interest in the subject matter at issue either in fact or law.

WHEREFORE, Plaintiffs and the other members of the Class seek a declaratory judgment to the effect that the Developer Defendants are in breach of the License Agreement, and for such other relief that the Court deems necessary or proper.

## COUNT V

### (Rescission Pursuant to § 718.503(1)(a)1, Florida Statutes)
### (Against Developer Defendants)

61.     Paragraphs 1 through 43 are incorporated herein by reference.

62.     The Developer Defendants have made changes to their offering of units in the Condominium Hotel.  The changes are material and adverse to Plaintiffs and the other members of the Class.

63.     Plaintiffs and the other Class members have sought rescission of the Purchase Agreements within 15 days after receiving notice of the material and adverse changes.

64.     Under section 718.503(1)(a)1 and the terms of the Purchase Agreements, Plaintiffs are entitled to rescind the Purchase Agreements and receive the refund of their deposit monies.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the Purchase Agreements, compensatory damages, punitive damages, costs, attorneys' fees, and such other relief that the Court deems necessary or proper.

## COUNT VI

### (Violation of the Florida Condominium Act, § 718.506(b), Florida Statutes)
### (Against Developer Defendants)

65.     Paragraphs 1 through 43 are incorporated herein by reference.

66.     The Condominium Hotel is a "condominium" as defined under section

718.103(11), Florida Statutes.

67.     The Developer Defendants are each a "developer" as defined under section

718.103(16), Florida Statutes.

68.     The Florida condominium statute at section 718.506(1), Florida Statutes, states

that,

> Any person who, in reasonable reliance upon any material statement or information that is false or misleading and published by or under authority from the developer in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising, pays anything of value toward the purchase of a condominium parcel located in this state shall have a cause of action to rescind the contract or collect damages from the developer for his or her loss prior to the closing of the transaction. After the closing of the transaction, the purchaser shall have a cause of action against the developer for damages under this section . . . .

69.     Advertising and promotional materials published by and under authority of the

Developer Defendants contained material statements and information that were false and

misleading.

70.     The advertising and promotional materials represented that the Condominium

Hotel was an elite "Trump Property" being developed by Donald J. Trump and his company, the

Trump Organization, and that the Condominium Hotel would be branded with the "Trump"

name.

71.     The advertising and promotional materials also represented that the project would

be completed in 2007.

72.     The advertising and promotional materials, including the condominium Prospectus, also promised that unit owners would be able to occupy their units, and that the property would include an operational and luxurious hotel component.

73.     In entering into the Purchase Agreement and paying preconstruction deposits, Plaintiff reasonably relied on the foregoing representations in Defendant's advertising and promotional materials.

74.     The Developer Defendants' representations were false, misleading, and material. The Developer Defendants knew that the representations were false and misleading at the time they were made.

75.     In fact, there is no agreement in place which guarantees that the Condominium Hotel can operate under the "Trump" banner once it is completed; indeed, Donald J. Trump intends to have his name pulled off the project.

76.     Furthermore, the completion date promised for the project was misleading, as the Condominium Hotel was not finished in 2007.

77.     Moreover, if purchasers actually close on the units, they will not be able to occupy their units, and there is grave doubt as to whether the hotel will ever open.

78.     Plaintiffs and the other Class members have been damaged by the foregoing misrepresentations and false information disseminated by the Developer Defendants in connection with the marketing of the Condominium Hotel.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the Purchase Agreements, compensatory damages, punitive damages, prejudgment and post-judgment interest, attorneys' fees, costs, and such other relief that the Court deems necessary or proper.

## COUNT VII

**(Violation of federal Interstate Land Sales Full Disclosure Act (ILSA), 15 U.S.C. §
1703(a)(2)(A)-(C))
(Against Developer Defendants)**

79.     Paragraphs 1 through 43 and 69 through 78 are incorporated herein by reference.

80.     The federal Interstate Land Sales Full Disclosure Act ("ILSA"), codified at 15

U.S.C. § 1701 *et seq.*, was enacted by Congress in 1968 to protect consumers from fraud and

abuse in the sale or lease of land.  ILSA applies to the sale of condominium units, and is

administered by the U.S. Department of Housing and Urban Development (HUD).

81.     ILSA applies to the Purchase Agreement entered into by Plaintiff for the purchase

and sale of the Hotel Unit at the Condominium Hotel, and the Condominium Hotel does not fall

under any of the exemptions set forth in ILSA.  The Condominium Hotel is registered with HUD.

82.     Pursuant to 15 U.S.C. § 1703(a)(2), it is unlawful for any developer or agent, with

respect to the sale or lease of any lot (including a condominium unit) not exempt under ILSA to:

a)      employ any device, scheme, or artifice to defraud, 15 U.S.C. §
        1703(a)(2)(A);

b)      obtain money or property by means of any untrue statement of a material
        fact, or any omission to state a material fact necessary in order to make the
        statements made (in light of the circumstances in which they were made
        and within the context of the overall offer and sale or lease) not
        misleading, with respect to any information pertinent to the lot or
        subdivision, *id.* § 1703(a)(2)(B); or

c)      engage in any transaction, practice, or course of business which operates
        or would operate as a fraud or deceit upon a purchaser, *id.* § 1703(a)(2)(C).

83.     Each of the Developer Defendants is a person who, directly or indirectly, sold, offered to sell, or advertised for sale units in the Condominium Hotel.

84.     Each of the Developer Defendants violated ILSA in making misrepresentations and omissions in their advertising and promotional materials for the Condominium Hotel.

85.     The advertising and promotional materials represented that the Condominium Hotel was an elite "Trump Property" being developed by Donald J. Trump and his company, the Trump Organization, and that the Condominium Hotel would be branded with the "Trump" name.

86.     The advertising and promotional materials also represented that the project would be completed in 2007.

87.     The advertising and promotional materials, including the condominium Prospectus, also promised that unit owners would be able to occupy their units, and that the property would include an operational and luxurious hotel component.

88.     The federal Property Report for the Condominium Hotel stated that the units were offered with the intent to be "part of a hotel complex."

89.     In entering into the Purchase Agreement and paying preconstruction deposits, Plaintiff reasonably relied on the foregoing representations in Defendant's advertising and promotional materials.

90.     The Developer Defendants' representations were false, misleading, and material. The Developer Defendants knew that the representations were false and misleading at the time they were made.

91.     In fact, there is no agreement in place which guarantees that the Condominium Hotel can operate under the "Trump" banner once it is completed; indeed, Donald J. Trump intends to have his name pulled off the project.

92.     Furthermore, the completion date promised for the project was misleading, as the Condominium Hotel was not finished in 2007.

93.     Moreover, if purchasers actually close on the units, they will not be able to occupy their units, and there is grave doubt as to whether the hotel will ever open.

94.     Plaintiffs and the other Class members have been damaged by the foregoing misrepresentations and false information disseminated by the Developer Defendants in connection with the marketing of the Condominium Hotel.

95.     In entering into the Purchase Agreements and paying preconstruction deposits, Plaintiffs and the other Class members reasonably relied on the foregoing representations in the Developer Defendants' advertising and promotional materials.

96.     The Developer Defendants' representations were false and misleading.

97.     The Developer Defendants made use of means and instruments of transportation and communication in interstate commerce and of the mails in making the foregoing omissions and representations.  The Developer Defendants offered, marketed and sold units in the Condominium Hotel to the public through the U.S. mail, U.S. telephone lines, and other instrumentalities of interstate commerce as part of a common promotion plan as defined in 15 U.S.C. §1701(4).

98.     The Developer Defendants made the foregoing omissions and representations with the intent to induce Plaintiffs and the other Class members to act upon them.

21

99.     Plaintiffs and the other Class members were injured by acting in reliance on the Developer Defendants' omissions and representations.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the Purchase Agreements, compensatory damages, punitive damages, prejudgment and post-judgment interest, attorneys' fees, costs, and such other relief that the Court deems necessary or proper.

## COUNT VIII

**(Violation of federal Interstate Land Sales Full Disclosure Act (ILSA), 15 U.S.C. § 1703(a)(1)(C) Against Developer Defendants)**

100.     Paragraphs 1 through 43, 69 through 78, and 80 through 99 are incorporated herein by reference.

101.     ILSA, at 15 U.S.C. § 1703(a)(1)(C), makes it illegal "to sell or lease any lot where any part of the statement of record or the property report contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein pursuant to sections 1704 through 1707 of this title or any regulations thereunder."

102.     The Developer Defendants violated ILSA because the Property Report provided to Plaintiffs and the other Class members, as well as the Statement of Record filed with HUD, violated 15 U.S.C. §1703(a)(1)(C) in the following ways:

        a)     The Property Report and Statement of Record misrepresented that the units for sale would be "part of a hotel complex";

        b)     The Property Report and Statement of Record omitted to disclose that the hotel would not open unless a certain threshold of closings occurred;

22

c)   The Property Report and Statement of Record omitted to disclose that under certain circumstances, unit owners would not be allowed to occupy their units, including in the event the hotel does not open; and

d)   The Property Report and Statement of Record omitted to disclose the terms of the License Agreement, or that Donald J. Trump could pull his name off of the Condominium Hotel before any closings took place.

103.   The Developer Defendants knew of the foregoing untrue statements and omissions of material facts at the time the Property Report was provided to prospective buyers and the Statement of Record was registered with HUD.

104.   Plaintiffs and the other Class members reasonably relied upon the foregoing misrepresentations and omissions in entering into the Purchase Agreements.

105.   Plaintiffs and the other Class members have been damaged as a direct and proximate result of the Developer Defendants' misrepresentations and omissions in the Property Report and Statement of Record.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the Purchase Agreements, compensatory damages, punitive damages, prejudgment and post-judgment interest, attorneys' fees, costs, and such other relief that the Court deems necessary or proper.

## COUNT IX

### (Violation Of 15 U.S.C. § 77e, The Securities Act of 1933)<br>(Against Developer Defendants)

106.   Paragraphs 1 through 43 are incorporated herein by reference.

107.   Count IX is brought pursuant to Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77*l*(a)(1) against the Developer Defendants.

108.    The Purchase Agreements for units in the Condominium Hotel constitute "investment contracts" and otherwise falls within the definition of a "securities" in 15 U.S.C. § 77b(a)(1), because, among other facts:

    a)    Both the substance and economic reality of the units in the Condominium Hotel unit offered to Plaintiffs and the other Class members is a "security."

    b)    Plaintiffs and the other Class members are severely restricted in their use and occupancy of the units after closing, and have been told of the strong likelihood they may not occupy the units after closing.

    c)    Plaintiffs and the other Class members were led to expect profits derived primarily from the efforts of the Developer Defendants and their affiliates, agents, and representatives.

    d)    Plaintiffs and the other Class members were led to believe that expenses would be shared and revenue would be apportioned among the hotel units by the Developer Defendants by rotating the occupancy of hotel units according to a plan which would attempt to equalize utilization of the hotel units.

    e)    The Developer Defendants offered Plaintiffs and the other Class members an opportunity to invest their money in a common enterprise managed by the Developer Defendants.  A common enterprise managed and staffed with adequate trained personnel is essential to achieving a material return on the investment.

f)      The success of the investment depends upon the expertise or experience of the Developer Defendants and their agents, and not Plaintiffs or the other Class members, in planning, developing, and managing a hotel.

g)      Individual management of the hotel units would not be economically feasible.

h)      In economic substance, Plaintiffs and the other Class members provided the investment capital for the Condominium Hotel and management, control and operation of the hotel as a common enterprise. The managerial efforts of the Developer Defendants are essential, and affect the financial success or failure of the common enterprise.

109.    The Developer Defendants are each "persons" as defined by 15 U.S.C. § 77b(a)(2) of the Securities Act.

110.    Interstate offerings of securities to the public must be registered with the Securities & Exchange Commission (SEC) pursuant to 15 U.S.C. § 77e.

111.    The failure to register a public securities offering is a violation of 15 U.S.C. § 77e, entitling a purchaser to rescind the transaction and other relief.

112.    The Developer Defendants offered and sold securities, which it failed to register pursuant to 15 U.S.C. § 77e, and the Developer Defendants used the U.S. Mails or a facility of interstate commerce in connection with the offer and sale of securities.

113.    By reason of the conduct alleged herein, the Developer Defendants violated and/or controlled a person who violated, 15 U.S.C. § 77*l*, and are liable to Plaintiffs and the other Class members as provided by the applicable law. Accordingly, Plaintiffs and the other Class members have the right to rescind and recover the full consideration paid for their respective

units in the Condominium Hotel, and they hereby elect to rescind and tender the security to the Developer Defendants and recover all monies and consideration paid for this security, with interest.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the Purchase Agreements, compensatory damages, punitive damages, prejudgment and post-judgment interest, attorneys' fees, costs, and such other relief that the Court deems necessary or proper.

## COUNT X

**(Violation of the Florida Securities And Investor Protection Act, Chapter 517 Florida Statutes)**
**(Against Developer Defendants)**

114.    Paragraphs 1 through 43 are incorporated herein by reference.

115.    Count X is brought by Plaintiffs and the other Class members pursuant to the Florida Securities and Investor Protection Act, (FSIPA), section 517.021(21)(q), Florida Statutes against Defendant.

116.    The Purchase Agreements are "securities" as defined by section 517.021(21)(q), Florida Statutes.

117.    The Developer Defendants are each "persons" for purposes of FSIPA.

118.    The Developer Defendants are each "issuers" for purposes of FSIPA.

119.    Pursuant to section 517.07, Florida Statutes, a security shall not be sold or offered for sale within the State of Florida unless it is exempt from the statute or registered.

120.    Pursuant to section 517.07, Florida Statutes, a security shall not be sold or offered for sale within the State of Florida unless it is exempt from the statute or a prospectus meeting

the requirements of FSIPA and the regulations adopted thereunder is furnished to the purchaser prior to the sale.

121. The Purchase Agreements entered into by Plaintiffs and the other Class members are not exempt from FSIPA.

122. The Developer Defendants failed to register the Purchase Agreements pursuant to FSIPA.

123. The Developer Defendants failed to provide a prospectus in compliance with FSIPA to Plaintiffs and the other Class members.

124. The Developer Defendants failed to secure a permit to sell securities as required by FSIPA.

125. Pursuant to section 517.211, Florida Statutes, every sale made in violation of sections 517.07 or 517.12(1) may be rescinded at the election of the purchaser, and each person making the sale and every director, officer, partner, or agent of or for each person making the sale may be held jointly and severally liable to the purchaser in an action for rescission.

126. Defendant has violated the foregoing provisions of FSIPA.

127. The Purchase Agreements for units in the Condominium Hotel constitute "investment contracts" and otherwise falls within the definition of "securities" because, among other facts:

> a) Both the substance and economic reality of the units in the Condominium Hotel unit offered to Plaintiffs and the other Class members is a "security."

27

b)      Plaintiffs and the other Class members are severely restricted in their use and occupancy of the units after closing, and have been told of the strong likelihood they may not occupy the units after closing.

c)      Plaintiffs and the other Class members were led to expect profits derived primarily from the efforts of the Developer Defendants and their affiliates, agents, and representatives.

d)      Plaintiffs and the other Class members were led to believe that expenses would be shared and revenue would be apportioned among the hotel units by the Developer Defendants by rotating the occupancy of hotel units according to a plan which would attempt to equalize utilization of the hotel units.

e)      The Developer Defendants offered Plaintiffs and the other Class members an opportunity to invest their money in a common enterprise managed by the Developer Defendants.  A common enterprise managed and staffed with adequate trained personnel is essential to achieving a material return on the investment.

f)      The success of the investment depends upon the expertise or experience of the Developer Defendants and their agents, and not Plaintiffs or the other Class members, in planning, developing, and managing a hotel.

g)      Individual management of the hotel units would not be economically feasible.

h)      In economic substance, Plaintiffs and the other Class members provided the investment capital for the Condominium Hotel and management,

control and operation of the hotel as a common enterprise. The

managerial efforts of the Developer Defendants are essential, and affect

the financial success or failure of the common enterprise.

128.    Plaintiffs and the other Class members are entitled to an award of their reasonable

attorneys' fees, pursuant to section 517.211(g), Florida Statutes.

129.    Plaintiffs and the other Class members are entitled to the same civil remedies

provided by the United States for the purchasers of securities, including an award of interest,

pursuant to section 517.241(3), Florida Statutes.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the

Purchase Agreements, compensatory damages, punitive damages, prejudgment and post-

judgment interest, attorneys' fees, costs, and such other relief that the Court deems necessary or

proper.

## COUNT XI

### (Violation of the Florida Deceptive and Unfair Trade Practices Act)
### (Against Developer Defendants)

130.    Paragraphs 1 through 43, 66 through 78, 80 through 99, 101 through 105, and 155

through 156 are incorporated herein by reference.

131.    Chapter 501, Florida Statutes, known as the Florida Deceptive and Unfair Trade

Practices ACT (FUDTPA), protects the consuming public, such as the Plaintiffs and other Class

members in this case, from those who engage in unfair methods of competition or

unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

132.    The aforementioned violations of ILSA and Chapter 718, Florida statutes,

combined with the Developer Defendants' refusal to return the deposits to Plaintiffs and the

other Class members, constitute unfair and/or deceptive trade practices.

133.    The violations described the preceding paragraph and in this complaint constitute *per se* violations of FDUTPA pursuant to section 501.203(3).

134.    The Developer Defendants' actions are likely to deceive a reasonable consumer, and have deceived the Plaintiffs and the other Class members.  This conduct violates FDUTPA.

135.    Plaintiffs and the other Class members have suffered actual damages by the Developer Defendants' unfair and/or deceptive trade practices, including monetary losses, interest on their deposits, loss of use of their deposits, loss of business opportunities, inconvenience, frustration, and other incidental and consequential damages.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the Purchase Agreements, compensatory damages, statutory damages, punitive damages, prejudgment and post-judgment interest, attorneys' fees, costs, and such other relief that the Court deems necessary or proper.

## COUNT XII

### (Constructive Trust and Equitable Lien (Injunctive Relief)) (Against Chicago Title)

136.    Paragraphs 1 through 43 are incorporated herein by reference.

137.    This is an action for the imposition of a constructive trust or equitable lien on any deposit monies paid under the Plaintiffs' and the other Class members' Purchase Agreements being held in an escrow account with Chicago Title.

138.    Plaintiffs and the other Class members paid monies, pursuant to their respective Purchase Agreements, which have been deposited into an escrow account with Defendant Chicago Title.  Some or all of such deposit monies are still in the possession of Chicago Title in an escrow account.

139.   A constructive trust or equitable lien must be imposed upon the deposit monies in order to prevent unjust enrichment of the Developer Defendants at the expense of Plaintiffs and the other Class members as a result of the Developer Defendants' fraudulent, deceptive, and misleading conduct.

140.   Plaintiffs and the other Class members are suffering continuing irreparable injury owing to the continued possession of their deposit monies by Chicago Title, and they have no adequate remedy at law.

WHEREFORE, Plaintiffs and the other members of the Class seek an injunction ordering that the deposit monies paid under the Plaintiffs' and the other Class members' Purchase Agreements being held in an escrow account with Chicago Title be subject to the imposition of a constructive trust or equitable lien, and pray for such other relief as the Court deems necessary or proper.

## COUNT XIII

### (Imposition and Foreclosure of Vendees' Liens)
### (Against SB Hotel and Corus Bank)

141.   Paragraphs 1 through 43 are incorporated herein by reference.

142.   Plaintiffs and the other Class members are entitled to the return of their deposit monies owing to the Developer Defendants' breach of contract, violations of ILSA, FDUTPA, Florida Condominium Act, and federal and state securities laws, as alleged in the preceding counts.

143.   The Developer Defendants have refused to return the deposit monies to Plaintiffs and the other members of the Class.  The deposit monies are earnest money deposits under Florida law.

144.    Because Plaintiffs and the other Class members have not received the return of their deposit monies, they continued to have equitable liens on the Condominium Hotel. Plaintiffs and the other Class members own and hold their equitable liens on the Condominium Hotel property.

145.    Plaintiffs and the other Class members intend to record a *lis pendens* to secure their deposit monies and equitable interest in the Condominium Hotel property.

146.    Plaintiffs and the other Class members are entitled to equitable liens on the Condominium Hotel to secure their deposit monies paid to the Developer Defendants, as well as to foreclose the equitable liens to satisfy and repay the Plaintiffs their deposit monies.

147.    Corus Bank may claim an interest in the Condominium Hotel property as a result of its construction loan to the Developer Defendants. Corus Bank's loan and interest in the Condominium Hotel property, however, is inferior to the equitable lien rights in the Condominium Hotel property of Plaintiffs and the other Class members.

WHEREFORE, Plaintiffs and the other members of the Class demand judgment imposing equitable vendees' liens on the Condominium Hotel property to the extent of Plaintiffs and the other Class members' deposits disbursed from escrow to which they are entitled, and foreclosure of their equitable liens, and pray for such other relief as the Court deems necessary or proper.

## COUNT XIV

### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Against Developer Defendants)

148.    Paragraphs 1 through 43 and 155 through 156 are incorporated herein by reference.

149. The Developer Defendants have breached express terms of the Purchase Agreements with Plaintiffs and the other Class members.

150. Furthermore, the Developer Defendants have breached the implied covenant of good faith and fair dealing which attaches to the performance of every contractual obligation under Florida law.

151. On exceedingly short notice, the Developer Defendants have scheduled "closings" on the units under contract with Plaintiffs and the other Class members, giving them just two weeks to obtain mortgage financing. But the Developer Defendants are fully aware that the Condominium Hotel is in no shape for closings by buyers – given the dark cloud hanging over the property as alleged herein – and the Developer Defendants are under no illusion that any of the buyers will actually close on units. Indeed, certain members of the Class have been told by agents of the Developer Defendants that the buyers are not expected to close, and that they should seek legal advice.

152. The Developer Defendants have scheduled closings not for the purpose of actually facilitating closings on any of the units, but to start the clock running on buyers, hoping that they will be able to declare many of the buyers to be in "default" under their Purchase Agreements. Once buyers are unilaterally declared to be in "default" by the Developer Defendants, the Developer Defendants intend to seek the release of monies being held by Chicago Title on behalf of the so-called "defaulting" buyers, thereby profiting from the "defaults."

153. The scheduling of closings on exceedingly short notice and in bad faith by the Developer Defendants has caused and is causing Plaintiffs and the other Class members

irreparable injury. Furthermore, the closings are prohibited under section 718.106(3), Florida Statutes.

WHEREFORE, Plaintiffs and the other members of the Class seek rescission of the Purchase Agreements, compensatory damages, statutory damages, punitive damages, prejudgment and post-judgment interest, attorneys' fees, costs, injunctive relief and a temporary restraining order postponing the closings, and such other relief that the Court deems necessary or proper.

## COUNT XV

**(Declaratory Relief Action for Violation of section 718.106(3), Florida Statutes)**
**(Against Developer Defendants)**

154.    Paragraphs 1 through 43 are incorporated herein by reference.

155.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

156.    There is an actual, real, and bona fide controversy as to the rights of Plaintiffs along with the other Class members and the rights of the Developer Defendants, and whether the closings scheduled by the Developer Defendants are legal under Florida law. While section 718.106(3), Florida Statutes provides that "[a] unit owner is entitled to the exclusive possession of his or her unit" and that "[h]e or she is entitled to use the common elements in accordance with the purposes for which they are intended," the owners of units in the Condominium will not be able to occupy the units or use the common elements after closing.

157.    The Plaintiffs along with the other Class members and the Developer Defendants have an actual, present, adverse, and antagonistic interest in the subject matter at issue either in fact or law.

WHEREFORE, Plaintiffs and the other members of the Class seek a declaratory judgment to the effect that the Developer Defendants are in violation of section 718.106(3),

Florida Statutes, that the scheduled closings cannot proceed under Florida law, a temporary restraining order and injunctive relief, and such other relief that the Court deems necessary or proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a) and Rule 23(b)(1)-(3) of the Federal Rules of Civil Procedure, that the Class as defined herein be certified, that the undersigned counsel for Plaintiffs be appointed lead counsel for the Class, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court adjudge and decree that the Developer Defendants are in breach of the Purchase Agreements entered into with Plaintiffs and the other Class members

C.      That the Court adjudge and decree that the Developer Defendants are in breach of the License Agreement and have thereby damaged Plaintiffs and the other Class members;

D.      That the Court adjudge and decree that Plaintiffs and the other Class members have a right to rescind the Purchase Agreements;

E.      That the Court adjudge and decree that the Developer Defendants have violated the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703(a)(1);

F.      That the Court adjudge and decree that the Developer Defendants have violated the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703(a)(2);

G.      That the Court adjudge and decree that the Developer Defendants' acts and practices violate the Florida Deceptive and Unfair Trade Practices Act;

H.     That the Court adjudge and decree that the Developer Defendants have violated the Securities Act of 1933;

I.     That the Court adjudge and decree that the Developer Defendants have violated the Florida Securities and Investment Protection Act;

J.     That the Court adjudge and decree that the Developer Defendants have violated the Florida Condominium Act;

K.     That Plaintiffs and the Class recover compensatory damages;

L.     That Plaintiffs and the Class recover statutory damages;

M.     That Plaintiffs and the Class recover punitive damages;

N.     That Plaintiffs and the Class recover their deposits paid to the Developer Defendants;

O.     That a constructive trust or equitable lien be imposed on any deposit monies paid under the Plaintiffs' and the other Class members' Purchase Agreements being held in an escrow account with Chicago Title;

P.     That equitable vendees' liens be imposed on the Condominium Hotel property to the extent of Plaintiffs and the other Class members' deposits disbursed from escrow to which they are entitled, and that the Court order foreclosure of their equitable liens;

Q.     That the Court grant injunctive relief and a temporary restraining order postponing or cancelling any closings scheduled by the Developer Defendants with respect to units under contract with Plaintiffs and the other Class members;

R.     That the Court award Plaintiffs' and the Class's attorneys' fees and costs as provided by law;

S.    That the Court award Plaintiffs and the Class pre-judgment and post-judgment interest as permitted by law, and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action; and

T.    That the Court award Plaintiffs and the Class such other further relief as may be deemed necessary or proper.

**JURY TRIAL DEMAND**

158.    Plaintiffs and the other Class members hereby demand a jury trial on all issues so triable.

DATED: May 26, 2009

RESPECTFULLY SUBMITTED,

By: Jared H. Beck

**BECK & LEE BUSINESS TRIAL LAWYERS**
JARED H. BECK
Florida Bar No. 20695
ELIZABETH LEE BECK
Florida Bar No. 20697
28 W. Flagler Street, Suite 555
Miami, Florida 33130
Telephone:    (305) 789-0072
Facsimile:    (786) 664-3334
jared@beckandlee.com
elizabeth@beckandlee.com

*Attorneys for Plaintiff*

# Exhibit A



# T R U M P
## INTERNATIONAL
## HOTEL & TOWER
## FORT LAUDERDALE



It is with great pleasure that I present my latest development, Trump International Hotel & Tower, Fort Lauderdale. This magnificent oceanfront resort offers the finest and most luxurious experience I have created.

I have selected Fort Lauderdale for my newest hotel because I believe it offers the best location for a world-class development. Having spent many years at my home Mar-a-Lago nearby, I have first hand knowledge of South Florida's golden beaches, clear waters and cultural amenities. These aspects, along with the building's innovative architectural design and spectacular views of the Atlantic Ocean, will make Trump International Hotel & Tower the most sought after destination.

Never before has there been an opportunity to experience beachfront living like this. Located on one of the last remaining development sites on Fort Lauderdale Beach, Trump International will become a place like no other.

Best Regards,

Donald J. Trump



EXHIBIT

A

# Exhibit B

# FREQUENTLY ASKED QUESTIONS

**What is a Hotel Condominium?**
A hotel condominium at Trump International Hotel & Tower provides a unique opportunity for you to own an elegantly appointed hotel guestroom on Fort Lauderdale Beach. This is a fee simple purchase of a deeded condominium unit, which may be sold or transferred at any time after closing. When in residence, you will have full access to the five-star amenities and services of a world-class luxurious hotel. When not occupied, ownership of your guestroom may include the opportunity to place your unit in a rental arrangement.

**What are the benefits of owning a Hotel Condominium?**
The hotel serves as a convenient in-town pied-a-terre for those seeking a second or even third home, but with the ability of having our hotel staff take care of your lifestyle and maintenance needs.

**What are the expenses for a hotel condominium?**
The expenses for a hotel guestroom include, monthly assessments for common elements and other shared expenses, other specific hotel maintenance expenses relating to upkeep, staffing, housekeeping and administration, utilities, real estate taxes, and principal interest on your mortgage, if any.

**Can the purchase of a hotel condominium be financed?**
Yes. The purchase of a hotel condominium can be financed. As is true with all loans, the lender's underwriting decision of whether to make the loan will be based on many factors, including the creditworthiness of the individual purchaser and the value of the unit being purchased.

**Can a hotel room be purchased under a corporate name or LLC?**
Yes. The Trump International is a deeded condominium and may be purchased in either a corporate or individual name.

**How are the hotel rooms furnished?**
World-renowned architect, Michael Graves & Associates will design the interiors in each guestroom according to five-star luxury standards. The décor will be elegant and tasteful for all rooms throughout, and will include a luxurious bathroom and a state-of-the-art kitchen. The latest technology is also included with a flat-screen television, DVD and CD players and connections for high-speed Internet access. Owners will also have a private locked closet to keep personal belongings between stays.

**Is the developer selling all of the hotel guestrooms?**
Yes. The developer presently intends to offer all of the hotel rooms for sale.

**What is the cost of the furnishings?**
Trump International's interior designs and furnishings are included in the total purchase price.

**What hotel services and amenities are available to owners?**
During your stay, all hotel services and amenities will be available to you. These include everything from 24-hour room service to our extensive health club and spa. You may also enjoy fine dining in your room from our world-class restaurant, evening turndown service, garment care, and of course, a round-the-clock concierge to arrange theatre and airline tickets or dinner reservations.

**Will Trump International be part of a worldwide reservation system?**
Yes. We are planning to use the reservation system of The Leading Hotels of the World.

**When will the hotel open to the public?  How many guestrooms will there be?**
The hotel is intended to open in early 2007. There will be 298 guest rooms.



# Composite

# Exhibit C

# DONALD J. TRUMP





Donald J. Trump is the very definition of the American success story. In 1980, he established The Trump Organization as the umbrella company for all of his real estate development and other corporate affiliates. He has continually set new standards of excellence while expanding his interests in luxury residential real estate, world-class hotels, office buildings, championship golf clubs, gaming and entertainment. Mr. Trump is committed to personal and direct involvement in everything that his name represents. This commitment has made him the preeminent developer of quality real estate known around the world.

No other real estate company has established the international brand identity that Trump has created. In an industry where quality is sometimes difficult to discern, the Trump signature is known and trusted the world over as the name in luxury real estate.

From project development to construction, sales and property management, The Trump Organization has carried out a variety of complex real estate deals. The company's proven organizational skills match the difficult challenges these projects have presented. From large scale resorts to intimate five-star hotels, and from urban hi-rises to suburban townhouses and golf clubs, The Trump Organization has worked closely with brokerage communities, financial institutions, construction managers, architects and governmental agencies.

The foundation of the company's success is based on solid management practices. From staff uniforms to property maintenance, The Trump Organization emphasizes service, skill and efficiency. At the heart of each successful venture is the fact that every purchaser, renter and visitor is assured of receiving the best service in secure surroundings.

In addition to being one of the largest developers in New York, Mr. Trump is currently planning residential, hotel and golf club projects in Los Angeles, Phoenix (planned), Las Vegas, Florida, the Carribean, Westchester, NY and Bedminster, NJ. He also continues to be active with numerous literary pursuits, charitable organizations and his world-wide number one hit reality television show, The Apprentice.



COMPOSITE
EXHIBIT
C



**James Shin** purchased a unit with the intention of hosting his family, who hails from Korea and around the world. *"Buying at Trump is a privilege. It offers me an opportunity to own something that has real stature and promises significant equity because of its location. I am really looking forward to seing the end product, and now that construction has begun, it will soon be quite apparent how this project compares to other condo/hotels in Ft. Lauderdale Beach."*

**Frank Borzen** believes that the Trump project will make a statement for all of South Florida. *"It will be a place everyone can be very proud of. As a first-class building in a first-class location, it will attract first-class people, and ultimately, other developers will build construction of the same caliber."*

**Sandra Lunden** is a New Yorker who feels that *"Buying a condo hotel unit in Donald Trump's building means that I am getting more than a place in a luxury building. It means that I'm getting the best of everything: amenities, services, design, and location. That construction is already under way only reinforces the fact that this is a developer who can get things done... and done right."*

**Timothy Duval** a local real estate investor hoping to be the next "Apprentice" Mr. Duval heard about other Trump projects through friends. *"Anything Mr. Trump does proves to be great !"* He says *"Compared to other projects, Trump International Hotel & Tower has a more favorable income share and I am really looking forward to ownership and all the benefits that come within a condo/hotel like this."*

**Dan Niles** of Michigan noted, *"What motivated me to buy, in addition to the fabulous beachfront locale, was unique design by Michael Graves."*

# Exhibit D

SB FORT LAUDERDALE HOTEL & CONDOMINIUM

PURCHASE AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

Additionally, under certain circumstances more particularly described in paragraph 4, and provided that the Developer has posted "Alternative Assurances" with the Division of Florida Land Sales, Condominiums and Mobile Homes, Seller may use all of Buyer's deposits (including those equal to the initial 10% of the purchase price for construction purposes).

In this Agreement, the term "Buyer" and/or "Purchaser" means or refers to the buyer or buyers listed below who have signed this Agreement. The word "Seller" and/or "Developer" means or refers to SB Hotel Associates LLC, a Delaware limited liability company.

If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or, if no definition is given in this Agreement, in the Declaration (as defined in paragraph 1 of this Agreement).

Buyer(s):    JOSEPH  SALERNO

Address:    307  WHITMAN  DRIVE

| City: | BROOKLYN | State: | N.Y. |
| Country: | USA | Zip Code: | 11234 |
| Home Phone: | (718) 531 8013 | Office Phone: | (718) 753 9056. |
| Tax I.D. No.: | | Fax. No. | (    ) |
| E-Mail: | | | |

1.     Purchase and Sale. Buyer agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit __1406__ (the "Unit") in the proposed SB FORT LAUDERDALE HOTEL & CONDOMINIUM (the "Condominium"). The Unit and the Condominium are described in greater detail in the proposed Declaration of Condominium (the "Declaration") included in the Prospectus and attached exhibits (the "Condominium Documents"). Buyer acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a Buyer, on or before the date of this Agreement. The foregoing statement shall not, however, be in lieu of the execution of a Receipt for Condominium Documents.

Inasmuch as the Condominium Property is intended to be operated as part of a hotel, Seller reserves the right, in its sole discretion, to rent out the Unit prior to closing. As such, at the time of closing, the Unit may be delivered subject to the possessory rights of any hotel guest then occupying the Unit (and Buyer agrees to accept title to the Unit subject to such possessory rights.) Inasmuch as Seller has reserved the right to rent out the Unit prior to closing, Buyer is hereby advised that, at the time of closing, THE UNIT MAY HAVE BEEN PREVIOUSLY OCCUPIED.

.2.     Payment of the Purchase Price. The total purchase price for the Unit is $ __737,625.__ (the "Purchase Price"). Buyer agrees to make the following payments against the Purchase Price:

**EXHIBIT**
**D**

|                        | Due Date                                        | Amount          |
|------------------------|-------------------------------------------------|-----------------|
| Payment  5%            |                                                 | $ 86,941.50     |
| Initial 10% deposit    | Upon execution of this Agreement                |                 |
|                        |                                                 | $ 73,762.25     |
| Additional 10% Deposit | 60 days after Buyer's execution of this Agreement |               |
|                        | from reservation                                | $ 36,821.25     |
| Additional Deposit     |                                                 | $ 590,100.00    |
| Balance                | Closing                                         | $ 737,625.00    |
| Total Purchase Price   |                                                 |                 |

Deposits may be made by personal check (subject to clearance), cashier's check or wire transfer of federal funds. **The balance due at closing must be paid by bank cashier's check or wire transfer of federal funds.** All payments must be made in United States funds and all checks must be payable on a bank located in the Continental United States. Even though Seller is not obligated to do so, if Seller accepts a deposit from Buyer by credit card and/or drawn on a foreign bank and/or payable in a currency other than U.S. currency, Buyer shall be solely responsible for all costs of collection and/or conversion and agrees to pay same to Seller promptly upon demand or, in Seller's sole and absolute discretion, Seller may permit such costs to be charged to Buyer at the time of closing. If Buyer fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Buyer will pay a late funding charge equal to interest at the rate of eighteen percent (18%) per annum from the date due until the date received and cleared by Seller.

Buyer also agrees to pay all costs and other sums required to be paid by Buyer in this Agreement (many of which are more particularly described in paragraph 11 below).

3.    **How Buyer Pays.** Buyer understands and agrees that Buyer will be obligated to pay "all cash" at closing. This Agreement and Buyer's obligations under this Agreement to purchase the Unit will not depend on whether or not Buyer qualifies for or obtains a mortgage from any lender. Buyer will be solely responsible for making Buyer's own financial arrangements. Seller agrees, however, to cooperate with any lender Buyer chooses and to coordinate closing with such lender, if, but only if, such lender meets Seller's closing schedule and pays Seller the proceeds of its mortgage at closing. Notwithstanding any cooperation provided by Seller, nothing herein shall be deemed to qualify or otherwise condition Buyer's obligation to close "all cash" on the purchase of the Unit.

Although Seller does not have to do so, if Seller agrees to delay closing until Buyer's lender is ready, or to wait for funding from Buyer's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check, Buyer agrees (i) that Buyer shall nonetheless be obligated for the payment of all real property taxes, assessments and charges attributable to the Unit from the date that closing is originally scheduled, and (ii) to pay Seller a late funding charge equal to interest, at the rate of eighteen percent (18%) per annum, on all funds due Seller which have not then been paid to Seller (and, with regard to personal checks, which have not been cleared) from the date Seller originally scheduled closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance). This late funding charge may be estimated and charged by Seller at closing. Seller's estimate will be adjusted after closing based on actual funding and clearance dates upon either Seller's or Buyer's written request. In the event that Seller does not receive immediately cleared funds at closing, Buyer will not be allowed to take possession of the Unit until Seller actually receives the funds and they have cleared. The foregoing paragraph will survive (continue to be effective after) closing.

4.    **Deposits.** Except as permitted below or by the provisions of the Florida Condominium Act, all of Buyer's deposits will be held in escrow by Chicago Title Insurance Company ("Escrow Agent"), with offices at 2701 Gateway Drive, Pompano Beach, Florida 33069, in accordance with the escrow agreement contained in the Condominium Documents. The escrow agreement is incorporated into this Agreement as if repeated at length here, and Buyer agrees that the deposits may be held in any depository which meets the requirements of the Act, including, without limitation, a financial institution chartered and located out of the State of Florida.

Buyer agrees that all of Buyer's deposits in excess of ten percent (10%) of the Purchase Price may be used by Seller for construction and development purposes as permitted by law. Additionally, Seller intends to use Buyer's deposits up to ten percent (10%) of the Purchase Price as and to the extent permitted by applicable law. Accordingly, if Seller has obtained or obtains the approval of the Director of the Division of Florida Land Sales, Condominiums and Mobile Homes to provide "Alternative Assurances", as permitted by law, in lieu of holding deposits up to ten percent (10%) of the Purchase Price in escrow, Seller may cause the Escrow Agent to disburse such deposits up to ten percent (10%) of the Purchase Price as permitted by law. If Seller has obtained such approval as of the date of this Agreement, a copy of the Escrow Agreement providing the mechanism for such disbursement has been delivered to Buyer. If such approval is obtained after the date of this Agreement, Buyer will be provided with a copy of the Escrow Agreement, but Buyer agrees that it shall not be deemed a material or adverse change in the offering of the Condominium by reason of the fact that Buyer has already agreed to the use of Buyer's deposits up to ten percent (10%) of the Purchase Price in the manner stated above.

Purchase Agreement
- 2 -

Joseph Salerno

If Buyer so requests, Buyer may obtain a receipt for Buyer's deposits from the Escrow Agent. Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Buyer's deposits (and any interest actually earned on them) may be transferred to the new escrow agent at Seller's direction.

At closing, all deposits not previously disbursed to Seller will be released to Seller. **Except where expressly provided herein to the contrary or otherwise required by law, all interest earned on Buyer's deposits shall accrue solely to the benefit of Seller, and shall not be credited against the Purchase Price of the Unit.** Buyer further understands and agrees that to the extent that deposit monies are used as permitted hereby, said monies are not available for investment and accordingly no interest shall be earned or deemed to be earned (even if Seller indirectly benefits from the use of said funds). No interest will be assumed to be earned, unless in fact said sums are invested in an interest bearing account and do in fact earn interest.

5.    Seller's Financing. Seller may borrow money from lenders for the acquisition, development and/or construction of the Condominium. Buyer agrees that any lender advancing funds for Seller's use in connection with the Condominium will have a prior mortgage on the Unit and the Condominium until closing. At that time, Seller shall cause the then applicable mortgages to be released as an encumbrance against the Unit and may use Buyer's closing proceeds for such purpose. Neither this Agreement, nor Buyer's payment of deposits, will give Buyer any lien or claim against the Unit, the Condominium or the real property upon which the Condominium is being developed. Without limiting the generality of the foregoing, Buyer's rights under this Agreement will be subordinate to all mortgages (and all modifications made to those mortgages) affecting the Unit, the Condominium or the real property upon which the Condominium is being developed, even if those mortgages (or modifications) are made or recorded after the date of this Agreement.

6.    Insulation; Energy Efficiency. Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Unit, insulation achieving, at minimum, the following insulation characteristics: (a) foil backed insulation on the walls, having an R-Value of R-4.2 and a thickness of 1½"; and (b) lightweight concrete insulation on the roof, having an R-Value of R-19 and of varying thickness. This R-value information is based solely on the information given by the appropriate manufacturers and Buyer agrees that Seller is not responsible for the manufacturers' errors.

To the extent required by applicable law, Buyer may have the Condominium building's energy efficiency rating determined. In accordance with the provisions of applicable law, upon the completion and certification of an energy performance level display card for the Condominium building, such card shall be forwarded to the Buyer and deemed incorporated in this Agreement. Buyer acknowledges receipt of the Department of Community Affairs' brochure regarding energy efficiency ratings.

All insulation and energy efficiency rating information is subject to Seller's general right, under paragraphs 14, 28 and 31, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

7.    Completion Date; Presale Contingency. Seller estimates it will substantially complete construction of the Unit, in the manner specified in this Agreement, by December 31, 2008, subject only to extensions resulting from "Force Majeure" (as same may be extended by Force Majeure, the "Outside Date"). The term "Force Majeure" as used in this Agreement shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions by any governmental or utility authority, civil riots, floods or other causes beyond Seller's control. Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right to cancel this Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least seventy five percent (75%) of the units in the Condominium. Seller must, however, notify Buyer of such a termination within one (1) year following the date of this Agreement, otherwise Seller will be required to construct the Condominium and the Unit and otherwise proceed to perform its obligations under this Agreement. The foregoing presale contingency is a provision solely for the benefit of Seller, and may be waived unilaterally by Seller. Accordingly, Seller may elect to proceed with the construction of the Condominium and to remain bound by the terms of this Agreement, whether or not the stated presales threshold has been met. In the event that Seller does elect to proceed without having met the threshold, Buyer will have no right to object thereto and shall remain bound by the terms of this Agreement. This paragraph shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement. In the event of Seller's termination of this Agreement pursuant to this paragraph, upon such termination and the return of Buyer's deposits, Seller and Buyer will be fully relieved and released from all obligations and liabilities under and in connection with this Agreement. Seller agrees to use its good efforts to meet the foregoing pre-sale requirement.

8.    Inspection Prior to Closing. Buyer will be given an opportunity prior to closing, on the date and at the time scheduled by Seller to inspect the Unit with Seller's representative. At that time, Buyer will sign an inspection statement listing any defects in workmanship or materials (only within the boundaries of the Unit itself) which Buyer discovers. If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards applicable in Broward County, Florida for similar property), Seller will be obligated to correct those defects at its cost within a reasonable period of time after closing, but Seller's obligation to correct will not be grounds for deferring the closing, nor for imposing any condition on closing. **No escrows or holdbacks of closing funds will be permitted.** Buyer understands and agrees that Seller's obligation to correct defects in the Unit noted during the pre-closing inspection shall automatically terminate (with Seller having no further

Purchase Agreement<br>- 3 -



closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at closing a late funding charge equal to interest, at the rate of eighteen percent (18%) per annum, on that

Purchase Agreement<br>- 4 -



obligations for the repair of such items) upon the earlier of: (i) the date that Buyer obtains a permit for construction and/or improvement of the Unit, or (ii) the date that Buyer commences construction and/or improvement of the Unit, whether or not a permit has been obtained. If Buyer fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Buyer will not be permitted to submit a punchlist at a subsequent time and Seller will not be obligated to reschedule an inspection prior to closing and Buyer shall be deemed to have accepted the Unit in its AS-IS condition.

From and after the closing, Buyer hereby grants Seller and its agents access to the Unit at reasonable times during normal business hours to complete any necessary repairs to the Unit. If Buyer cannot be present at the time such work is to be performed to facilitate completion of such work, Buyer hereby authorizes Seller, its agents, employees and contractors to enter the Unit for such purposes using a master key or a key maintained by the Association. If Buyer cannot or elects not to be present at the time that Seller performs any such work, Buyer hereby waives and releases Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) from any and all claims that Buyer may have against Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) relating to damage to or theft of property from the Unit that is not due to the negligence or intentional act of Seller or its partners, contractors, subcontractors, employees, agents, designees and/or assigns.

Buyer acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives. Buyer agrees not to interfere with or interrupt any workers at the site of the Unit. No personal inspections (other than the one pre-closing inspection) will be permitted. Buyer may not commence any work on the Unit, other than prepaid options or extras that Seller agrees in writing to provide, until after closing. **Buyer recognizes that Seller is not obligated to agree to provide extras or options.**

Buyer can examine Seller's Plans and Specifications at Seller's business office, located on site during regular business hours by making an appointment to do so in advance.

9.    Closing Date.  Buyer understands and agrees that Seller has the right to schedule the date, time and place for closing, which shall in no event be later than six (6) months following the Outside Date. Before Seller can require Buyer to close, however, two things must be done:

(a)    Seller must record the Declaration and related documents in the Broward County public records; and

(b)    Seller must obtain a temporary (or permanent) certificate of occupancy for, or covering, the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be lived in), but, subject and subordinate to the provisions of paragraphs 8 and 27 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements, the Shared Components and other portions of the Condominium Property need not then have certificates of occupancy, nor be completed, provided however, that the certification of substantial completion described in Section 718.104(4)(e), Florida Statutes, shall be included as an exhibit to the Declaration, as recorded. Seller does, however, agree to complete those amenities, roads, streets and facilities for water, sewer, gas and electric service within a reasonable time following closing and otherwise in accordance with the terms of the Property Report dated as of October 28, 2005.

Buyer will be given at least ten (10) days' notice of the date, time and place of closing. Seller is authorized to postpone the closing for any reason and Buyer will close on the new date, time and place specified in a notice of postponement (as long as at least three (3) days' notice of the new date, time and place is given). A change of time or place of closing only (one not involving a change of date) will not require any additional notice period. Any formal notice of closing, postponement or rescheduling may be given by Seller orally, by telephone, telegraph, telex, telecopy, mail or other reasonable means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of the information specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any change prior to the date the notice is given. These notices will be effective on the date given or mailed (as appropriate). An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

After the notice is given or mailed, and if requested in writing by Buyer, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions. This written confirmation is given merely as a courtesy and is not the formal notice to close. Accordingly, it does not need to be received by any particular date prior to closing. Buyer agrees, however, to follow all instructions given in any formal notice and written confirmation.

If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of address or phone, telecopy or telex number, because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other reason, Buyer will not be relieved of Buyer's obligation to close on the scheduled closing date unless Seller agrees in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule closing at Buyer's request, or if Buyer is a corporation or other entity and Buyer fails to produce the necessary documentation Seller requests and, as a result, closing is delayed, or if closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at closing a late funding charge equal to interest, at the rate of eighteen percent (18%) per annum, on that



portion of the purchase price not then paid to Seller (and cleared), from the date Seller originally scheduled closing to the date of actual closing. Except only as may result from delays desired, requested or caused by Seller, all prorations will be made as of the originally scheduled date. **Buyer understands that Seller is not required to reschedule or to permit a delay in closing at Buyer's request.**

10.   Closing. The term "closing" refers to the time when Seller delivers the deed to the Unit to Buyer and ownership changes hands. Buyer's ownership is referred to as "title". Seller promises that the title Buyer will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below). Notwithstanding that Buyer is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price, Buyer shall have the right to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, or Buyer may elect to have Seller's closing agent issue the title insurance commitment and policy, in accordance with terms set forth in paragraph 11 below.

In the event that Buyer elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, (i) Buyer shall provide Seller with written notice of same five (5) business days prior to the originally scheduled closing date, (ii) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Buyer and (iii) Buyer shall, no later than five (5) business days prior to closing (the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Buyer), provided that if Buyer fails to give Seller written notice of defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

Buyer will receive two (2) documents at closing which Buyer agrees to accept as proof that Buyer's title is as represented above:

(a)   A written commitment, whether provided by Seller's closing agent or otherwise, from a title insurance company licensed in Florida agreeing to issue a policy insuring title or the policy itself. This commitment (or policy) will list any exceptions to title. Permitted exceptions (exceptions which Buyer agrees to take title subject to) are:

(i)   Liability for all taxes or assessments affecting the Unit starting the year Buyer receives title and continuing thereafter;

(ii)   All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements now or hereafter recorded in the public records, which may include, without limitation, zoning restrictions, property use limitations and obligations, easements (rights-of-way) and agreements relating to telephone lines, water and sewer lines and other utilities;

(iii)   The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate), which are recorded, now or at any time after the date of this Agreement, in the public records;

(iv)   Pending governmental liens for public improvements as of closing (Seller will be responsible, however, for certified governmental liens for public improvements as of closing; provided, however, that to the extent that any such certified liens are payable in installments, Seller shall only be responsible for those payments and/or installments due prior to closing, and Buyer hereby assumes all payments and/or installments coming due after closing);

(v)   Standard exceptions for water-front property and artificially filled-in property which once was in navigable waters and all other standard exceptions for similar property;

(vi)   All standard printed exceptions contained in an ALTA Owner's title insurance policy issued in Broward County, Florida (the "gap exceptions" and standard exceptions for parties in possession, and construction liens shall be deleted, however, at closing or otherwise insured over); and

(vii)   Any matters not listed above as long as affirmative title insurance is given for these matters.

(b)   A Special Warranty Deed. At closing, Seller promises to give Buyer a special warranty deed to the Unit. The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above.

Buyer will also receive at closing a bill of sale for any appliances or furnishings included in the Unit and Seller's form of owner's ("no lien") affidavit and FIRPTA (non-foreign) affidavit. When Buyer receives the special warranty deed at closing, Buyer will sign Seller's closing agreement, a settlement statement and all papers that Seller deems reasonably necessary or appropriate.



If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title. If Seller cannot, after making reasonable efforts to do so (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments) correct the title defects, Buyer will have two options:

1.　Buyer can accept title in the condition Seller offers it (with defects) and pay the full Purchase Price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit. Buyer will not make any claims against Seller because of the defects; or

2.　Buyer can cancel this Agreement and receive a full refund of Buyer's deposits. Seller will be relieved of all obligations under this Agreement (and otherwise) when Seller refunds the deposits to Buyer.

At the same time Buyer receives the special warranty deed, Buyer agrees to pay the balance of the Purchase Price and any additional amounts owed under this Agreement. Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Buyer agrees Seller may unilaterally record in the Public Records of the County). This paragraph shall survive closing.

11.　Costs and Fees. Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing. These include:

(a)　A "development fee" equal to one and three quarters percent (1.75%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price). This fee will be used, in part, to pay for the following closing costs: (i) the costs of officially recording the deed in the Public Records of the County (currently, recording fees are $10.00 for the first page of an instrument and $8.50 for each additional page), (ii) the documentary stamp taxes payable in connection with the deed conveying the Unit to Buyer (currently, documentary stamp taxes are $.70 for each $100.00 of consideration), and (iii) for the premium on the owner's title insurance policy, at the minimum promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home credits, if any), whether obtained from Seller's closing agent, or elsewhere. The balance of the "development fee" shall be retained by Seller to provide additional revenue and to offset certain of its construction and development expenses, including without limitation, certain of Seller's administration expenses and Seller's attorneys' fees in connection with development of the Condominium. Accordingly, Buyer understands and agrees that the development fee is not for payment of closing costs or settlement services (other than to the extent expressly provided above), but rather represents additional funds to Seller which are principally intended to provide additional revenue and to cover various out-of-pocket and internal costs and expenses of Seller associated with development of the Condominium. In the event that (i) any sales tax is imposed in connection with the subject transaction, (ii) there is an increase in either the minimum title insurance rates or in the documentary stamp tax rate, (iii) any interim services fee is imposed by any governmental authority, or (iv) any new governmental tax or charge on deeds is imposed, Buyer agrees to pay all such increases, surcharges or new taxes or charges, in addition to the development fee;

(b)　Working capital contributions in an amount equal to the aggregate of two (2) times the regular monthly assessment for the Unit due the Condominium Association as determined at the time of closing and two (2) times the regular monthly allocated amount for the Unit due the Hotel Unit Owner with respect to the Hotel Shared Costs as determined at the time of closing. These charges will not be credited against regular assessments or charges, with respect to the contribution for the Hotel Shared Costs, shall be payable directly to the Hotel Unit Owner and may be used to pay any deficits or other sums the Hotel Unit Owner or any of its affiliates may be required to pay.

(c)　Any and all sales tax due in connection with the acquisition of any furnishings, finishes and/or equipment.

(d)　A reimbursement to Seller for any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to closing for the Unit. The amount of this charge is now unknown.

(e)　The remaining balance, if any, of any charges for options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Buyer and Seller.

(f)　Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating closing with Buyer and/or Buyer's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others. The amount of these charges is now unknown.



(g)    In the event that Seller allows any delay in closing (which it has no obligation to do) or any other change in closing (which it has no obligation to do), Seller may impose a "redraw fee" to reimburse Seller for any additional costs it incurs as a result of any such rescheduling or change.

(h)    A refundable damage deposit to offset any damages that may be caused during Buyer's move-in.

(i)    The late funding charges provided for elsewhere in this Agreement. The amount of any such charges is now unknown.

In addition, if Buyer obtains a loan for any portion of the Purchase Price, Buyer will be obligated to pay any loan fees, closing costs, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Buyer a mortgage, if applicable. Additionally, if Buyer obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Buyer agrees to pay, in addition to any other sums described in this Agreement, such closing agent an aggregate sum equal to $795.00, for a simultaneously issued mortgagee's title insurance policy, the agent's title examination, title searching and closing services related to acting as "loan closing agent". In addition to that sum, Buyer shall be obligated to pay the premiums (at promulgated rate) for any title endorsements requested by Buyer's lender. Notwithstanding any of the references in this paragraph to coordinating closing with any lender that Buyer may elect to obtain, nothing herein shall be deemed to make the Agreement, or the Buyer's obligations under the Agreement, conditional or contingent in any manner on the Buyer obtaining a loan to finance any portion of the Purchase Price; it being the agreement of the Buyer that the Buyer shall be obligated to close "all cash".

Current expenses of the Unit (for example, taxes and governmental assessments, current monthly assessments of the Association and current monthly charges of the Hotel Shared Costs) will be prorated between Buyer and Seller as of the date of closing. Additionally, at closing, Buyer shall be obligated to prepay the next month's maintenance assessment to the Association and the next month's charge for the Hotel Shared Costs. These prepayments are in addition to Buyer's obligation to pay the working capital contributions, as described above. If taxes for the year of closing are assessed on the Condominium as a whole, Buyer shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) for the Unit from the date of closing through the end of the applicable calendar year of closing. Buyer should understand that during the year in which the Declaration of Condominium is recorded, it is likely that real property taxes will be assessed as a whole against the entire Condominium Property (rather than on a unit-by-unit basis, which is how the Condominium Property will be assessed during all years following the year during which the Declaration is recorded). As such, if Buyer is closing in the calendar year during which the Declaration is recorded, Buyer should anticipate having to pay to Seller, at closing, the estimated prorated amount of real property taxes attributable to the Unit for the period from the date of closing through December 31 of the year of closing. Depending upon the value of the Unit, this may be a substantial sum. If taxes for the year of closing are assessed on a unit-by-unit basis, Buyer and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Buyer responsible for paying the full amount of the tax bill and Seller reimbursing Buyer for Seller's prorated share of those taxes. Buyer agrees that Seller's prorated share of the taxes due as of closing need not be paid to Buyer, however, until the actual tax bill is presented to Seller, and any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party, provided, however, that (i) the actual amount of taxes is at least 10% higher or lower than the estimate used for prorations, and (ii) any request for reproration is made within six (6) months following the issuance of the actual tax bill for the Unit (it being assumed, for purposes hereof, that tax bills are issued on November 1 of each tax year). No request for proration of amounts less than the threshold set forth above or made beyond the six (6) month period shall be valid or enforceable. In addition, Buyer shall pay, or reimburse Seller if then paid, for any interim proprietary and general services fee imposed by any governmental authority having jurisdiction over the Unit. This Subsection shall survive (continue to be effective after) closing.

12.    **Adjustments with the Association.** Buyer understands that Seller may advance money to the Association to permit it to pay for certain of its expenses (for example, but without limitation, insurance premiums, common element utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the Association and other similar expenses). Seller is entitled to be reimbursed by the Association for all of these sums advanced by Seller. The Association will reimburse Seller out of regular assessments paid by Buyer and other owners as those contributions and assessments are collected, or as otherwise requested by Seller. Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the Association.

13.    **Default.** If Buyer fails to perform any of Buyer's obligations under this Agreement (including making scheduled deposits and other payments) Buyer will be in "default". If Buyer is still in default twenty (20) days after Seller sends Buyer notice thereof, Seller shall be entitled to the remedies provided herein.

Upon Buyer's default (and the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Seller can resell the Unit without any accounting to Buyer. Buyer understands that because Seller has taken the Unit off the market for Buyer, has spent money on sales, advertising, promotion and construction and has incurred other costs incident to this sale, Buyer's default will damage Seller. As compensation for this damage, in the event Seller cancels this Agreement because of Buyer's default, Buyer authorizes Seller (subject to the limitation provided below) to keep (or if not then paid by Buyer, Buyer will pay to Seller) all deposits and other pre-closing advance payments (including, without limitation, those on options, extras, upgrades and the like) Buyer



has then made (and which would have been required to have been made had Buyer not defaulted) and all interest which was, or would have been, earned on them, all as liquidated damages (and not as a penalty). If Buyer defaults after fifteen percent (15%) of the Purchase Price, exclusive of interest, has been paid, Seller will refund to the Buyer any amount which remains from the payments Buyer made after subtracting fifteen percent (15%) of the Purchase Price, exclusive of interest. Any damage or loss that occurs to the Property while Buyer is in default will not affect Seller's right to liquidated damages.

If Seller defaults under this Agreement, Buyer will give Seller twenty (20) days' notice of it and if Seller has not cured the default within such period, Buyer will have such rights as may be available in equity and/or under applicable law, provided, however, that absent an intentional and wilful default of Seller, Buyer shall not be permitted to seek to specifically enforce the Agreement.

This paragraph will survive (continue to be effective after) closing.

14.    Construction Specifications.  The Unit and the Condominium will be constructed in substantial accordance (in Seller's opinion) with the plans and specifications therefor kept in Seller's construction office, as such plans and specifications are amended from time to time.  Seller may make such changes in the plans and specifications that it deems appropriate at any time, to accommodate its in the field construction needs (as more fully discussed in this paragraph 14) and in response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers.  Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications". Without limiting Seller's general right to make changes, Buyer specifically agrees that the changes described above, changes to Units to cause same to be readily accessible for handicapped persons and/or to otherwise comply with applicable disability requirement of City, State or Federal law, and changes in the dimensions of rooms, patios and balconies, in the location of windows, doors, walls, partitions, utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, and in the general layout of the Unit and Condominium, may be made by Seller in its discretion.  To the extent that the Unit is constructed and finished in a manner to be readily accessible to handicapped persons and/or to otherwise comply with applicable disability requirement of City, State or Federal law, must be maintained in that condition and can not be altered.  Buyer understands and agrees that the Unit must be maintained in that condition and that Buyer shall be precluded from altering those features of the Unit.

Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs.  These changes and adjustments are essential in order to permit all components of the Unit and the Building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium.  Buyer further acknowledges and agrees that (i) the plans and specifications for the Unit and the Condominium on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications, and (ii) because of the day-to-day nature of the changes described in this paragraph 14, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities).  As a result of the foregoing, Buyer and Seller both acknowledge and agree: **The Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities.  Without limiting the generality of paragraph 31, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications.  Seller has not given and Buyer has not relied on or bargained for any such warranties.  In furtherance of the foregoing, in the event of any conflict between the actual construction of the Unit and/or the Building, and that which is set forth on the plans, Buyer agrees that the actual construction shall prevail and to accept the Unit and Building as actually constructed (in lieu of what is set forth on the plans).**

Without limiting the generality of the foregoing, because of Seller's need to coordinate the appearance and design of the overall development of the Condominium, both in connection with the nature and layout of the land on which construction is to take place and of the street, common areas and other features of the development, Buyer understands and agrees: **The Unit may be constructed as a reverse ("mirror image") of that illustrated in the floor and building plan of the applicable model and building (as shown in the condominium documents or in any illustrations of the model and building); and may be "sited" in a position different from that of the applicable model and floor and building plan (or any such illustrations).  Buyer agrees to accept the Unit and the said building as "sited" by Seller and as constructed according to a reverse floor and/or building plan.** This paragraph does not limit the generality of Seller's rights, set out elsewhere in this Agreement, to make other changes in the Unit, the Condominium and the Condominium Documents.

Buyer further understands and agrees that Seller may, in its sole and absolute discretion, determine to build-out certain units in the Condominium in a manner designed to be handicapped accessible, which may include, without limitation, the installation of grab bars and alterations to the standard floor plan for the Unit.  In the event that Seller elects to build-out the Unit in such manner, Buyer shall be deemed to have authorized and agreed to same, and to accept same at closing, without claim against Seller.  Buyer further understands and agrees that Buyer may not make any alteration to the Unit subsequent to closing that may affect its suitability for handicapped persons.



Buyer understands and agrees that in designing the Condominium, the stairwells within the Condominium Property were intended primarily for ingress and egress in the event of emergency and, as such may be constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. Similarly, the garage and utility pipes serving the Condominium are intended primarily for functional purposes, and as such may be left unfinished without regard to the aesthetic appearance of same. Further, Buyer hereby acknowledges and agrees that sound and/or odor transmission in a multi-story building such as the Condominium is very difficult to control, and that noises from adjoining or nearby Units, noises and/or vibrations from HVAC and/or mechanical equipment, and/or elevators, plumbing and/or piping installations, and/or noises from activities at the Hotel (including noises from the hotel entry operation) can often be heard in other Units. Without limiting the generality of paragraph 31, Seller does not make any representation or warranty as to the level of sound and/or odor transmission between and among Units and/or vibrations from HVAC and/or mechanical equipment and the other portions of the Condominium Property, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from vibration, sound and/or odor transmission. Lastly, Buyer understands and agrees that there are various methods for calculating the square footage of a Unit. Additionally, as a result of in the field construction and other permitted changes to the Unit, as more fully described in this paragraph, actual square footage of the Unit may also be affected. Accordingly, during the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit. By closing, Buyer shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit. Without limiting the generality of any other provision of this Agreement, Seller does not make any representation or warranty as to the actual size, dimensions (including ceiling heights) or square footage of the Unit. Nothing herein shall be deemed to deny or abridge the rights granted under Section 718.506, Florida Statutes. Notwithstanding the above, nothing herein shall waive or release Developer from any of the Developer's obligations under 718.506 (1) F.S.

The agreements and waivers of Buyer contained in this paragraph will survive (continue to be effective after) closing.

15. **Certain Items and Materials.** Buyer understands and agrees that certain items, which may be seen in models (if any) or in illustrations, are not necessarily included with the sale of the Unit, but rather are displayed to provide Buyer with ideas for furnishing and decorating the Unit. Buyer understands and agrees that only those items of personal property which are specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller are to be included with the Unit.

Buyer further understands and agrees that certain items, if included with the Unit, such as tile, cabinets, wood, stain, grout, wall and ceiling textures, cultured marble, granite, stone, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, or if Seller elects to omit certain items, Seller may modify the list of standard features or make substitutions for equipment, material, appliances, etc., with items which in Seller's opinion are of equal or better quality (regardless of cost). Buyer also understands and acknowledges that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any). Buyer recognizes that certain colors as shown in displays or in the models, including, but not limited to, carpeting and wood stain, will weather and fade and may not be duplicated precisely. Buyer further understands and agrees that the underside of each ceiling is not intended to be level, but rather may have a rough, unfinished, unlevel appearance.

If Seller allows Buyer to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within fourteen (14) days after the date the list of selections (if any) is made available to Buyer. If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood that the choices will be made by Seller in Seller's sole discretion.

The agreements and waivers of Buyer contained in this paragraph will survive (continue to be effective after) closing.

16. **Litigation.** In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorney's, paralegals and para-professionals fees and court costs at all trial and appellate levels. This paragraph will survive (continue to be effective after) any termination of this Agreement, but shall otherwise be deemed merged into the deed at closing.

17. **Maintenance Fee.** Buyer understands and agrees that the Estimated Operating Budget for the Condominium Association and the costs associated with the operation and maintenance of the Shared Components (the "Budgets") contained in the Condominium Documents provide only an estimate of what it will cost to run the Association and operate and maintain the respective facilities during the period of time stated in the Budgets. The monthly assessments shown in the Condominium Association Budget for the Unit are guaranteed, if at all, in the manner stated in the Condominium Documents. Please note, however, that in addition to the amounts payable to the Condominium Association, each Owner shall be obligated to pay assessments in connection with the operation and maintenance of the Shared Components. These assessments and costs are not guaranteed in any manner. The Budgets, themselves however, as opposed to the levels of assessments payable to the Condominium Association, are not guaranteed, and there may be changes in the applicable Budgets at any time to cover increases or decreases in actual expenses or in estimates. Changes in the applicable Budgets may be made at any time to cover



increases or decreases in actual expenses or in estimates. It is intended that the Seller, as the sole Unit Owner upon the formation of the Condominium, will vote not to provide any reserves for the initial year of the Condominium. Thereafter, on an annual basis, a majority of the Condominium Association's members may vote to continue not to provide any reserves for the Condominium. Reserves are expected to be collected annually with respect to the Shared Components.

18. **Condominium Association.** This Agreement is also Buyer's application for membership in the Condominium Association, which membership shall automatically take effect at closing. At that time, Buyer agrees to accept the liabilities and obligations of membership.

19. **Seller's Use of the Condominium Property.** As long as Seller (or any of its affiliates) owns a unit or units or any other portion of Condominium Property and is offering same in the ordinary course of business, it and its agents are hereby given full right and authority to place and maintain on, in and about the Condominium Property and/or the Association Property (excluding the Unit after closing) model units, sales and leasing offices, administrative offices, signs and lighting related to construction and sales promotion purposes, for such period of time, at such locations and in such forms as shall be determined by Seller in its sole and absolute discretion. Seller, its employees, agents contractors and prospective buyers are also hereby given, for construction and sales promotion purposes, the right of entry upon, ingress to, egress from and other use of the Condominium and/or Association Property (excluding the Unit after closing), and the right to restrict and regulate access to the Common Elements and/or Association Property, subject to Buyer's reasonable access to and from the Unit after closing, for the purposes of completing construction of the Common Elements, Association Property and/or other Units within the Condominium Property. Seller's salespeople can show units, the Association Property and/or the Common Elements, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell, resell or lease Units or other portions of any improvements to be constructed upon the Condominium Property or develop and manage the Condominium Property and Association Property, or to provide management and administration and/or financial services, but Seller's use of said properties must be reasonable, in Seller's opinion, and can't unreasonably interfere, in Seller's opinion, with Buyer's use and enjoyment of the Unit. This paragraph will survive (continue to be effective after) closing.

20. **Sales Commissions.** Seller will pay all sales commissions due its in-house sales personnel and/or exclusive listing agent and the co-broker, if any, identified on the last page of this Purchase Agreement (if such space is left blank, it shall mean that Seller has not agreed to pay any co-broker and that Seller represents that there is no co-broker who can claim by, through or under Buyer), provided that such co-broker has properly registered with Seller as a participating co-broker. By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement), nor has the sale been procured by any real estate broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement). Buyer will indemnify and hold Seller harmless for and from any such person or company claiming otherwise. Buyer's indemnity and agreement to hold Seller harmless includes, without limitation, Buyer's obligation to pay or reimburse Seller for all commissions, damages and other sums for which Seller may be held liable and all attorneys' fees and court costs actually incurred by Seller (including those for appeals), regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately wins or loses.

This paragraph will survive (continue to be effective after) closing.

21. **Notices.** Whenever Buyer is required or desires to give notice to Seller, the notice must be in writing and it must be sent certified mail, postage prepaid, with a return receipt requested to Seller at 276 5ᵗʰ Avenue, Suite 708, New York, New York 10001, Attn: Legal Department, or such other addresses as Seller may otherwise direct. Notwithstanding the foregoing, Buyer's notice to cancel pursuant to Paragraph 28 below, may be made in any manner permitted under the Interstate Land Sales Full Disclosure Act and the regulations promulgated thereunder.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Buyer, the notice must be given either in person, by telephone or in writing and, if in writing, it must be sent either by: (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Buyer may be sent by regular air mail); (ii) facsimile transmission if Buyer has indicated a telecopy number on Page 1 of this Agreement; or (iii) a recognized overnight courier service (i.e., FedEx, Express Mail, United Parcel Service, etc.), to the address for Buyer set forth on Page 1 of the Agreement.

A change of address notice is effective when it is received. All other written notices are effective on the day they are properly given or mailed, whether or not received (and all permitted non-written notices to Buyer are effective on the date given by Seller) unless receipt is required specifically in portions of this Agreement.

22. **Transfer or Assignment.** Buyer shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable). To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee. Any such assignee must fully assume all of the obligations of Buyer hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. If Buyer is a corporation, partnership, other business entity, trustee or nominee, a transfer of any direct or indirect stock, voting interest, partnership interest, equity, beneficial or principal interest in Buyer will constitute an assignment of this Agreement



requiring consent. Without limiting the generality of the foregoing, Buyer shall not, prior to closing on title to the Unit, unless first obtaining the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion) advertise, market and/or list the Unit for sale or resale, whether by placing an advertisement, listing the Unit with a broker, posting signs at the Unit or at the Condominium, allowing the Unit to be listed for sale on the internet or the Multiple Listing Service or otherwise. Seller may assign or transfer freely all of its rights and obligations under this Agreement (including its rights in and to Buyer's deposits and all other payments made by Buyer).

23.    Others Bound by this Agreement.  If Buyer dies or in any way loses legal control of Buyer's affairs, this Agreement will bind Buyer's heirs and personal representatives.  If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving such interest.  If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity.  If more than one person signs this Agreement as buyer, each will be equally liable, on a joint and several basis, for full performance of all Buyer's duties and obligations under it and Seller can enforce it against either as individuals or together.

24.    Public Records.  Buyer authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Broward County, Florida.  Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded.

25.    Buyer's Right to Cancel.  **THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES.  THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER.  ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT.  BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED.  BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.**

If Buyer does not cancel this Agreement during this 15-day period, it means that Buyer ratifies this Agreement and the Condominium Documents and Buyer agrees that their provisions are fair and reasonable in Buyer's opinion.

26.    Coastal Construction Control Line.  Buyer is aware that the Unit and/or portions of the Condominium may be located in coastal areas partially or totally seaward of the coastal construction control line as defined in Section 161.053, F.S.  Buyer is fully apprised of the character of the regulation of property in such coastal areas and Buyer hereby waives and releases any right to receive at closing a survey delineating the location of the coastal construction control line with respect to the Unit and the Condominium in accordance with Section 161.57, F.S.

27.    Florida Law; Severability.  Any disputes that develop under this Agreement, and any issues that arise regarding the entering into, validity and/or execution of this Agreement, will be settled according to Florida law.  If any part of this Agreement violates a provision of applicable law, the applicable law will control.  In such case, however, the rest of the Agreement (not in violation) will remain in force.

Without limiting the generality of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms.  If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified.  If the unenforceable part or parts cannot be so modified, such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms) can be achieved.

28.    Changes.  Seller may make changes in the Condominium Documents in its sole discretion by providing Buyer with all such amendments that are made, provided that, as to these changes, Buyer will have fifteen (15) days from the date of receipt of such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Buyer in which to cancel this Agreement (by delivering written notice to Seller of such cancellation) and receive a refund of any deposits with applicable interest earned, if any.  Seller will be relieved of all obligations under this Agreement when Seller refunds the deposits and interest, if any.  Buyer will not be permitted to prevent Seller from making any change it wishes in its sole discretion, nor to pursue any remedy other than the 15-day cancellation remedy described above (and then only for the kind of changes that materially alter or modify the offering in a manner that is adverse to Buyer).

If Buyer has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Buyer, Buyer's failure to request cancellation in writing within the



15-day period will mean that Buyer accepts the change and waives irrevocably Buyer's right so to cancel. All rights of cancellation will terminate, if not sooner, then absolutely at closing. After closing, Buyer will have no remedy for any changes Seller may make or have made.

Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (i) substitute the final legal descriptions and as-built surveys for the proposed legal descriptions and plot plans contained in the Condominium Documents even though changes occur in the permitting stage and during construction, and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall common elements in any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected.

This paragraph will survive (continue to be effective after) closing.

29.     Nearby Construction. Buyer understands and agrees that for some time in the future Buyer may be disturbed by the noise, commotion and other unpleasant effects of activities at the hotel entry and/or from nearby construction activity and Buyer may be impeded in using portions of the Condominium Property by that activity. Because the Condominium is located in an urban area, demolition or construction of buildings and other structures within the immediate area or within the view lines of any particular Unit or of any part of the Condominium (the "Views") may block, obstruct, shadow or otherwise affect Views, which may currently be visible from the Unit or from the Condominium. Therefore, the Buyer hereby agrees to release Seller, its partners and its and their officers, members, directors and employees and every affiliate and person related or affiliated in any way with any of them ("Seller's Affiliates") from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorney's fees and costs, including those incurred through all arbitration and appellate proceedings, related to or arising out of any claim against the Seller or Seller's Affiliates related to Views or the disruption, noise, commotion, and other unpleasant effects of nearby development or construction. As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter, except as is set forth herein or in the Prospectus.

Additionally, inasmuch as the Hotel Unit and/or Commercial Units may attract customers, patrons and/or guests who are not members of the Association, such additional traffic over and upon the Condominium Property shall not be deemed a nuisance hereunder. Buyer understands and agrees that inasmuch as hotel operations are intended to be conducted from the Condominium Property, including, without limitation, upon the pool deck and on other portions of the Shared Components, noise, inconvenience and/or other disruptions may occur, including, without limitation, noise and/or disruptions resulting from activities at the hotel entry and private events requiring certain portions of the Shared Components to be closed off and/or restricted. By acquiring a Unit, Buyer agrees not to object to the operations of the hotel, and/or any operations from the Hotel Unit and/or any Commercial Unit, which may include, noise, disruption, inconvenience and the playing of music outdoors, and hereby agrees to release Seller, Hotel Manager and the Hotel Unit Owner from any and all claims for damages, liabilities and/or losses suffered as a result of the existence of the hotel and the operations from the Hotel Unit and/or any Commercial Unit, and the noises, inconveniences and disruptions resulting therefrom.

30.     Time of Essence. The performance by Buyer of all obligations on the precise times stated in this Agreement is of absolute importance and failure of Buyer to so perform on time is a default, time being of the essence.

31.     Disclaimer of Implied Warranties. All manufacturers' warranties will be passed through to Buyer at closing. At closing, Buyer will receive the statutory warranties imposed by the Florida Condominium Act.

**To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Florida Condominium Act to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character are specifically disclaimed. Without limiting the generality of the foregoing, Seller hereby disclaims any and all express or implied warranties as to design, construction, view, sound and/or odor transmission, furnishing and equipping of the Condominium Property, the existence of molds, mildew, spores, fungi and/or other toxins within the Condominium Property, except only those set forth in Section 718.203 of the Act, to the extent applicable and to the extent that same have not expired by their terms. Seller has not given and Buyer has not relied on or bargained for any such warranties, either with respect to any portions of the Condominium Property.**

**As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above).**

**Buyer acknowledges and agrees that Seller does not guarantee, warrant or otherwise assure, and expressly disclaims, any right to view and/or natural light.**

**Further, given the climate and humid conditions in South Florida, molds, mildew, spores, fungi and/or other toxins may exist and/or develop within the Unit and/or Condominium Property. Buyer is hereby**



advised that certain molds, mildew, spores, fungi and/or other toxins may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk. By executing and delivering this Agreement and closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, spores, fungi and/or other toxins and to have released and indemnified Seller and Seller's Affiliates from and against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, the inability to possess the Unit, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities and/or personal injury and death to or suffered by any of Buyer's Guests as defined below and any other person or any pets). Without limiting the generality of the foregoing, leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of mold, mildew, fungus or spores. Buyer understands and agrees that Seller is not responsible for, and Seller hereby disclaims any responsibility for any illness or allergic reactions which may be experienced by Buyer, its pets, its family members and/or its or their guests, tenants and invitees (collectively "Buyer's Guests") as a result of mold, mildew, fungus or spores. It is solely the Buyer's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination.

Lastly, Buyer understands and agrees that pursuant to applicable City, County and State laws, codes, ordinances and regulations (as all of same may be modified from time to time) there is no assurance that a Unit Owner (or any member of the Unit Owner's family, nor any person legally dependent upon the Unit Owner) may establish a permanent residence at the Unit or any real property contiguous thereto or that the Unit Owner (or any member of the Unit Owner's family, nor any person legally dependent upon the Unit Owner) may utilize the Unit address for the purpose of student or voter registration, obtaining a driver's license or registration of a motor vehicle. As such, under certain circumstances the Unit may not qualify as the homestead of a Unit Owner (or any member of the Unit Owner's family, nor any person legally dependent upon the Unit Owner), and as a result, no Unit Owner shall rely on the ability to file a claim for homestead exemption from ad valorem taxes with respect to such Unit, or rely on the ability to use the Unit address for the purpose of student or voter registration, obtaining a driver's license or registration of a motor vehicle. Buyer shall be deemed to understand and agree that, pursuant to applicable City, County and State laws, codes, ordinances and regulations (as same may be modified from time to time), certain restrictions may exist or be imposed affecting continuous occupancy of the Units.

This paragraph will survive (continue to be effective after) closing.

32. Return of Condominium Documents. If this Agreement is canceled for any reason, Buyer will return to Seller all of the Condominium Documents delivered to him in the same condition received, reasonable wear and tear excepted. If Buyer fails to return the Condominium Documents, Buyer agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

33. Roadways. Access to the Condominium is via Fort Lauderdale Beach Boulevard (a/k/a State Road A1A), which is currently a four (4) lane divided street. The width of Fort Lauderdale Beach Boulevard at that location is approximately seventy-three feet (73') and is asphalt covered. Fort Lauderdale Beach Boulevard is a public road, primarily maintained by the applicable governmental authorities. Private access drives will be constructed by Seller. These private access drives will have at least one lane of traffic in each direction. The cost of road construction will be borne by Seller, however, there is no financial assurance of completion of the private access drives. See the Property Report delivered to you simultaneously herewith for details regarding the maintenance of the private access road.

34. Waiver. Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.

35. Survival. Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed. All other provisions shall be deemed merged into the deed.

36. Substantial Completion. Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete or substantially complete when so complete or substantially complete in Seller's reasonable opinion. Notwithstanding the foregoing, however, neither the Unit nor the Building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the Building intended to be used exclusively by Buyer) is physically habitable and useable for the purpose for which the Unit was purchased and the certification of substantial completion described in Section 718.104(4)(e), Florida Statutes, is included as an exhibit to the Declaration, as recorded. The Unit (and such portion of the Building) will be considered as so useable if the Unit is ready for occupancy and has all necessary and customary utilities extended to it. Other units (and other portions of the building) may not necessarily be so complete and useable.

37. Disclosures. Under the laws of the State of Florida, Buyer is hereby advised as follows:

(a) RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over



time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Seller does not conduct radon testing with respect to the Units or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium.

(b)     CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR UNIT OR CONDOMINIUM. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS AGREEMENT, A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

(c)     BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE.   A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(d)     The Condominium is structured to operate as a hotel. Residential Unit Owners, through the Association, do not exercise the control over the operation of the Condominium normally found in residential condominiums.

38.     Incorporation; Definitions. The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here. When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Buyer and Seller.

39.     Seller's Representations.   Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any hotel affiliation or any monetary or financial advantage. Further, no statements or representations have been made by Seller, or any of its agents, employees or representatives with respect to (i) the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit (except only in response to a direct inquiry from Buyer), (ii) the economic or tax benefits to be derived from the managerial efforts of a third party as a result of renting the Unit or other units, or (iii) the economic or tax benefits to be derived from ownership of the Unit. Buyer acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit. Neither Seller, nor anyone working by, through or under Seller, has made any statement or suggestion that Buyer would not be obligated to fully comply with the terms of this Agreement and to close on the purchase of the Unit. Further, Buyer understands and agrees that neither Seller, nor any brokerage company, in-house sales personnel and/or other persons working by, through or under Seller, are under any obligation whatsoever to assist Buyer with any resale of the Unit.

This Agreement contains the entire understanding between Buyer and Seller, and Buyer hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the sales office and model suite are for promotional purposes only and may not be relied upon. **Buyer warrants that Buyer has not relied upon any verbal representations or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) potential appreciation in or resale value of the Unit, (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future, (c) traffic conditions in, near or around the Condominium Property, (d) disturbance from nearby properties, (e) disturbance from air or vehicular traffic, or (f) any particular hotel affiliation or maintaining any existing hotel affiliation.** The provisions of this paragraph shall survive the closing.

Buyer understands and agrees that the Hotel Unit Owner intends (without creating any obligation) to retain Trump Florida Management LLC (including its affiliates, "Trump Management") as the initial Hotel Manager and to obtain a limited license agreement from Donald J. Trump ("Trump") to operate the hotel under the tradename "Trump International Hotel & Tower Fort Lauderdale". Buyer further understands and agrees that in the event that any agreement between the Hotel Unit Owner, or the affiliates of the Hotel Unit Owner, and Trump and/or Trump Management is terminated for any reason, whether at the expiration of the term or earlier, all use of Trump's



tradename and Trump's trademark or service marks shall cease and all indicia or connection between the Condominium and Trump and/or Trump Management, including signs or other materials bearing any of Trump's trademarks or servicemarks or tradenames shall be removed from the Condominium. Additionally, Buyer acknowledges and agrees that any use of any of Trump's tradenames and Trump's trademarks or service marks, without proper licensing from Trump, is expressly prohibited.

40. Offer. The submission by Seller of this Agreement to Buyer for examination does not constitute an offer by Seller to Buyer, or a reservation of or option for any Unit in the Condominium. This Agreement shall not become binding until executed and delivered by both Buyer and Seller. Upon execution by Seller, an executed copy of this Agreement shall be sent to Buyer, otherwise the firm offer shall be considered rejected and all funds deposited by Buyer shall be promptly returned to Buyer.

41. Liability. The liability of Seller under this Agreement or any amendment or any instrument or document executed in connection with this Agreement shall be limited to and enforceable solely against the interest of Seller in the Condominium, and not against any other assets of Seller or any partner of Seller (or its or their officers, principals, directors, employees, managers, members or agents).

42. Interpretation; Miscellaneous. Notwithstanding that this Agreement was prepared by one party hereto, it shall not be construed more strongly against or more favorably for either party; it being known that both parties have had equal bargaining power, have been represented (or have had the opportunity to be represented) by their own independent counsel and have equal business acumen such that any rule of construction that a document is to be construed against the drafting party shall not be applicable. Buyer acknowledges and agrees that Buyer has had ample opportunity to inspect other similar condominiums and condominium documents, that Seller has clearly disclosed to Buyer the right to cancel this Agreement for any reason whatsoever, including any dissatisfaction Buyer may have with this Agreement or the Condominium Documents, within fifteen (15) days of the date Buyer executes this Agreement or has received the Condominium Documents, whichever is later, and that although Seller's sales agents are not authorized to change the form of this Agreement, they have strict instructions from Seller to communicate any of Buyer's requests for such changes to Seller's management, which has given Buyer the opportunity to discuss and negotiate such changes. Buyer, by executing this Agreement confirms and agrees that Buyer is of legal age, has legal capacity to enter into binding agreements of this nature and has entered into this Agreement of its own free will, without any duress or coercion by any party whatsoever.

43. Move-In Date. Buyer shall be entitled to possession of the Unit as of the Closing Date; however, Buyer's right to move into the Unit shall be subject to a "move-in" schedule for all buyers and the move must be scheduled with the Association, or its manager. Moving shall only be permitted in accordance with the Rules and Regulations of the Association.

44. Entire Agreement. This Agreement is the entire contract for sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by the party against whom enforcement is sought which specifically states that it is amending this Agreement. **Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect. Buyer has not relied on them.**



**GENERAL INFORMATION:**

**Co-Broker Information:** (See paragraph 20 above; if the space for Co-Broker's name is left blank, it shall mean that Seller has not agreed to pay any co-broker)

Co-Broker's Name:
Co-Broker's Sales Agent _____ JOEL GREENE _____
Co-Broker's Address

Phone No. _____          Fax No. _____
E-Mail _____          License No. _____

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO THE SELLER UNTIL MIDNIGHT OF THE FIFTEENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT.

IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGULATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT MAY BE CANCELED AT YOUR OPTION, FOR TWO YEARS FROM THE DATE OF SIGNING.

Witnesses:
X _____

JOEL GREENE

BUYER(S)
X _Joseph Salerno_

JOSEPH SALERNO

Date: _1-20-06_

SELLER:

SB Hotel Associates LLC, a Delaware limited liability company

X _Maritza Meza_

MARITZA MEZA

By: _____
Authorized Representative

Date: _2/26/06_

# Exhibit E

Members: Log in | Not Registered? Register for free extra services.

South Florida Business Journal - May 19, 2009
/southflorida/stories/2009/05/18/daily25.html

## South Florida
## BUSINESS JOURNAL

Tuesday, May 19, 2009

# Corus Bank ordered to submit capital plan

South Florida Business Journal - by Brian Bandell

**Corus Bank** shares, which has warned it could be placed into receivership, has now been given until Friday to submit a capital restoration plan to federal regulators.

The Chicago-based bank holding company (NASDAQ: CORS) disclosed the May 1 order in its first quarter report, filed on Monday with the **Securities and Exchange Commission**, in which it said it lost $285 million.

The news should come as no surprise, given that Corus Bank also disclosed in the report that just one of its condo development loans in South Florida is not at risk of foreclosure.

If the bank does wind up in receivership, the **Federal Deposit Insurance Corp.** could put more than $1 billion in loans to South Florida projects on the market.

This is not the first time federal regulators have come down on Corus. **In February**, they placed restrictions on management and ordered the bank holding company to raise its capital level by June 18. That deadline still stands.

In the May 1 order, additional restrictions were placed on management.

The order also limits the interest rates Corus Bank can offer on deposits to no more than 0.75 of a percent above the national average.

Since the bank attracts most of its deposits through high-rate certificates of deposit via the Internet, this could cause a liquidity problem for Corus Bank, said Philip van Doorn, a senior banking analyst at The Street.com Ratings in Jupiter.

Based on the average deposit return rates contained in a database of 5,000 banks on Tuesday, van Doorn said Corus Bank offered the highest CD return rate in the nation.

If regulators force it to lower its rates, depositors could flee when their terms expire, he said.

Corus Bank said it has hired an investment bank to explore ways to raise capital, but it warned shareholders it might not be successful.

"Any material failure to comply with the provisions of the regulatory agreements could result in further enforcement actions by both the Federal Reserve Board and the **Office of the Comptroller of the Currency**, or the placing of the bank into conservatorship or receivership," Corus wrote in its quarterly report.

Van Doorn said Corus' prospects for raising capital and avoiding receivership appear dim. He cited its $6.4 million loss on net interest – essentially negative revenue for a bank. That means Corus paid out more to depositors in the first quarter than it received in interest from its loans.

The bank missed out on $38 million in interest payments in the first quarter because of its $2.04 billion in nonperforming loans, which represented 49 percent of Corus' total loans.

A Corus spokeswoman did not immediately return a call seeking comment.

Corus President and CEO Robert J. Glickman and Chairman Joseph C. Glickman resigned in April, although the latter continues to collect lifetime annual compensation of $59,000.

The bank's condo construction-intensive strategy made it a major financer of South Florida's building boom – and it is suffering as a result.

Corus Bank had 14 condo construction loans and two apartment loans with a $1.03 billion balance as of March 31. Of those, 12 condo loans and both apartment loans with balances and commitments of $955 million were nonperforming. In addition, one more South Florida condo loan valued at $49 million was classified as a potential problem loan, which mean Corus expects to record a loss on the project.

That means only one Corus development loan in South Florida, valued at $28 million, was in good standing as of March 31. It is not clear which project it is for, but it has been completed.

Corus-financed projects in South Florida account for 2,350 completed units, which have had 737 closings as of March 31, and an additional 1,334 units under construction, according to the company's SEC filing.

**EXHIBIT E**

There have been significant construction cost overruns at some of the bank's South Florida projects. Six nonperforming South Florida loans with balances of $216 million have rung up $56 million in cost overruns that Corus funded to keep work going. That's much higher than the national cost overrun rate the bank has experienced.

Corus valued its one repossessed condo in South Florida, the Tao in Sunrise, at $73.2 million on March 31, down from $80.9 million at year-end. It has sold nine of the 369 units there, according to the company's SEC filing.

Corus said it was in the process of seeking foreclosure against three South Florida projects with $164.9 million in loans and 569 units as of March 31.

The bank has since filed a foreclosure lawsuit in Miami-Dade County Circuit Court against the developer of the 118-unit Onyx on the Bay condo, which has 41 unsold units. The original loan was for $44.1 million.

Other major Corus-financed projects in South Florida include:

- Jade Ocean Condominiums in Sunny Isles Beach
- Paramount Bay in Miami
- The Mint at Riverfront in Miami
- Trump International Hotel and Tower in Fort Lauderdale
- Caribbean Miami Beach
- Infinity at Brickell in Miami
- The Ivy in Miami

Van Doorn said there would be a lot of vulture investor interest in Corus' South Florida condo loans because of the high quality of the projects, but they probably won't be discounted enough for buyers unless the bank falls into federal receivership.

"I don't see how Corus will get out of it," he said.

*All contents of this site © American City Business Journals Inc. All rights reserved.*

# Exhibit F

--- On Wed, 3/11/09, Michele Conte <*michele@stillmandevelopment.com*> wrote:
From: Michele Conte <michele@stillmandevelopment.com>
Subject: RE: Trump Intnl- David Hackert/ John Bellini unit 205- reply requested
To: pycinc@yahoo.com
Cc: carinaradonich@hotmail.com
Date: Wednesday, March 11, 2009, 9:48 AM

David,

    A new problem has arisen since I returned from Fort Lauderdale, which was the last time I saw you and John.  The media has discussed the financial condition of Corus Bank, our primary lender on the project.  Corus's stock has plunged, and their future is uncertain.

    They may not be able to fund the final $15 million we need to open Trump International Hotel & Tower, and that may or may not mean we cannot close anyone.  At this time we are simply laying in wait for some direction, and I have been instructed to be straight with our buyers, which I just have been with you.  If you speak to an attorney, please tell him or her what I just said; it's no secret anyway that Corus is in financial difficulty.  Explore your options from every possible scenario.

    But for now, no one knows what will happen, although again, we are also exploring how to proceed around the uncertain issues presented by Corus's situation.

    Feel free to call me later today at 212 - 686 - 2400.  I'll be back in the office around 3:00 pm.
Warm regards,
Michele

**From:** David Hackert [mailto:pycinc@yahoo.com]
**Sent:** Friday, March 06, 2009 8:13 AM
**To:** Michele Conte
**Cc:** carina radonich
**Subject:** Trump Intnl- David Hackert/ John Bellini unit 205- reply requested

1



EXHIBIT
F

# Exhibit G

**SB Hotel Associates, LLC**
**505 Park Avenue, 17th Floor**
**New York, NY 10022**
**866 878-6701**

May 13, 2009

**VIA Certified Mail**

Trilogy Properties LLC
28 Sulegrave Road
Scarsdale, NY 10583

RE:   **Trilogy Properties LLC,** (the "Buyer") purchase of Unit 205 (the "Unit") in SB FORT
LAUDERDALE HOTEL & CONDOMINIUM (the "Condominium") from Hotel Associates LLC, a
Delaware limited liability company ("Seller"), pursuant to that certain agreement between Buyer
and Seller (the "Purchase Agreement")

Dear Trilogy Properties LLC, :

We are pleased to advise that the Condominium has been completed, the certificate of occupancy issued by the City of Fort Lauderdale and the furniture moved into the rooms.  We are sure you are anxious to coordinate your closing, so this letter is intended to provide you with important information to allow you to make your plans.

**Walk-Through Inspection**.  Your pre-closing "Walk-through" inspection of your Unit has been scheduled for **May 28, 2009 at 10:00 AM**.  A customer service representative will meet you in the Lobby Area of the building on the date and time specified. As I'm sure you will understand, each day there are several residences scheduled to complete their inspections and closings.  On behalf of the closing team, we ask that you please arrive promptly for your walk-through appointment.  You are not obligated to attend the walk-through; however, pursuant to the terms of your purchase agreement, you will be deemed to have accepted the Unit in as-is condition.

**Closing Date**.  This letter will serve as notice that, pursuant to Paragraph 9 of your Purchase Agreement, your closing has been scheduled for **May 28, 2009** at **1:00 PM**.  The closing will take place at the law offices of Greenberg Traurig, P.A., 1221 Brickell Avenue, 22nd Floor, Miami, Florida 33131.  Please contact Mayra Mir at (305) 789-5465 to coordinate your preliminary closing matters.  To the extent that you have scheduling issues, please be assured that we will try to accommodate all of your needs.  Please contact Michele Conte at (866) 878-6701 with any scheduling issues that may be of concern.

**Financing**.  Under the Agreement, your obligation to close on the Closing Date is not conditioned upon your obtaining mortgage financing.  If you plan to finance your purchase, and have not yet started the process to secure a mortgage, we encourage you to do so immediately.  Once you have determined who your lender will be, it is very important that your lender directly contact our closing coordinator, Mayra Mir at (305) 789-5465 to facilitate a smooth closing.  Please advise our closing coordinators of the name of you lender and the loan officer assisting you with your loan as soon as you know that information.  We ask that you remember to keep in contact with your lender to make sure all contingencies are cleared and the mortgage paperwork is ready in time for the  closing.

**Cash to Close**.  Please contact the closing coordination team at least one business day prior to the Closing Date so that they may inform you of the exact amount of cash it will be necessary for you to bring to the closing.  You will be required to provide those funds either by wire transfer or by **cashier's check** in U.S. funds by a bank located in the Continental U.S. For your convenience, wiring instructions are attached.  It is your obligation to make sure that all funds are received no later than the date and time of closing.



**Opening of Hotel**.  Given the uncharted economic climate that we are adapting to, and the impact that the economy has had on both the real estate and hospitality industries, we do not believe that the hotel operation will open if purchasers have closed on fewer fifty percent (50%) of the units in the Condominium.  If that closing threshold is not achieved, we would not envision that the hotel will open.  Additionally, please note that given the governmental approvals for the Condominium, we do not believe that you will be permitted to occupy your unit or the Condominium until such time as the hotel opens. Lastly, we want to advise you that we received a Notice of Default from a Trump entity purporting to control our License Agreement with Donald J. Trump for the use of trademarks and tradenames associated with the hotel.  We do not believe that there is merit to the claims set forth in the Notice of Default, but wanted you to be aware of the existence of their claim.  We wanted you to be advised of these matters as you prepare for closing.

Thank you in advance for your cooperation. If you have any questions, or we can be of assistance please feel free to call, or you can contact Michele Conte at (866) 878-6701.

Sincerely,

SB HOTEL ASSOCIATES, LLC

WIRING INSTRUCTIONS FOR GTH CITIBANK TRUST ACCOUNT ARE AS FOLLOWS:

TO:         CITIBANK F.S.B.
            8750 DORAL BLVD
            MIAMI, FL 33178
            ABA#266086554
            SWIFT NUMBER CITIUS33MIA
FOR CREDIT TO: GREENBERG TRAURIG ET AL TRUST ACCOUNT
            ACCOUNT NO. 2101970278
REFERENCE:  CLIENT NAME: Stillman, Bayrock, Mermac
                         SB Fort Lauderdale
            FILE NUMBER: 069919.010200
            ATTORNEY NAME: Gary A. Saul

# Composite

# Exhibit H

Trump condo-hotel in Fort Lauderdale might not open, developers say -- South Florida Sun-Sentinel.com     Page 1 of 2

sun-sentinel.com/business/sfl-trump-condohotel-woes-051409,0,6387088.story

# South Florida Sun-Sentinel.com

## Trump condo-hotel in Fort Lauderdale might not open, developers say

**Investors are told that future of beach project depends on them closing on the unit sales**

By Doreen Hemlock

South Florida Sun-Sentinel

7:02 PM EDT, May 14, 2009

The much-touted and long-delayed Trump International Hotel & Tower on Fort Lauderdale beach might not open.

Developers of the 298-unit condo-hotel informed investors in a May 13 letter that they must close on their units this month and unless half do, "we do not envision that the hotel will open."

Furthermore, the letter said buyers likely can't occupy their units until the hotel opens, and a Trump group may pull its celebrity name from the property, claiming developers have defaulted on their obligations.

Neither the developer, SB Hotel Associates LLC, nor the Trump Organization in New York could be reached to comment Thursday despite repeated messages.



The woes are the latest in a series for a $200 million venture that was supposed to bring cachet to Broward County and open in 2007. The 24-story project features some of the area's most expensive condos, with studios and one- and two-bedroom units priced from about $500,000 to more than $3 million each.

Several lawsuits are pending from unhappy investors who want refunds of their 20 percent deposits. Allegations include misleading advertising and breach of contract for failing to finish the project on time -- no later than December 2008.

Fort Lauderdale attorney Joseph E. Altschul, who represents investors in more than two dozen units, said investors have little incentive to close on units this month when developers can't assure them that the hotel will open or that the Trump label will remain.

"Talk about a risk," Altschul said. "They're asking people to say, 'Here's the other 80 percent of my money, and maybe I can move in someday.'"

Jared Beck, a Miami lawyer representing other investors in the property, also questioned why buyers would close on their units when the project faces serious financial woes.

Developers pre-sold most units in 2005 and 2006 when condo values were far higher. And the lender for the venture, Chicago-based Corus Bank, is teetering, ordered by federal authorities to raise $390 million by July or face receivership.

"The implications for this project could be devastating if Corus goes under," Beck said, urging developers to refund deposits to investors.

The condo-hotel at 551 N. Fort Lauderdale Beach Blvd., just north of Las Olas Blvd., is one of several Trump-brand projects in South Florida. The real estate mogul also has invested or licensed his name to unrelated properties in

Trump condo-hotel in Fort Lauderdale might not open, developers say -- South Florida Sun-Sentinel.com        Page 2 of 2

Hollywood and Sunny Isles Beach.

A Trump condo-hotel project recently collapsed in Mexico, just south of California, with investors losing their deposits.

Doreen Hemlock can be reached at dhemlock@SunSentinel.com or 305-810-5009.

Copyright © 2009, South Florida Sun-Sentinel

Case 1:09-cv-21406-KMW   Document 1   Entered on FLSD Docket 05/26/2009   Page 74 of 81
Trump wants name off condo project - 05/15/2009 - MiamiHerald.com

Page 1 of 2

# The Miami Herald

Posted on Fri, May. 15, 2009

## Trump wants name off condo project

BY DOUGLAS HANKS
dhanks@MiamiHerald.com

Donald Trump may not be coming to Fort Lauderdale, after all.

After seeing one hotel project in the resort city fizzle amid a depressed real-estate market, the celebrity mogul has informed developers of another that they can't use his name on their 298-unit property.

Trump claimed the developers of the Trump International Hotel and Tower were in default of a licensing agreement that allowed use of Trump's name on the project, according to a letter the developers sent to buyers this week.

That licensing deal boosted sales at the 24-story tower, where units sold for $600,000 and up. The Trump brand was seen as injecting luxury into a hotel market long known for spring breakers and budget rates.

And while developers plan to fight to keep Trump's name on the front of the building, the conflict adds to the legal fights facing condo-hotels across South Florida as buyers try to escape sales contracts written during the recent real-estate boom.

"It was difficult before this financial crisis to get financing for a condo-hotel. Now it's virtually impossible," said Robert Cooper, a Miami lawyer who represents about 50 condo-hotel buyers in various projects throughout South Florida. ``Unless they have cash to close, there's no way they can close on these condo units."

### THE LAWSUIT

Thirty buyers of Trump International units at 551 N. Fort Lauderdale Beach Blvd. are suing the developers and Trump for allegedly misleading them into thinking the TV star's participation was a sure thing. Though sales contracts identify the project as the SB Fort Lauderdale Hotel & Condominium and state that Trump can withdraw from the licensing deal, the suit claims that marketing materials suggested Trump was on board as a developer.

"Everybody thought they were buying into Trump Tower," said Joseph Altschul, the Fort Lauderdale lawyer who filed the suit in Broward County Circuit Court.

The suit claims plaintiffs "paid a premium for a condominium unit with the Trump name purportedly attached to it," reads the suit filed in Broward County Circuit Court. The project's website described it Thursday as ``a signature development by Donald J. Trump."

SB Hotel Associates, the New York company behind the project, and lead developer Roy Stillman did not respond to requests for comment. A spokeswoman for Trump, whose casino company filed for bankruptcy protection in February, issued a statement saying his organization wasn't the developer of the property, adding ``for all other inquiries, please contact the owner."

### TROUBLES MOUNT

As recently as two years ago, Trump symbolized the transition under way in Fort Lauderdale's hotel industry. The prolific real-estate salesman sold his name to a pair of luxury condo-hotel projects set to rise two miles away from each other on the beach.

Trump wants name off condo project - 05/15/2009 - MiamiHerald.com

In 2007, when developers suspended plans for the Trump Las Olas Beach Resort at 525 S. Fort Lauderdale Beach Blvd, Trump expressed confidence that his other Fort Lauderdale venture would prosper despite the slump.

But this week, SB Hotel Associates sent out a letter hinting at troubles ahead.

The May 13 letter said given the "uncharted economic climate," developers did not expect the hotel to open if fewer than 50 percent of buyers close on their units. But if the hotel doesn't open, the letter said, owners could not occupy their units, given local zoning rules for condo-hotels.

Altschul said buyers hadn't heard from the developers for about a year, before receiving letters announcing closings would be taking place at the end of May. He said that while the units seem mostly finished, the public areas of the hotel need work.

"There's a shell where the restaurant and spa are supposed to be," he said.

© 2009 Miami Herald Media Company. All Rights Reserved.
http://www.miamiherald.com

# Exhibit I

Trump Baja project is turning into a legal battle of Trump proportions - Los Angeles Times

Page 1 of 4



Hello elvir74@yahoo.com · Profile · Logout

Jobs | Cars.com | Real Estate | Rentals | Foreclosures | More Classifieds

LAT Home | Print Edition | All Sections

## Los Angeles Times   Business

SEARCH

Technology   Personal Finance   Small Business   Economy   Energy   Careers   Showbiz   Real Estate   Autos   Business

You are here: LAT Home > Business News



Save on home delivery.
ORDER NOW

as of 04:00PM ET 5/15/2009

DJIA 8268.64   NASDAQ 1680.14   S&P500 882.88

Quote: Symbol or Name

Email | Print | Text | RSS

ADVERTISEMENT

Business

- Technology
- Personal Finance
- Small Business
- Economy
- Energy
- Careers
- Showbiz
- Real Estate
- Autos
- Business A-Z

Blogs
- Money & Co
- LA Land
- Up to Speed
- To Live and Buy in LA
- Entertainment News & Buzz

News/Opinion
California | Local
National
World
Business
Sports
Washington
Science
Environment
Opinion

Arts/Entertainment
Entertainment
The Guide
Company Town
Arts & Culture
Calendar
The Envelope
TV Listings
More Showtimes

Living
Travel
Health
Autos
Home & Garden
Food
Image
Books
Brand X new
Magazine

COURTS

# Trump Baja project is turning into a legal battle of Trump proportions



Don't sacrifice the quality of your **employees'** health care benefits.

**Attention:** Employers

Aetna

Don Bartletti / Los Angeles Times
Security guard Edgar Lopez and his dog at the entrance to the 17-acre Trump Ocean Resort Baja Mexico. The project never progressed beyond a hole in the ground.

**To angry buyers, the heart of the dispute over the failed luxury vacation home complex is this: If Donald Trump is identified as a project's builder, is he liable if the actual builder fails?**

By Stuart Pfeifer
May 5, 2009

Reporting from Tijuana -- Waves crash against a rocky shore while a couple stroll hand in hand on the beach. Poolside, a bartender is mixing up a batch of margaritas.

Then comes Donald Trump, smooth and confident, singing the praises of the new Trump Ocean Resort Baja Mexico north of Rosarito Beach, an area he touts as "the next Cabo."

Most Viewed   Most E-mailed

1. Lakers in control of Rockets after three quarters
2. Atheists: No God, no reason, just whining
3. Schwarzenegger's doomsday message may be too late
4. Michelle Obama implores UC Merced graduates' creativity and persistence
5. Read this over coffee
6. Obama addresses abortion-rights furor at Notre Dame
7. For Lakers, Game 7 will mean new life or a dead end
8. The war on drugs is over
9. Clayton Kershaw leads Dodgers to victory
10. A giant leap toward space-based solar power

ADVERTISEMENT

Related Content



Photos: Trump resort

Map

"Donald Trump sues developer of Baja California condo project bearing his name

EXHIBIT 1

Trump Baja project is turning into a legal battle of Trump proportions - Los Angeles Times

Page 2 of 4

Data Desk
Video
Photography
Obituaries
Crosswords/Sudoku
Your Scene

Blogs
Columnists
Print Edition
Readers Rep
Corrections
All Sections

Buy, Sell & More
Jobs
Cars
Real Estate
Foreclosure Sale
Rentals
Personals
Local Values
Coupons
Newspaper Ads

Place an Ad
In the Newspaper
Online

Settings/Services
Sign In
Register
E-Mail Newsletters
RSS Feeds
Help
Contact Us
L.A. Times Archives
Reprint Requests
Work for Us

Home Delivery
Customer Support
Subscribe

"I'm very proud of the fact that when I build, I have investors that follow me all over," he says in the eight-minute marketing video produced for potential buyers. "They invest in me. They invest in what I build, and that's why I'm so excited about Trump Ocean Resort.

"This is going to be something very, very special."

So special that 80% of the first phase sold within hours in a 2006 presale. Many of the buyers were Southern California residents looking for affordable oceanfront vacation property.

But three years later, the only progress is a gigantic hole in the ground and a heap of dirt.

Instead of a 526-unit luxury vacation home complex with pools and tennis courts, this project is shaping up to be a legal battle of Trump proportions.

Dozens of angry buyers have sued Trump for failing to complete the project. He, in turn, sued the Los Angeles-based builders, saying he had only lent his name to the project, and it was the developers who allowed the project to fail.

To the buyers, the heart of the dispute is this: If Trump is identified as a project's builder, is he liable if the actual builder fails?

Yes, says Hamed Hoshyarsar, a Northridge accountant who bought one of the units.

"That's the reason why we went with this project; Trump's name was on it," said Hoshyarsar, 30. "If we would have known he just licensed his name and he wasn't the developer, then we wouldn't have bought it."

Now he changes the channel when Trump appears on television.

"I can't believe a person with the reputation of Donald Trump and all that he represents on 'The Apprentice,' that he let this happen to us," Hoshyarsar said. "It's unbelievable."

Trump said in an interview that sales contracts made it clear that he was not the developer. He said he licensed his name because the developer had a "good reputation" and had been a reliable partner in a similar project on Waikiki Beach.

"The documents state very clearly that we were not the developer," Trump said. "We're looking into the whole situation, because it doesn't make me happier than it makes them. I don't like to see people lose money."

Before the reality-TV hit "The Apprentice," the premium vodka and the signature clothing line at Macy's, Trump in fact did make a name for himself building luxury office towers, hotels and casinos. Over time, the Trump name became a symbol of glamour and success.

In his newly released book "Think Like a Champion," Trump wrote about the power of his name.

"My buildings sell out before they are built," Trump wrote. "People recognize the brand name and know what they will be getting: the best for their money."

Developers pay handsomely to stamp that Trump cachet on their projects. Such deals have proved profitable for both Trump and builders who paid to use his name.

The Baja project was developed by Irongate Wilshire and PB Impulsores, which both operate from offices in Westwood. Irongate principals Jason Grosfeld and Adam Fisher did not respond to requests for comment.

Irongate and PB Impulsores have not filed a response to the buyer lawsuits. In an e-mail to buyers in February, which a plaintiff provided to The Times, the developers blamed the project's failure on the "global meltdown of the credit markets," making it impossible to obtain financing.

But the buyers say Trump's liability is clear. "Nobody ever said anything about this being a licensing deal," said Daniel J. King, a lawyer for the buyers. "None of them would have bought if they knew the real arrangement."

In February, the developers notified buyers that they had spent their deposits -- $32 million -- and were abandoning the project because they could not obtain financing to finish it.



BEAT CANCER NOW



City of Hope

## Real Estate Headlines

1. 'Laguna Beach's' Kristin Cavallari lists it, well, Laguna Beach
2. Singer Leona Lewis leases Hollywood Hills house for nearly $8,000 a month
3. >> More Hot Property
4. Craftsman rustic meets a 21st century sensibility
5. HOME OF THE WEEK UPDATE

## Mexico Under Siege



The drug war at our doorstep
Video Q&A | Photos | Interactive map


LA TIMES
NOW ON KINDLE


LA Times
eEdition





Sixty-nine people who paid for units at Trump Ocean Resort Baja Mexico filed suit in March in Los Angeles County Superior Court against Trump and the developers accusing them of falsely portraying Trump as the builder. Although the project was to be in Mexico, the suit seeks to apply U.S. law because the properties were marketed and sold here.

Trump, the 62-year-old symbol of capitalistic success, sued developer PB Impulsores in U.S. District Court in New York, accusing it of failing to make good on its promise to build the project and demanding an accounting of how the buyer deposits were spent.

Bert I. Ring, another lawyer for the buyers, said he considered Trump's suit a "publicity stunt" that would not relieve him of culpability in the Baja project.

"If Trump is truly interested in the best interests of the buyers, he could reach in his pockets and make the buyers whole," Ring said.

Meanwhile, 10 miles south of the border, Trump's smiling face and famously big hair can still be viewed on a billboard at the resort site, alongside the slogan "Owning here is just the beginning."

On a recent weekday, the paved road that leads to the 17-acre property was blocked by a single strand of steel chain. A security guard cautioned in Spanish that no one was allowed on the property.

If things had gone as billed, the first of three towers — a monolith of marble and glass rising above the coast and providing picturesque views of the Pacific Ocean and the Coronado Islands — would have been completed by now.

In January, Trump backed out of the project after it became clear that the developers were not going to complete it.

"This was not a deal where I could control things," Trump told The Times. "I am personally looking into it."

As for buyers who appear to have lost their investments, Trump said: "They'll have to speak to the developer."

George Lefcoe, a USC law professor who specializes in real estate financing and land use, said the buyers might have a difficult time pursuing damages against Trump.

"He doesn't promise unconditionally that if anything goes wrong, he'll give you the money back," Lefcoe said. "What this controversy shows is you need to be sure your money is held by a third party, not controlled by the seller."

Some people familiar with Baja real estate said they thought the project was doomed from the outset.

Trump or not, northern Baja was not the place for a five-star resort, said Brian Flock, a Baja California real estate agent. It's a place where people wear flip-flops day and night, buy Coronas by the bucket and barter for serapes, ceramics and other souvenirs.

"Frankly, we're not in the tropics. We're not an international resort destination. They don't land in the airport and walk along a polished marble floor and shops like Gucci and Louis Vuitton," Flock said. "The project didn't fit the profile at all of Baja California north. . . . I never sold a single unit there. I never promoted it at all."

Still, buyers swamped a December 2006 sales event at a posh San Diego hotel and purchased about 80% of the units in the first tower.

Trump Baja buyer Lupe Mendoza, a single mother with two teenage boys, said she started to become concerned by late 2007 when there had been little progress at the construction site.

"I would always get these responses, 'Yes, it's happening, but it's underground. You can't see anything,'" Mendoza said. "To me, the word is 'unbelievable.' I was led to believe I was investing with a multimillionaire. I believed my investments were as safe as safe could be. I believed the man was a man of his word."

stuart.pfeifer@latimes.com

 Digg    StumbleUpon    Reddit    Mixx   ShareThis

 Save over 50% off the newsstand price. Click here to subscribe to The Times.

ADS BY GOOGLE

Is Your Bank In Trouble?
Free list Of Banks Doomed To Fail. The Banks and Brokers X List. Free!
www.MoneyAndMarkets.com

Rosarito Inn Condo Suites
Spring Break on the Beach Share 1,2,3, and 4 BR Suites
www.resaritoinn.com

View Mexico Homes
Browse Rosarito Real Estate Homes For Sale on ResortScape
www.resortscape.com

More on LATimes.com
Advertising  |  Investing Tools  |  Technology  |  Work
and Careers

Partners
VivebHoy  |  KTLA  |  Metromix  |  Daily Pilot
Glendale News Press  |  Grocery Coupons  |  Zap2it

Classifieds
Career Builder  |  Cars.com  |  Apartments.com   FSBO
(For Sale By Owner)  |  Open Houses

Copyright 2009 Los Angeles Times          Privacy Policy | Terms of Service | Advertise | Home Delivery , Reprint Requests | Help & Services | Contact |
202 West 1st Street, Los Angeles, California  90012                                                                                    Site Map

%JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Trilogy Properties LLC et al. | SB Hotel Associates LLC et al. |

**(b)** County of Residence of First Listed Plaintiff  **Broward, FL**

County of Residence of First Listed Defendant  New York, NY

(EXCEPT IN U.S. PLAINTIFF CASES)

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jared H. Beck, Esq.
Beck & Lee, P.A., 28 W. Flagler St. Ste. 555, Miami, FL 33130
(305) 789-0072

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE   ☐ MONROE   ☐ BROWARD   ☐ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE
HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☑ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Dade 09cv 21406 — Jordan / Riley

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Re-filed- (see VI below)

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

a) Re-filed Case  ☐ YES  ☑ NO          b) Related Cases  ☐ YES  ☑ NO

## VI. RELATED/RE-FILED CASE(S)

(See instructions second page):

JUDGE                              DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

28 U.S.C. § 1332(d)(2)(A) (class action diversity)

LENGTH OF TRIAL via  5  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
5,000,001.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  MAY 26, 09

FOR OFFICE USE ONLY

AMOUNT  350-       RECEIPT #  1001633       IFP