2     UNITED STATES DISTRICT COURT
      MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

3     --------------------------------------------- x

4     STEVE AARON, ET AL,

5                   Plaintiffs,      Index No.:
                                         8:09-CV-2493

6       -against-

7     THE TRUMP ORGANIZATION, INC., A NEW YORK
      CORPORATION, and  DONALD J. TRUMP, AN INDIVIDUAL,

8
                    Defendants.

9

     --------------------------------------------- x

10

11        EXAMINATION BEFORE TRIAL of the Defendant,

12    DONALD J. TRUMP, taken by the Plaintiff, pursuant to

13    Order, held at the offices of Foley & Lardner, LLP,

14    90 Park Avenue, New York, New York, on September 20,

15    2010, at 10:00 a.m., before a Notary Public of the

16    State of New York.

17

18

19

20

21

22    *********************************************

23        BARRISTER REPORTING SERVICE, INC.
                120 Broadway
24          New York, N.Y. 10271
            212-732-8066
25



EXHIBIT
415
3-2-12

Case 1:09-cv-21406-KMW   Document 230-5   Entered on FLSD Docket 06/04/2012   Page 2 of 149

2

```
 1

 2      A P P E A R A N C E S:

 3           CLARK & MARTINO, PA
                  Attorneys for Plaintiffs
 4                3407 West Kennedy Boulevard
                  Tampa, Florida  33609
 5
             BY:   J. DANIEL CLARK, ESQ.
 6

 7           WILLIAMS SCHIFINO MANGIONE & STEADY, PA
                  Attorneys for Plaintiffs
 8                201 North Franklin Street
                  Suite 3200
 9                Tampa, Florida 33602

10           BY:   DAN WALBOLT, ESQ.

11

12           BAJO CUVA COHEN & TURKEL, PA
                  Attorneys for Plaintiff
                  100 North Tampa Street
13                Suite 1900
                  Tampa,Florida  33602
14
             BY:   KENNETH G. TURKEL, ESQ.
15

16           FOLEY & LARDNER, LLP
                  Attorneys for Defendants
17                PO BOX 3391
                  Tampa, Florida  33601
18
             BY:   CHRISTOPHER GRIFFIN, ESQ.
19

20           ALAN G. GARTEN, ESQ.
                  Attorneys for Defendants
21                725 Fifth Avenue
                  New York, New York  10022
22
             BY:   ALAN G. GARTEN, ESQ.
23

24      ALSO PRESENT:

25           J.D. MARTINEZ, Videographer
```

3

```
 1                    Donald Trump
 2          THE VIDEOGRAPHER:  We are on
 3     the record.  This is the videotaped
 4     deposition of Donald Trump taken in
 5     the case of Steve Aaron, et al, versus
 6     the Trump Organization, Inc., a New
 7     York Corporation, and Donald Trump, an
 8     individual, filed in the United States
 9     District Court, Middle District of
10     Florida, Tampa Division.
11          Today's date is September 20,
12     2010.  The time on the videotaped
13     record is 10:08 a.m.  This deposition
14     is being held at 90 Park Avenue, New
15     York, New York.  My name is J.D.
16     Martinez on behalf of Digital Media
17     Productions of 120 Broadway, New York,
18     New York.
19          Would everyone please introduce
20     themselves and state whom they
21     represent?
22          MR. CLARK:  Thank you.  I'll
23     begin. Dan Clark, Clark & Martino, on
24     behalf of the named plaintiffs.
25          MR. TURKEL:  Ken Turkel, Bajo
```

                                            4

```
 1                    Donald Trump
```

```
 2            Cuva Cohen &  Turkel, on behalf of the

 3            named plaintiffs.

 4                   MR. CLARK:  Dan Walbolt is also

 5            with me, with my firm.

 6                   MR. GRIFFIN:  Chris Griffin,

 7            Foley & Lardner, for the defendants.

 8                   MR. GARTEN:  Alan Garten for

 9            the defendant.

10                   THE WITNESS:  Donald Trump.

11

12    D O N A L D   J.   T R U M P,

13            Having been first duly sworn before a Notary

14            Public of the State of New York, was examined

15            and testified as follows:

16

17                   (Whereupon New York Times

18            Magazine article dated October 2006 is

19            marked Plaintiff's  Exhibit 1 for

20            identification as of this date.)

21

22    EXAMINATION BY

23    MR. CLARK:

24    Q    Please state your name for the record.

25    A    Donald Trump.
```

5

```
 1                   Donald Trump

 2    Q    What is your address?
```

```
 3      A       726 Fifth Avenue, New York, New York,

 4      10022.

 5      Q       Mr. Trump, good morning.  Thank you

 6      for the short delay.  We spoke off the

 7      record.  I introduced myself.  Thank you for

 8      accommodating us.  We started a little bit

 9      late, my apologies.

10              We are here to take your deposition in

11      a case that's been filed against you and your

12      company by a number of people in Tampa that I

13      represent.

14              One of the first things I will show to

15      you -- and we will have exhibit boards here

16      shortly that will be identical to what you

17      see -- there is the New York Times Magazine

18      that demonstrates all of your signature

19      properties as of October of '06.

20              I believe you had an opportunity to

21      take a look at that?

22      A       Yes.

23      Q       Can you open that up just so I can

24      refer to those?  The Donald Trump -- excuse

25      me, Donald J. Trump Signature Properties, who
```

6

```
 1                      Donald Trump

 2      began that slogan of the marketing of your

 3      properties as such?

 4      A       I did.
```

```
5       Q       When did that begin?

6       A       I would say 10 years ago.

7       Q       Was that an idea just taking your

8       ingenuity and your value of your name and

9       putting it into a marketing title for those

10      properties?

11      A       I think generally speaking, yes.  I

12      mean, marketing, but also ownership,

13      different forms of ownership, consulting, et

14      cetera, et cetera, but a better property, a

15      better property or potential property, we use

16      the word signature.

17      Q       I know -- I have tried to study as

18      much as I possibly could, understanding your

19      properties and gearing up for the deposition,

20      quite frankly, before I took the case.

21              Can you express to those who may watch

22      this video down in Tampa, in this case, what

23      it means to be a Donald J. Trump property, in

24      terms of value, as in terms of success?

25              MR. GRIFFIN:  I am going to
```

7

```
1                       Donald Trump

2       object to the form of the question.

3               If I make objections such as

4       that, it is for the record and for the

5       judge to determine later.  Please,
```

```
 6           after my objection, go ahead and

 7           answer the question.  If for some

 8           reason I think that it is a greater

 9           objection than the norm, I will

10           instruct you not to answer it.

11                  There is no instruction at this

12           time, and if I ever make an objection

13           and you would like the question read

14           back before you answer it, you are

15           welcome to ask for that.

16   A       You mean a Donald J. Trump Signature

17   property?

18   Q       That's correct.

19   A       Because you left the word Signature

20   out.

21   Q       My apologies.

22   A       You mean Signature Property?

23   Q       Yes, sir?

24   A       It would not necessarily indicate

25   ownership, but in some cases it does.  In
```

8

```
 1                  Donald Trump

 2    many cases, as I look at some of these

 3    buildings, it does indicate ownership.  It

 4    indicates quality more than anything else.

 5    The property would have to be of a

 6    significant quality to use the Donald J.

 7    Trump Signature Property.
```

8    Q       Is there a distinction in your mind

9    between a Donald J. Trump Signature Property

10   and maybe another property that you are

11   involved with, whether by ownership or

12   otherwise?

13   A       I think Signature generally is the

14   highest end property.

15   Q       Starting 10 years ago, you came out

16   with that --

17   A       Yes.

18   Q       -- trademarked description of those

19   properties?

20   A       That is correct.

21   Q       On that list of properties, obviously

22   they caught our attention -- the Trump Tower

23   Tampa is there.  You see that there?

24   A       Correct.

25   Q       There are a couple of other properties

9

1                    Donald Trump

2    there that have been in some dispute.  I

3    believe there is a number of the Trump

4    International hotels that are referenced

5    there?

6    A       Correct.

7    Q       What I was interested in knowing, sir,

8    was what is the difference between the Trump

```
 9    Tower and the hotel and residence?  I mean, I

10    stayed in your New York hotel over the

11    weekend.  I know that you have a residence

12    next door.

13    A       Well, they are both --

14            MR. GRIFFIN:  I object to the

15            form of the question.  Go ahead.

16    A       They are both very successful.  They

17    are both very well located.  They are

18    different in that Trump Towers is quite a bit

19    taller building.  Trump Towers is on 57 and

20    56th Street and Fifth Avenue. It is a retail

21    primarily, which Trump International doesn't

22    have.  It is a retail office and residential,

23    whereas the building you stayed at, Trump

24    International Hotel and Tower, is a hotel and

25    residential.  It doesn't have office and it
```

10

```
 1              Donald Trump

 2    doesn't have retail.

 3    Q       Do you agree, and I absolutely think

 4    that I know your answer to this, when you put

 5    the Trump name on a property, it brings

 6    immediate value?

 7    A       Yes.

 8    Q       The Trump factor, it has been called?

 9    A       Yes, that's been very well proven.

10    Q       There was -- I forgot the guy's name
```

11  that came up with the "Trump factor" as that
12  quoted language.  That Trump factor, have you
13  ever tried to put a dollar figure on it so
14  that you go out to the marketplace, whether
15  it is on your financials or however else one
16  would account for that; have you ever tried
17  to do that?
18  A      Well, we have looked into it and
19  reports have been done.  I don't have them
20  available now, but I think I could probably
21  find them, where there is a value
22  attributable to a Trump building.  I don't
23  know if that's because of the brand or
24  because of the locations or because of lots
25  of goodwill that's been built up over the

                                            11

1                   Donald Trump
2   years, but there is a value to the Trump name
3   being on a building.
4   Q      We were all excited in Tampa when you
5   came to put your name on the Trump Tower
6   Tampa.
7   A      So was I.
8   Q      We knew that value was going to be
9   brought to our home town.  When I grew up,
10  Tampa was not what it is today, 20, 30 years
11  ago.  When you came to Tampa, how did you

12  know that this was a right place for a Trump

13  Tower?

14          MR. GRIFFIN:  Object to the

15      form of the question.  Go ahead.

16  A       I was very excited also to be in

17  Tampa. A good friend of mine that passed

18  away, George Steinbrenner, loves Tampa --

19  loved Tampa.  He actually told me what a

20  wonderful site this was and what a great job

21  this would be.  George actually had a lot to

22  do with it.

23          Derek Jeter was somebody that told me

24  also it is great.  He lives in one of my

25  buildings.  He lives at Trump World Tower

                                                    12

1                Donald Trump

2   opposite the United Nations.  We have a lot

3   of the Yankees, traditionally, that have been

4   living in my buildings.

5           Derek was actually very excited about

6   it.  He expressed it one time.  George

7   thought it was a great site, a really good

8   site. I asked him about it specifically and

9   he was very excited that I was going down

10  there.  I was very excited that I was going

11  to Tampa.

12  Q       When you looked at those properties,

13  the Signature properties, clearly one cannot

```
14      make distinctions between what you, sir,

15      Mr. Trump, owned versus something else.

16              Can you point out for me from that

17      list of properties which are owned and

18      largely developed by you versus a license

19      arrangement like you had in that situation?

20      A       Sure.  You want me to start all of

21      them?

22      Q       If it is going --

23      A       We can do it quickly.  If you look up,

24      Trump National Golf Club is a hundred percent

25      owned by me.  Trump National of Bedminster
```

                                                    13


```
                         Donald Trump

1

2       is a hundred percent owned by me.  Trump

3       International of Palm Beach is owned by me a

4       hundred percent.  Trump Canouan is a licensed

5       deal.  That's a licensed transaction.  I

6       don't own that and I am not a partner in

7       that.  Some licensing deals, I consider

8       myself to be a partner and we are partners.

9               Trump Tower, I own that.  Trump Park

10      Avenue, that's my job.  Trump World Tower,

11      where Derek Jeter lives, is my job.  I own

12      that, I built that.

13              Trump International Hotel and Tower,

14      Number One Central Park West, where you
```

15    stayed, that was my job. I built that job.

16    Trump Place on the West Side, I built that

17    job with partners.  We had partners from

18    different places.

19          Trump Park and Trump Park East, that's

20    my job.  I built it.  Trump Palace in New

21    York, that's my job.  I built it.

22          16 Park Avenue, I did that with Colony

23    Capital, which is a big fund in California.

24    It was a very big success.

25          The Trump building at 40 Wall Street,

14

1                   Donald Trump

2    I own that building.  I own a hundred percent

3    of that building.

4          Trump Tower White Plains, that was a

5    licensing deal that I am -- that I have a

6    licensing fee for.  I am not a partner, per

7    se.  I have a licensing fee.  There is a

8    difference, which I am sure we will get into.

9          Trump Plaza New Rochelle, that was a

10    licensed deal.  Trump Soho, that's a

11    licensing deal, but I get a percentage of the

12    profits, so in a sense, I am a partner there.

13    Q    Kind of like Trump Tower Tampa

14    ultimately as amended -- excuse me?

15    A    I view a partnership to be when we get

16    a percentage of profits, when I have a

17      percentage of ownership, when I have --

18      beyond just a fee, beyond a flat fee, where

19      you get a flat fee for helping to -- for

20      using the name or for using the name and

21      helping with the building.

22           Trump Hollywood, that's a licensing

23      deal.  Trump Plaza Jersey City is a licensing

24      deal.  The estates of Trump International and

25      Los Angeles on the ocean, I own that.  Trump

15

1                     Donald Trump

2       International Hotel and Tower in Ft.

3       Lauderdale, that was a licensing deal.  Trump

4       Towers Sunny Isle, that's a licensing deal.

5       The Dubai project was partially licensed,

6       partial partnership.

7            The Trump International Hotel and

8       Tower in Chicago, I own that building.  It is

9       a big building and I own it.  Trump World

10      Tower in Soho, that was a licensing deal.

11           Trump National Golf Club, Los Angeles,

12      I own that.  Trump New Orleans, that's a

13      licensing deal.

14           Trump International Hotel and Tower

15      Waikiki -- it just opened two weeks ago.

16      That's a combination of licensing and other

17      things.  Trump International Hotel Las Vegas,

```
18        I own that.  Trump Tower Philadelphia, that's
19   a licensing deal.
20        Trump Tower Tampa, that's a
21   partnership, and I also get licensing fees,
22   but it was a partnership because I get a
23   substantial percentage of profits.
24        Trump Ocean Club is a licensing deal.
25   Trump Grande is a licensing deal.  Trump Las
```

16

```
 1             Donald Trump
 2   Olas is a licensing deal.  The Mar-a-Lago
 3   Club, I own.
 4        The Villa Trump in Brazil, I sold a
 5   couple of years ago, and Trump International
 6   Hotel in Toronto, that's a partnership.
 7   Other than that, I covered a lot of
 8   territory.
 9   Q    That was a lot of territory, sir.
10   Thank you for going through that.  Based upon
11   what you do in a given day and where you
12   manage your time, is there any distinction
13   whether it is an owned property or one that
14   you largely are developing, versus a
15   licensing deal or a partnership, as you kind
16   of described it?
17   A    Anything I put my name to is very
18   important.  If I allow my name to be used,
19   whether it is a partnership or whether it is
```

20      a licensing deal, they are all very important

21      to me.

22      Q       Because your name, that has value, and

23      if something happens to your name--

24      A       The name has a lot of value, and so

25      any time I use my name, whether it is a

17

1                      Donald Trump

2       licensing deal or whether it is something I

3       own and build myself, it is very important.

4       I mean, I don't break it up and say, oh, gee,

5       this is more important than that.  Anything

6       that I have my name on is very important.

7       Q       Do you agree with me that anybody

8       that's looking at investing or buying into

9       one of your properties, whether they are

10      licensed partnership or owned, has

11      expectations of quality, absolute?

12      A       That's true.

13      Q       Expectations that when you put your

14      name on something, it's going to be top

15      shelf, the best available?

16      A       That's true.

17      Q       Whether you actually come out of

18      pocket, Mr. Trump, and put your money in a

19      deal, from your perspective it doesn't

20      matter.  You are still going to commit a

21    hundred percent, or as my father used to say,

22    110 percent, to anything you put your name

23    to?

24    A    I think that's true, yes.

25    Q    There are also distinctions between

18

1              Donald Trump

2    the properties, a license deal and one you

3    own.  There are some distinctions?

4    A    There are legal distinctions.  There

5    are distinctions, I guess.  Each property is

6    in a different form.  I just went through a

7    lot of properties, and there are very few

8    that are similar.  There are many different

9    forms of ownership, partnership and licensing

10    deals.

11    Q    There are legal distinctions.  Do they

12    cause projects to have difficulties, whether

13    it be needing money, permitting, whatever the

14    various things, getting the best contractor

15    on the job, getting financing?  Are there

16    problems when you have distinctions legally

17    and the effect that those distinctions may

18    have on a property?

19             MR. GRIFFIN:  Object to the

20          form of the question.  Go ahead.

21    Q    Do you understand my question?

22    A    I would like it explained maybe a

23     little differently.

24     Q     I am a lawyer trained so I understand

25     when you say legal distinctions.  Legal

19

1                    Donald Trump

2     distinctions is -- for those who may watch

3     this, there is a clear distinction between a

4     licensing deal when you've endorsed or put

5     your mark to something and to which you on

6     the flip side of that own something.  Legally

7     that's a different document, correct?

8     A     Yes.

9     Q     Legally your name and you may have to

10    sign various guarantees when you are the

11    owner, correct?

12    A     Correct.

13    Q     Those distinctions, those legal

14    distinctions are going to have some effect on

15    the project, would you agree, from the

16    smallest to the largest?

17    A     Well, again, when I own something, I

18    work very hard to make sure it is successful.

19    If we license something and there are many

20    forms of licensing, but if we license

21    something we also make sure --you know, we

22    try our best to make it very successful.  It

23    is very important to us to have the license

24      deals also be successful.

25      Q       Those distinctions can cause trouble,

20

1                       Donald Trump

2       because if Donald Trump owns a project, owns

3       a building, owns a development, Donald Trump

4       can go out and get financing?

5       A       Yes, I can get financing generally.

6       Q       You have a variety of projects that I

7       have studied, whereas the owner of the

8       property -- you are not going to have trouble

9       getting financing for a project.

10      A       I think today everybody has trouble

11      getting financing for a project.  Actually

12      since the real estate depression, as I call

13      it, I mean everybody really has trouble

14      getting financing.

15      Q       Does that apply to you, sir?  Have you

16      had trouble on projects that you have owned

17      and developed?

18      A       I haven't done certain projects

19      because financing is not available.

20      Q       Okay.

21      A       Certain projects aren't done because

22      financing is just not available.

23      Q       Let's put out a couple of examples.

24      A       Go ahead.

25      Q       That were going up, Trump Tower Tampa

21

```
 1                    Donald Trump
 2    was going up or was coming out of the ground
 3    about the same time as some of the other ones
 4    that you were owning?
 5    A       Correct.
 6    Q       The ones that you were owning at the
 7    time you got financed, correct?
 8    A       Well, I would have to look at the
 9    individual jobs.  I mean, certain jobs didn't
10    get financed.  For instance, I was doing a
11    job in Dubai, and that was going to be built
12    by essentially the country of Dubai.  Now,
13    what's better than Dubai?  Guess what, they
14    went essentially bust.  They were taken over
15    by another country.
16            Who would have thought that job that
17    was Trump Palm built on the island of Dubai
18    and that job was a government job and they
19    weren't able to get financing for it.  That
20    was the country of Dubai.  Things happen.
21            I am just looking at another one,
22    Philadelphia.  They were unable to get
23    financing, a very strong partnership.  I will
24    say this, what I do strive to get are great
25    locations.  You know, when you get outside of
```

```
 1                    Donald Trump
 2     Manhattan, which is my base, it is very hard
 3     to do things without a partnership in the
 4     world of real estate because real estate is
 5     largely a local business.  The people in
 6     Tampa know the best sheetrock contractor,
 7     they know the best plumbers, they know the
 8     best roofers.  I don't.
 9          I know the Yankees because I go to see
10     Tampa.  I used to go a lot with George to the
11     Yankee games in Tampa.  But they know the
12     different contractors, so I always believed
13     in getting partners once I get too far
14     outside of my own realm, especially in places
15     like Dubai and other things, but also in
16     places like Tampa or Miami, et cetera.
17          We have had some very good partners,
18     but sometimes a market supersedes a partner.
19     When the market crashed, very many brilliant
20     real estate men went bust over the last few
21     years.  They essentially went out of
22     business.  They went bankrupt or out of
23     business.  That had to do with a very major
24     market condition and it is a tough period of
25     time for people.
```

1                    Donald Trump

2      Q      The Trump Hotel and Tower in Toronto,

3      the Trump Soho, Trump International Hotel in

4      Panama all got financing?

5      A      They did.

6      Q      Through the market crash, for lack of

7      a better description?

8      A      They did, but some didn't.

9      Q      Those properties that I just

10     mentioned, Toronto, Soho and Panama, all were

11     your own projects, correct?

12     A      Well, let's go over them.  Soho was a

13     licensed deal with a partnership interest

14     and --

15     Q      That's in your backyard.

16     A      A little bit like Tampa.  I have a

17     partnership interest and I also have a

18     license deal.  The other one you mentioned

19     was what?

20     Q      The Panama project.

21     A      No, the Panama project is purely a

22     licensed deal.

23     Q      That got financed?

24     A      That got financed.  It was just prior

25     to the depression.  They got their financing

                                              24

1                    Donald Trump

2    just in time.  Somebody said it was the last

3    bond issue done.  Now it is starting up again

4    with the bond issues, as you have been

5    reading.

6    Q     Sure.

7    A     That was the last bond issue.  That is

8    a license deal that got financed, a developer

9    in Panama.

10    Q     Toronto?

11    A     Toronto was a licensing deal that also

12    got financed.  A very rich developer from the

13    Toronto area is doing that job.  That is

14    going up and I think it is doing very well.

15    That got financed, yes.

16    Q     Did you have any opportunity to step

17    in to help with financing of this project,

18    Tampa?

19    A     The Tampa project?

20    Q     The Trump Tower Tampa.

21    A     What happened in Tampa, there was a

22    big problem, as I remember, with the

23    foundations, but that's a problem that's

24    always surmountable.  You can do that with --

25    I always say you have to throw some money at

                                                25

                    Donald Trump

1

2    it.  The real problem was the market was --

3    you know, it went from being very good to

4    being horrendous.  You know, the Tampa market

5    right now is in very bad shape.

6         Would I have stepped in?  Well, if I

7    did, it would have been a mistake, because if

8    the building had been built, it would have

9    been pretty problematic, as you know, because

10   all you have to do is look at the Tampa

11   market.

12   Q    But you pulled your name from it, so

13   once you pulled your name from it, I don't

14   care who you are, nobody is going to be

15   putting that type of money.

16   A    Yes, I took my name off.  As I

17   remember, they were -- you have to speak to

18   my attorneys about this, but we sent them a

19   legal notice to take the name off because of

20   certain obligations which they did not meet.

21   Q    But at that point they are dead in the

22   water once you pulled your name off; would

23   you agree with that?

24        MR. GRIFFIN:  Object to the

25        form of the question.  Go ahead.

                                          26

                    Donald Trump

1

2    A    I think they were -- I think the

3    market changed very radically prior to my

4    pulling the name off.  I think they tried

```
 5    very hard to make this job successful.

 6    Q       There were other projects that just

 7    got put on hold though during the market

 8    crash?

 9    A       Some get put on hold, some get

10    terminated and some get dumped. In this

11    particular case, they were having some very

12    serious market problems prior to my pulling

13    the name off.

14    Q       Las Olas in Ft. Lauderdale?

15    A       Yes.

16    Q       Am I saying it correctly?

17    A       Yes.

18    Q       That got put on hold; right?

19    A       That got put on hold.  That was a

20    license.

21    Q       It is not dead in the water?

22    A       Well, I think it is.  The market

23    killed it.  That was a licensing deal.  That

24    was -- I really have nothing to do with that

25    one.  That was put on hold.
```

27

```
 1                    Donald Trump

 2    Q       Have you pulled your name from it?

 3    A       I think it was terminated.

 4    Q       Sorry to interrupt.

 5    A       I think we had, yes.  Again, market
```

6   conditions made it impractical, really

7   impractical to build.

8   Q     Is that your final answer kind of

9   thing in this case, Tampa Trump was killed by

10  the market?

11           MR. GRIFFIN:  Object to the

12           form of the question.  Go ahead.

13  A     Well, I think the market was a

14  disaster.  The market in Tampa was record

15  bad.  It was as bad as Miami.  It was as bad

16  as other locations, and continues to be.

17  Certainly had the market -- let's put it this

18  way, had the crash, which we all know about,

19  which we all acknowledge, I think, had the

20  crash not occurred, this building would have

21  been built.  I have no doubt about that.

22  Q     Why do you say that?

23  A     I just think it would have been built.

24  Had the crash not occurred, I think this

25  building would have been built.

                                            28

1                 Donald Trump

2   Q     If you would have been the owner of

3   this project, would it have been dead in the

4   water, as it is now?

5           MR. GRIFFIN:  Object to the

6           form of the question.  Go ahead.

7   A     With the crash having taken place as

8     it did?

9     Q     Yes.

10    A     Yes.

11    Q     Everything staying equal, but changing

12    the fact --

13    A     I think probably the project would not

14    have been built.  I was a partner in the job

15    as it was.  I hated to see this job not get

16    built because it was a beautiful job in a

17    good location, but the market conditions

18    throughout the world were so bad that had it

19    been built, it would have been much worse.

20         Frankly it would have been much worse

21    for the people had they bought their property

22    and closed.  They would have lost a lot more

23    money.

24    Q     Is it your position in this case that,

25    yes, we had a market crash, particularly

                                        29


1                   Donald Trump

2     Tampa, and given the market effect there that

3     that's the distinction between your other

4     projects going up, whether you're licensed or

5     owned in comparison to Tampa?  It is just

6     location?

7                   MR. GRIFFIN:  Object to the

8               form of the question.

```
 9    A      I will give you an example.  In
10    Chicago, I built a big building, a much more
11    expensive building by -- I got that one
12    built.  The difference is that in Chicago I
13    got my financing just prior to the crash.
14    So, we built it during the crash, but I had
15    financing.  I was just about the only
16    building to get built in Chicago, but that
17    building was built because the financing was
18    secured prior to the crash.  Some buildings
19    weren't built like Dubai and others.
20    Q      When you had the line in the sand in
21    your head right before the market crash or
22    right on the eve of that in making
23    comparisons, is there a date or a time period
24    in your mind when you had to get your
25    financing before things went bad?
```

30

```
 1                  Donald Trump
 2                  MR. GRIFFIN:  Object to the
 3            form of the question.
 4    A      We can look up the date.  I don't know
 5    exactly what that date was, but there was
 6    basically a crash having to do with Lehman,
 7    and ultimately having to do with Bear
 8    Stearns, and it was a mess.  It was a very
 9    tragic period.  It was, you know, the second
10    greatest crash after the Great Depression.
```

11    We could have gone into the Great Depression,

12    but no bank was loaning money for anything,

13    let alone to build a condominium development,

14    whether it is Tampa or anybody else or

15    anyplace else, and that means virtually

16    anywhere in the world.  We are not talking

17    about Tampa.  This is not a Tampa problem.

18    This was a worldwide problem.

19    Q      I guess what I am thinking off the top

20    of my head is the crash is over here and

21    Trump Tower Tampa had a ton of time to get

22    its financing in place before the crash

23    occurred.  Do you agree with that?

24    A      I think what they were doing was they

25    were making sure everything was good.  Again,

31

1                    Donald Trump

2    you would have to ask them.  The developing

3    group was, from what I have found out, this

4    is a little bit subject to checking.

5    Q      Second-hand?

6    A      It is second-hand, but they were

7    working very hard, I will say that.  They

8    were really trying to do a really good

9    project.  They wanted everything perfect and

10    they figured they could get their financing

11    because history shows there is a long window

12    for getting financing.

13         Then one day Lehman went bad, Bear

14    Stearns went bad, and the entire market

15    crashed.  Yes, I think they would have gotten

16    their financing had we not had that.  I think

17    they probably felt, like many people, you are

18    not the only ones; if they wait, they will

19    get a better deal.  But what happened is they

20    did wait and the market crashed.

21         A lot of people were in that same

22    position.  They wanted their plans perfect.

23    They wanted their plans and specifications

24    perfect.  They waited and frankly.  Getting

25    financing was easy.  Getting financing was

                                              32

1                   Donald Trump

2     easy for jobs like this, for any of the jobs.

3     Then one day there was a crash and you could

4     not get financing, so I don't think they did

5     anything different than many, many developers

6     throughout the country and throughout the

7     world.

8          They were getting their plans and

9     everything ready.  They were focused on the

10    job.  They were doing sales and presales and

11    then the market crashed.

12    Q     The Chicago property has your personal

13    guarantees, correct?

```
14      A       Limited, limited guarantees, but it
15      had some guarantees.
16      Q       Donald J. Trump, you, sir, guaranteed
17      to a certain extent, whatever that extent is?
18      A       But again, that financing was
19      gotten -- I had limited guarantees, very
20      limited, but that financing was gotten prior
21      to the crash.  Same thing with my Las Vegas
22      job.  I built that also, and I owned that.
23      Q       Personal guarantees?
24      A       Very limited, completion, but that
25      was, I got that financing prior to the crash.
```

                                                33


```
1                       Donald Trump
2       Had I not, I wouldn't have been able to have
3       gotten that done.
4       Q       That was a huge project, was it not?
5       A       Big project, sure, both of them.
6       Q       There were no personal guarantees from
7       you for the Trump Tower Tampa, correct?
8       A       None whatsoever.
9       Q       In the other license deals --
10      A       In fact, I don't even know how I am in
11      this case personally, okay?  So you will have
12      to explain that to me.
13      Q       I will be glad to.
14      A       You will have to explain that to my
```

15    lawyer.  I had absolutely no personal

16    guarantees.

17    Q      Very good.  In your other licensing

18    deals, do you -- putting aside the Trump

19    Tower Tampa for a minute, those other

20    licensing deals, whether they are just

21    straight licensing fees versus a partnership,

22    do you, sir, or your company disclose to

23    those buyers that you're merely licensing

24    your name?

25           MR. GRIFFIN:  Object to the

                                                    34

1                     Donald Trump

2            form of the question.  Go ahead.

3    A      I think in some cases we do. I am just

4    not sure.

5    Q      Tell me what you know.

6    A      I really don't.  I mean, I really

7    don't.  As I told you before, whether I

8    license or whether I own, we work very hard

9    to make sure the building is going to be a

10    really good building.  I don't know, every

11    deal is so different.  Each deal here, every

12    one of these deals is a totally different

13    deal.  Real estate is a complex subject and

14    every deal is a different deal.

15    Q      The licensing agreement in this

16    particular case, Trump Tower Tampa with

17    Simdag, had a very structured confidentiality

18    that nobody to the agreement could disclose

19    the terms of it?

20    A    Correct.

21    Q    Especially some of the key terms that

22    went into the termination letter that was

23    sent out prior to your lawsuit with Simdag.

24    Do you know, sir, whether that similar

25    confidentiality agreement or provision is in

35

1                    Donald Trump

2    other licensing agreements?

3    A    I think I have it in every one or

4    almost every one.  Confidentiality is very

5    important.  I don't want my competitors to

6    know my deals.  I don't want them to see what

7    deal I am making in Tampa, what deal I am

8    making in Panama, what deal I am making in

9    New York, what deal I am making throughout

10    the world.  So, we have confidentiality in

11    many of our deals, if not all.  I mean, you

12    would have to ask my lawyer that question,

13    but we have -- confidentiality is very

14    important.

15    Q    Regardless of the structure, the terms

16    of your licensing deals that I absolutely

17    agree would be confidential to the extent of

18    dollars being paid, what the terms are, but

19    the general sense of disclosing to ultimate

20    buyers on the street that want to go live or

21    invest in a Trump property, in these other

22    licensing deals, putting aside Trump Tower

23    Tampa, do you disclose to buyers your actual

24    involvement owner versus a licensing

25    arrangement?

                                          36

1                    Donald Trump

2              MR. GRIFFIN:  Object to the

3         form of the question.

4    A     Each deal is different.  I would love

5    to give you one answer, but every deal is

6    totally different.  As an example, every

7    deal, many of the deals I have different

8    lawyers.  I have lawyers where this gentleman

9    is not involved.  I have a different set

10   that's involved in California.  I have

11   different sets that are involved and they

12   have their own way of doing things of the

13   each -- and Dubai I had lawyers from --

14   Q     Dubai?

15   A     Dubai.  We have good lawyers, but they

16   all have their own way of doing things.  And

17   probably, again, I wouldn't know the answer

18   to this, but there are probably different

19   disclosures for different deals.

20    Q    I don't want you to guess because we

21    are not here to take guesses.  It helps

22    nobody on either side.  My question is more

23    focused to what you know as you sit here

24    right now.  Do you know if you disclosed in

25    these other licensing deals your actual

37

1                    Donald Trump

2    involvement as a licensor of the name?

3    A    I don't know.  I really don't.

4    Q    Do you know whether you disclosed the

5    licensing arrangement in general sense,

6    without necessarily the terms, to anyone with

7    respect to the Trump Tower Tampa?

8    A    I really don't know.  I really don't

9    know.

10    Q    Do you recall ever discussing in any

11    way, shape or form, you personally, to anyone

12    that this was just a licensing arrangement?

13                    MR. GRIFFIN:  Object to the

14              form of the question.

15    A    I don't think -- first of all, when

16    you say just a licensing, I don't consider

17    this to be just a licensing deal.  I consider

18    myself to be a partner in the Tampa deal.  I

19    have told you other cases where I was a

20    licensor, I was purely a licensor.  In the

21      Tampa deal I got a major percentage of the

22      profits from the deal.  We worked very hard

23      on the design of the building.   My staff

24      worked very hard to make sure the ceiling

25      heights were right, the windows -- a lot of

38

1                      Donald Trump

2      different things went into this building.  It

3      was a complicated building, but it would have

4      been a beautiful building had it not been for

5      the market crash.

6              I don't consider this to be merely a

7      licensing deal.  I consider, really, being a

8      partner in this deal because of the fact that

9      I share a major percentage of the properties

10      in the deal.

11      Q      You would expect those who were

12      investing and buying the property to have

13      those expectations, given your name was put

14      to the project, that you were partner

15      quality --

16      A      No, I wouldn't expect that.  I would

17      say if somebody were to ask, they could be

18      told, but in the case of Tampa, I really

19      considered -- Tampa, we worked harder in

20      Tampa than we worked on most jobs.  In Tampa

21      I considered myself to be a partner because

22      we shared in the profits.  I don't usually --

23    I don't always do that.  Sometimes I do,

24    sometimes I don't, but when I start sharing

25    in profits, we really -- that really is in

39

1                    Donald Trump

2    the form of a partner.

3    Q      Would you expect people buying or

4    investing in a Trump property like Trump

5    Tower Tampa, would you expect them to know

6    the distinction between you as a licensing

7    partner and an owner?

8                    MR. GRIFFIN:  Object to the

9                    form of the question.  Go ahead.

10   A      I think they knew that I wasn't down

11   there building the building.  People didn't

12   expect that I was going to be spending the

13   next two years in Tampa building the

14   building.

15   Q      I am sorry, you are right.

16   A      I think they felt confident that I was

17   not going to be in Tampa building the

18   building.  They also knew of Simdag.

19   Everybody knew of Simdag.  The developers

20   were very well known in the area and

21   respected in the area.  I think they knew

22   that Donald Trump wasn't the person that was

23   going to be down there building the building.

24    Certainly they didn't think -- I never got a

25    call from somebody saying why aren't you down

                                                    40

1                         Donald Trump

2    there building this building.  Nobody

3    expected it.

4    Q        Is there such a thing as Donald Trump

5    building the building in any of these

6    projects?

7    A        Sure.

8    Q        Can you name one?

9    A        Chicago.

10   Q        Chicago, where you are actually on

11   site?

12   A        Yes, well -- no, not on site, but I

13   went there a lot.  I was building the

14   building, my people were building the

15   building.  Las Vegas, my people were building

16   the building.

17   Q        When you say your people?

18   A        People that worked for me directly,

19   people that I paid a salary to.  They were

20   building that building.

21   Q        What makes you say that the buyers --

22   forget the buyers for a second.  Tampa, from

23   the mayor all the way down, did not expect

24   that Donald Trump would be building this

25   building.  What makes you say that?

41

```
1                     Donald Trump
2     A     Well, I just feel that, number one, I
3     think that was the perception, that I wasn't
4     building the building.  I think there were
5     numerous articles, press articles that I
6     wasn't building the building, per se.  I
7     wasn't building it.  I would say that that
8     would be to me, that would be the perception.
9          If somebody were to ask or if somebody
10    were to call my office, I would certainly say
11    that I am not building the building.  If they
12    ask whether or not I was a partner in the
13    building, I would say yes, I got a percentage
14    of the profits in the building.  I had a big
15    stake in the building.  I had a very big
16    stake in the building, but because
17    development is a local business, it was
18    better that local people were building the
19    building than me because I don't know the
20    sheetrock contractors and I don't know the
21    plumbers and the roofers and the people in
22    Tampa. I don't know them.  I wouldn't be as
23    good building the building as a local group.
24    Q     I think you said this already, but I
25    just want to be crystal clear in my head.  In
```

```
 1                    Donald Trump
 2    your opinion, sir, you personally, did you
 3    think the deal in Tampa was dead before you
 4    pulled your name from the project?
 5                    MR. GRIFFIN:  Object to the
 6              form of the question.  Go ahead.
 7    A       I didn't know it was dead or not.  I
 8    know that we sent out a notice I guess that
 9    was based on a default, that they had not --
10    Q       Paid you.
11    A       They had not paid us.  They had run
12    into terrible market conditions and I
13    understood that and they had not paid us.
14    Q       How much did you ultimately get out?
15    I know it is probably confidential in Simdag.
16    I know it went to mediation and ultimately
17    resolved and the file is closed.  I don't
18    know if there is anything dangling.  I don't
19    know if your lawyer has any instruction for
20    you, and I want to give an introduction to
21    that, to the extent you are going to instruct
22    him so wait.
23                    MR. GRIFFIN:  Let me just, if I
24              may, if you are going to get into any
25              specifics about the settlement of
```

43

```
 1              Donald Trump
 2       other lawsuits, it is confidential.  I
 3       will instruct him not to answer on
 4       that basis.
 5   Q    Let me lay the question out.  Take the
 6   instruction and we will deal with it later,
 7   okay?
 8   A    Okay.
 9   Q    Did you settle your lawsuit with
10   Simdag?
11            MR. GRIFFIN:  I will instruct
12       you not to answer.
13   Q    Yes or no, either way?
14            MR. GRIFFIN:  Look, I will
15       stipulate that the lawsuit was
16       dismissed.  Beyond that I am not going
17       to let him answer any questions.
18   Q    Understood.  Next question, did you
19   settle your lawsuit with Dr. Shahanassarian's
20   wife?
21            MR. GRIFFIN:  I instruct you
22       not to answer.  I object on the basis
23       of confidentiality.
24   Q    With respect to any ongoing litigation
25   with respect to those projects that were
```

44

 1              Donald Trump

```
 2     licensing arrangements, have you settled any
 3     of those lawsuits?
 4              MR. GRIFFIN:  I am going to
 5          have to speak to Mr. Garten.  I don't
 6          know anything about other lawsuits,
 7          whether we can -- so give me a second.
 8              MR. CLARK:  Sure, let's take
 9          two minutes.  We can table it and just
10          keep moving.
11              MR. GRIFFIN:  Good idea.
12     Q     You sued Simdag, as I read the lawsuit
13     and the pleadings, because they did not pay
14     you the licensing fee, is that correct, or
15     were there other reasons?
16     A     I would rather have you ask my lawyers
17     because--
18     Q     I am only asking you what you know.
19     If you don't know, that's completely fine and
20     understandable.
21     A     We sued them for various reasons, I
22     guess, and I would rather have you refer to
23     my lawyers on what exactly took place.  I
24     don't want to be inaccurate.
25     Q     One of the things that was disclosed
```

45

```
 1              Donald Trump
 2     in this case, and I won't bore you with all
```

3   the procedural steps in the Federal case, it

4   is disclosed to us that your son Mr. Trump

5   Jr., possesses general information about the

6   amendment that was the first amendment that

7   went to the licensing arrangement.

8         I thought it was kind of awkward that

9   in the disclosures you possessed the

10  background going into the original agreement

11  and that your son possessed information

12  separately about the amendment.  Is there a

13  distinction, in your mind, about what you

14  know with respect to the original agreement

15  and the amendment, or am I just off base?

16  A     My son became involved with the job

17  over a period of time so he would know

18  something about the job.

19  Q     The distinction between the two

20  documents, as I see it, the licensing

21  arrangement on solid dollars went from

22  2 million to 4 million.  Do you know the

23  chronology of events that led to that?

24  A     I do not.

25  Q     Would he know that, if you know?

                                              46

1                 Donald Trump

2   A     I sort of doubt it.

3   Q     The licensing arrangements that you

4   pointed out for these projects, who came up

5    with the idea of licensing your name?

6    A    I did.

7    Q    Can you take us back in time when that

8    came about?

9              MR. GRIFFIN:  Object to the

10             form.

11   Q    Is there a time period in your mind

12   and you said -- this is me talking -- I've

13   created a great name from hard work, value,

14   all the things that we have read about and

15   know about of you, sir, that I am going to go

16   out and license my name and give people

17   quality without actually having to put and

18   investing dollars in the project?

19   A     It took place years ago.  I had done a

20   good job.  We have had great success, and I

21   think the brand has become very valuable,

22   only enhanced very greatly by the Apprentice,

23   which you watched the other night.  I

24   appreciate your telling me that.  And the

25   brand has been enhanced by the great success

                                          47

                    Donald Trump

1    of the Apprentice and Celebrity Apprentice on

2    television.

3              Years ago, we started -- people would

4    come to us and they say, you know, we want to

5

6    build a building in a certain location in

7    Waikiki and we would like to use the Trump

8    brand or we want to build a building

9    someplace else and we want to use the Trump

10    brand.

11        All of a sudden, we started making

12    some deals which were licensing deals, some

13    deals which were licensing and partnership

14    deals.  It is very funny because almost all

15    of the deals are different.  I mean, I can't

16    think of -- it is not just like a

17    boilerplate, where you just sign.  Every deal

18    is different.  Some people have cash and they

19    would rather pay cash.  Other people don't

20    have cash, they would rather pay a percentage

21    over a period of time.  Some people would

22    rather have you as a partner and give you a

23    piece of the deal or a piece of the profits.

24    Each deal is very different.

25    Q    The dollars of how you value licensing

48

1                Donald Trump

2    your name, whether it is just a straight fee

3    versus a partnership, is there a value that

4    you put into each deal?  Is there some kind

5    of calculation that you go in and say, okay,

6    guys, are you coming to me, hypothetically?

7    A    Yes, it is very ad hoc.

8      Q       Really?

9      A       It depends on the developer, it

10     depends on the location, it depends -- as an

11     example, we did a deal in New Orleans, a

12     licensing deal and, like, almost -- I may be

13     wrong on this a little bit, but a few days

14     later it got hit by the big hurricane, the

15     disaster.  They paid a lot of money to go in.

16     I think it was $2 million up front.  I called

17     them, I said do you want your money back.

18     They said, no, no, we are going to build this

19     job, and that was, like, how many years ago.

20     Years ago.

21     Q       Five, six?

22     A       They are still working on that job.  I

23     think they are going to get it built.  It is

24     amazing.  They didn't want their money back.

25     Things happen.  In that case it was Katrina.

                                                          49

1                      Donald Trump

2      But things happen.  That was an amazing one

3      because we had made the deal, and I remember

4      reading or hearing that there is a big

5      hurricane coming into New Orleans.  I called

6      them up I said you guys okay.  They said no

7      problem.  The next day it was like a

8      disaster.

9        Whether it is Katrina or whether it is

10    a depression, which is what we had a few

11    years ago, a couple of years ago, things stop

12    jobs and they also help jobs get built.  Good

13    things happen also.  Like, the market goes

14    up.  Lots of things happen in real estate.

15    It is complicated and it takes a long time.

16        It is not like you wave a magic wand

17    and the building appears.  Buildings take

18    years and years and years to develop and to

19    get going, and market forces can change the

20    success or failure of a building.

21    Q    The Trump brand that we are talking

22    about and the value we are talking about, do

23    you think buyers and investors in your

24    property expect the brand to pay returns in

25    value?

50

1                Donald Trump

2    A    I think they value the brand, yes.

3    Q    If you take your brand with you from a

4    project, whatever it may be -- this happened

5    to be one example, but I am not tying it to

6    it -- you lose value, it is not a Donald

7    Trump brand property, correct?

8    A    What do you mean?

9    Q    If you take your name off it?

10    A    If I take my name off.

11    Q     If you went to the hotel that I stayed

12    at and pulled your name from it and put some

13    other person there, that loses value?

14    A     Well, when we took our name from the

15    Tampa job, it looked like the market had

16    destroyed that job, so I don't know that it

17    lost value.

18    Q     You would agree, if you yank your

19    brand name from a project, it loses value

20    that day.  Do you agree with that?

21    A     I think the projects are more valuable

22    if my name is on them, yes.

23    Q     The flip side of that, not to try to

24    heckle you with questions, if you pull your

25    brand name from that, there goes the value as

51

                    Donald Trump

2     well?

3     A     I don't say there goes the value, but

4     I think the brand has a value.  It doesn't

5     mean it won't be successful without the

6     brand.  A job can go up without my brand and

7     be very successful also.

8     Q     The deal that was structured for Trump

9     Tower Tampa put a price point in place for

10    units square footage.  With your Trump brand

11    on that project, you well exceeded the square

http://media40.myvq.net/media/resources/2011/Apr/21/Trump_Transcr.

12     footage value, correct?

13     A      I don't remember.

14     Q      You don't remember.  Well, you can

15     assume it because I looked at the numbers.

16     A      I think so.  I am not surprised.  It

17     has happened elsewhere.

18     Q      It seems to me that you can go into a

19     project, and tell me if I am wrong, and look

20     at a project, look at the market, see what

21     the market retails at and say if I put my

22     brand here it is going up 20, 30 percent, and

23     then you put that into the equation of your

24     agreement so that you take a piece of that if

25     you are partnering, correct?

                                                52

1                     Donald Trump

2      A      Very complicated.  It is a very

3      complicated -- there is no formula.  Each job

4      is different.  Each job is totally different.

5      It depends on the developer, the location,

6      the city, the area.  Some don't have very

7      much cash, some have a lot of cash.  Each job

8      is different.  Every one of these jobs is

9      different.

10     Q      My example of going to the

11     marketplace, knowing your square footage of a

12     normal development, and knowing the Trump

13     brand is going to increase that retail value,

14    does that go into your equation when you are

15    doing the deal?

16    A    Maybe subconsciously, yes.

17          MR. CLARK:  Let's take a

18    two-minute break.  Let your lawyers

19    talk real quick.  If you want to make

20    any calls, please feel free.

21          THE VIDEOGRAPHER:  Going off

22    the record at 10:57 a.m.  End of tape

23    number one.

24          (Whereupon a brief recess was

25    taken.)

53

1             Donald Trump

2          THE VIDEOGRAPHER:  Returning to

3    the record 11:05 a.m., beginning of

4    tape number two.

5    Q    I'm going to show you, this is just

6    one example of what I call the silver book.

7    One of the things that was handed out and

8    what was identified as Chris's Exhibit 1, the

9    first exhibit -- excuse me, the first

10    exhibit, Exhibit 1, was the New York Times

11    Magazine.

12          This one will be Exhibit 2.  I will

13    call it the silver book.

14          MR. GRIFFIN:  That's fine.  By

```
15              the way, so the record is clear,

16              Mr. Trump, what is the date of that

17              New York Times Magazine?

18      Q       October '06.  It is on the front page

19      right under --

20                     MR. GRIFFIN:  Sure.

21                     (Whereupon silver book is

22              marked Plaintiff's Exhibit 2 for

23              identification as of this date.)

24      Q       Have you seen this book before?

25      A       Yes, I have.
```

                                                                54


```
1                      Donald Trump

2       Q       When you came down to Tampa initially

3       for your one visit you were in Tampa that got

4       so much coverage, this was what was available

5       to everybody showing up that night; do you

6       recall that?

7                      MR. GRIFFIN:  Object to the

8               form of the question.

9       A       I think that's right, yes.

10      Q       Whether you had already laid down a

11      reservation or put money down, this was being

12      put out on the marketplace?

13                     MR. GRIFFIN:  Object to the

14              form of the question.

15      A       I believe that's true.

16      Q       All the marketing -- I have read the
```

17    agreement, and as lawyers we all know what

18    certain things mean, but with respect to your

19    marketing for this particular project, Trump

20    Tower Tampa, were you personally reviewing

21    all the stuff that was going to be putting

22    out to the marketplace?

23    A    I wouldn't say everything, but a lot

24    of it, yes.

25    Q    Who was in charge of making sure it

                                              55

                        Donald Trump

1

2    was being done right?

3    A    I would say my -- from my

4    organization.

5    Q    From your group?

6    A    I would think my son Don Jr. more than

7    anybody else.  Myself and my son.

8    Q    The things that get said about you and

9    things that are quoted from you, do you have

10    somebody in your organization that tracks

11    that to make sure people were doing it right?

12                MR. GRIFFIN:  Object to the

13          form of the question.

14    A    We like to say the right thing, but I

15    don't know that we have anybody that actually

16    tracks it, no.  I don't think we would have

17    anybody that tracks it.

18   Q     As I am sitting here, I am thinking

19   our President gets a briefing every morning

20   about what is going on.  Do you have

21   something like that, where somebody briefs

22   you on a weekly, monthly, daily basis of what

23   is being out there, put out there?

24   A     No.

25   Q     About you or maybe you being quoted?

                                        56


                        Donald Trump

1

2    A     No.

3    Q     When something is submitted by your

4    organization or you, whether it be the

5    simplest to the more detailed, like that

6    book, do you have somebody checking the

7    accuracy of it?

8    A     Within reason.  I mean, it is a big

9    organization with a lot of different

10   development, so only within reason.

11   Q     Do you know if anything was marketed

12   incorrectly, quoted wrong with respect to the

13   Trump Tower Tampa?

14                MR. GRIFFIN:  Object to the

15                form of the question.

16   A     Not to my knowledge.

17   Q     Have you had anybody look?  There has

18   been a massive amount of stuff produced in

19   this case.  Has somebody gone and reported to

20        you -- and wait for your instruction, because

21        if you are getting an instruction or

22        direction from your lawyer listen to it --

23        has anybody reported to you that something

24        was done inaccurately?

25                    MR. GRIFFIN:  I'm going to

                                                        57

                            Donald Trump

1

2                    instruct you not to answer any

3                    communications that you have had with

4                    your lawyers, whether it be Alan,

5                    myself or anybody else on your legal

6                    staff, with respect to a response to

7                    Mr. Clark's question.

8        A        Not to my knowledge.

9        Q        One of the projects, Las Olas -- is

10       that how you pronounce it?

11       A        Las Olas.

12       Q        Ft. Lauderdale.

13       A        Yes.

14       Q        Put on hold.  That's a licensing deal,

15       licensing fee deal only?

16       A        I believe so, yes.

17       Q        Is that on this?

18       A        Yes, it is on the left-hand corner.

19       Q        Beach Resort, Ft. Lauderdale.  That

20       was a project, again, just so 1 am crystal

21   clear in my head, was this a licensing fee,

22   not a partnership?

23   A      I believe that was a licensing fee,

24   yes.

25   Q      Have you been deposed in that case

                                                          58

                          Donald Trump

1

2    yet?

3    A      No.

4    Q      This is the first time you have been

5    deposed in any of these disputes over

6    projects and licensing and whatnot?

7    A      We have won most of the cases.

8    Q      Good.

9    A      That's the good news.  So, I haven't

10   had to -- it is amazing.

11   Q      May I have a moment.  Keep everything

12   like that.  I will ask the court reporter, if

13   she would, this is the same Exhibit 1, the

14   New York Times Magazine.  Will you be able to

15   get that, if you can?  Step back a little

16   bit.  The general sense of what we have been

17   talking about, sir, is your property and the

18   value that your brand brings to a project.

19   You would agree with me there is no

20   distinction in this short little ad, this one

21   distinction between licensing and owning,

22   correct?

```
23    A     Correct.

24    Q     In fact, nothing in your marketing

25    that you do individually or through your
```

                                                        59

```
1                     Donald Trump

2     organization makes that distinction; is that

3     correct?

4                     MR. GRIFFIN:  Object to the

5                form of the question.

6     A     I don't really know the answer to

7     that.  I mean, some may say something, so I

8     can't answer definitively, but overall, and

9     as I told you before, if we do a licensing

10    job or if it is a job that I own, they are

11    both of equal importance to me.  I want to

12    make sure it works out well.

13    Q     Because of what the slogan here is,

14    the finest properties from your name?

15    A     Correct.

16    Q     With respect to the properties here,

17    we went through some of them and you

18    mentioned licensing arrangements for a host

19    of them, correct?

20                    MR. GRIFFIN:  Object to the

21               form of the question.  Go ahead.

22    A     We went through all of them.

23    Q     All of them, but a lot of them were in
```

24      fact licensing deals?

25      A      Yes.

                                        60

1                       Donald Trump

2       Q      Whether it is a licensing fee or

3       indeed a partnership arrangement?

4       A      Some were licensing, some were

5       ownership, yes.

6       Q      Again, no distinction, as far as you

7       know, in this piece; an asterisk, a footnote

8       nothing to make the distinction?

9       A      That's correct.

10      Q      The properties, as you have it, all

11      have value because your brand name is added

12      to them, correct?

13      A      There is a value.

14      Q      If you pull that brand name from those

15      projects, they lose value, correct?

16                     MR. GRIFFIN:  Object to the

17                     form of the question.

18      A      It depends, again, if the market is

19      going up.  And if I pull my name but the

20      market is going up, I think you will

21      recapture any value that's lost, if there is

22      a value that's lost, but, yes, I think my

23      name has value.

24      Q      Again, the distinction, I want people

25      that may watch this in Tampa to hear it from

61

1                    Donald Trump

2        you, if you would.  If you pull your name,

3        everything being equal, from a project, value

4        goes down?

5                    MR. GRIFFTN:  Object to the

6                    form of the question.

7        Q       Correct?

8        A       I don't know that that's necessarily

9        correct.  This was a development that was

10       killed because of market conditions.  It

11       was -- sadly, I mean, because I wanted to do

12       it very much.  I wanted to do it to a certain

13       extent because of George Steinbrenner, who

14       was a friend of mine, who was a very good

15       friend of mine.  This was a job that was --

16       the Tampa job was killed because of market

17       conditions.  It wasn't going to get built

18       whether it had my name or not.  I don't think

19       it was any less valuable or more valuable

20       whether or not it had my name.  This was a

21       dead job.

22             The market crash killed this job.  Had

23       the market not crashed, had Lehman not gone

24       bankrupt, had Bear Stearns not gone out of

25       business, had the world and the stock market

1                    Donald Trump

2    not gone down by 60 percent or whatever it

3    was, this job would have been built.  This is

4    like thousands of other jobs in the United

5    States.  It went bad because of market

6    conditions.  Had that not happened, this job

7    would have been built, so I don't think it

8    mattered whether my name was on it or not.  I

9    don't think it hurt the value of the job that

10   I pulled my name, because they did whatever

11   they did as the people I am talking about,

12   the representatives in Tampa.  The job had no

13   value because of market conditions.  It had

14   no more value or less value because my name

15   was on it at that point.

16   Q       Of all the properties up there, Trump

17   Tower Tampa is the only one dead in the

18   water?

19                    MR. GRIFFIN:  Object to the

20            form of the question.

21   A       I didn't say that.  I mean, I told you

22   there were numerous other jobs up there that

23   didn't get built.  This ad was from years

24   ago.  This ad was in the go times when

25   everything was getting built.

http://media40.wnyc.net/media/resources/2011/Apr/21/Trump_Transcr.

```
1                    Donald Trump
2          As I told you, Dubai, who would think
3     that Dubai was going to--
4     Q     Leaving Dubai out of it?
5     A     Okay, Las Olas didn't get built.
6     Q     It is not dead in the water?
7     A     It is dead in the water.  I think it
8     is dead in the water.
9     Q     Okay.
10    A     Philadelphia didn't get built.
11    Q     We have not talked about Philadelphia.
12    A     No, I think --
13    Q     Was that a licensing deal?
14    A     Philadelphia was a licensing deal that
15    did not get built because it hit the wrong
16    market.  Philadelphia was going to get built.
17    It was a wonderful job in a wonderful
18    location.  Lehman Brothers went bankrupt and
19    it and never got built.
20    Q     None of your properties that you owned
21    are dead in the water.  Maybe Dubai, based
22    upon what you described?
23    A     Dubai is dead in the water.  Forget
24    about me owning it.  It was owned by the
25    government of Dubai.  Who would think that
```

64

```
1                    Donald Trump
```

2       they would go under?

3       Q       None of the properties that you own

4       are dead in the water?

5                       MR. GRIFFIN:   Object to the

6               form of the question.

7       A       By the way, even if they got built,

8       they are worth much less money than they

9       would have been.  As an example --

10                      MR. GRIFFIN:   Dan, please let

11              him finish his answer.

12      A       As an example, had we built the Tampa

13      job, had everybody paid millions of millions

14      of dollars for their units based on old

15      pricing, right?

16      Q       Right?

17      A       They would have lost much more money

18      had we built the job than losing their

19      deposit.  They would have lost much more

20      money because the apartments -- they would

21      have paid, during good times, they would have

22      paid $2 million for their apartment.  That

23      apartment today would be worth $500,000.

24      They were better off losing their deposit.

25      Q       That's the ups and downs of real

                                                        65

1                       Donald Trump

2       estate.  In 10 years, 15 years, who is to say

3      that that value returns, sir?

4                    MR. GRIFFIN:  Wait --

5      A     Your lawsuit is as of now.

6      Q     Understood --

7                    MR. GRIFFIN:  Mr. Trump, and,

8              Dan, please, you guys are kind of

9              talking over each other.  Let him

10             finish the question, let him finish an

11             answer.  Please, let's kind of slow it

12             down.

13     Q     Your analysis that you just gave us

14     takes out the fact that real estate.  We

15     don't know where it is going to be in 10 or

16     15 years.

17                    MR. GRIFFIN:  Objection to the

18             form of the question.

19     Q     Correct?

20     A     It might go down.

21     Q     It might go up?

22     A     It might go down.  So far I have been

23     right.  It has been going down.

24     Q     You would agree -- maybe you don't --

25     it is better to have something you can touch,

                                                         66

                          Donald Trump

1

2      open a door to then have nothing in hand?

3                    MR. GRIFFIN:  Object to the

4              form of the question.

```
5    A      I disagree in this case.  The

6    apartments were sold at a very high price

7    during a very good portion of the market,

8    when the market was raging.  This was before

9    Lehman Brothers went bankrupt, Bear Stearns,

10   et cetera.  Those prices today, had they been

11   bought by the people that you represent,

12   those units would be worth 60 or 70 percent

13   less today.  With or without the name Trump,

14   they would be worth 60 or 70 percent less.

15   If somebody paid two or $3 million for a

16   unit, that unit would be worth 60 or

17   70 percent less.

18          By the way, that's just Tampa.  That's

19   the whole country.  Some sections are a

20   little bit better than others.  New York is

21   better than other sections, as the example,

22   but Tampa got hit very hard by the

23   depression.  Those units would be worth a

24   tremendous amount less had they bought them.

25   In other words, had they put up their
```

67

```
1                    Donald Trump

2    $2 million, their $2 million would now be

3    worth five or $600,000.

4    Q      Not to continue to debate--

5    A      To be honest with you, they were
```

6   better off that the building wasn't built.

7   Q      Your value in the hotel here in New

8   York City from that stake would arguably be

9   less because of the marketplace, correct?

10   A      I am going by the Tampa market.  I am

11   saying the Tampa market got hit very, very

12   hard, as bad as any market in the country,

13   and a $2 million r apartment in Tampa would

14   be worth about five or $600,000 today.  The

15   best thing that happened to your clients was

16   that the building was not built.

17   Q      Trump Tower Tampa sold out though from

18   reservation-wise money down?

19   A      That's right, at very high prices, and

20   those prices today are worth 70 percent.

21   Sixty, 70 percent less than that sell out.

22   Q      You've gotten an undisclosed number

23   out of this project, correct?

24           MR. GRIFFIN:  Wait, wait, wait.

25           Counsel looked at me, the settlement.

68

1                  Donald Trump

2           MR. CLARK:  The settlement,

3       whatever what's been paid in.

4           MR. GRIFFIN:  I am going to

5       tell Mr. Trump to not answer any

6       questions regarding any settlement of

7       this or any other case.  I would ask

```
 8              that we not address and I will stand
 9              by the objection and the instructions.
10      Q      I'm with you.  My point is I don't
11    know the exact number that you have been
12    paid, because I do know what was accounted
13    for up to your lawsuit but I do not know, and
14    your counsel has instructed you not to tell
15    me, whether you were paid anything.  So,
16    that's a number that you pulled out of this
17    project?
18              MR. GRIFFIN:  No, it is not.  I
19              am telling you that we are not
20              answering.  We have not disclosed any
21              information about any number, whether
22              it was received at all or not.  You're
23              saying something that doesn't have a
24              factual basis.
25              MR. TURKEL:  So the record is
```

                                                                69


```
 1              Donald Trump
 2    clear, you are taking a
 3    confidentiality position on licensing
 4    fees pre-default?
 5              MR. GRIFFIN:  No.
 6              MR. TURKEL:  You are taking a
 7    position on anything that may have
 8    happened post-default, post-loss.
```

```
 9              MR. GRIFFIN:  That's correct.

10              MR. TURKEL:  Even the

11      acknowledgment of the settlement.

12              MR. GRIFFIN:  That's correct.

13              MR. TURKEL:  Pre-default, if we

14      were to ask you today how many dollars

15      were you paid while they were

16      performing, you would not take the

17      position.

18              MR. GRIFFIN:  Correct, that's

19      not confidential.

20              MR. CLARK:  That's what I was

21      about to pull out.

22   Q     There are two pockets here.  One, we

23   don't know, and you need to follow what your

24   lawyer is telling you and do so, and a number

25   that's been paid to you already as a
```

                                        70

```
 1                  Donald Trump

 2   licensing fee, correct?

 3   A     Okay.

 4   Q     You do know that you received some

 5   money, and I have the figures, and I don't

 6   really care what the number is.  You agree

 7   with that and you know that, correct?

 8   A     I believe so, yes.

 9   Q     Why haven't you returned those funds

10   to this project and given back that money?
```

https://media.TLSY.Dev/hection/4ur28/2011/Apr/21/Trump_Transcr.

```
11                MR. GRIFFIN:  Object to the

12         form of the question.

13    Q      If the project didn't get built?

14    A      Well, because I had no obligation to

15    the people that signed me to give it back,

16    number one, and number two, the money was a

17    very small amount relative to -- in fact, I

18    would say that I lost money on this project.

19    If you add all of what everybody has been

20    through including yourselves, I have lost

21    money on this project.

22           This has been a loser, not a positive,

23    and most of the money that I would have made

24    on this project would have been from a

25    percentage of profits had the market stayed
```

71

```
1                 Donald Trump

2     strong.

3     Q      Your analysis over the marketplace and

4     what it has done to devaluing property?

5     A      Yes.

6     Q      You agree with me even with the

7     marketplace and the devaluation of

8     properties, your properties, your Signature

9     properties have more value with your brand

10    name on it?

11                MR. GRIFFIN:  Object to the
```

12          form of the question.

13    Q        Correct?

14    A        Well, if they are ever built.  You are

15    talking about a project that's not built.

16    You are talking about a project that had no

17    value.  So.  Whether it had my name on it or

18    not.  It wouldn't have made any difference.

19    Q        We are going to switch, based on what

20    we have talked about.  We will go straight

21    through and get you out of here.

22    A        That would be great.  That would be

23    much nicer.

24               MR. CLARK:  Thank you, Chris.

25               MR. GRIFFIN:  You're welcome.


                                                    72


1               Donald Trump

2               MR. CLARK:  Thank you,

3        Mr. Trump.

4               THE WITNESS:  No problem.

5    EXAMINATION BY

6    MR. TURKEL:

7    Q    Mr. Trump, just so the record is

8    clear, I am Ken Turkel.  I am co-counsel with

9    Mr. Clark in this case.

10          Your lawyer as well, you have allowed

11    me to ask a portion of these questions today,

12    which we appreciate.

13          By way of general background, there

14    are a few areas I want to clean up with you

15    as we head into some more specifics about the

16    license agreement.

17         The first one is this.  One of the

18    comments you made to Mr. Clark was that it

19    was very well proven that the Trump name

20    brings immediate value, using words, you can

21    put them in quotes, "very well proven."

22         Do you have any internal reports or

23    data in your own possession or the possession

24    of the Trump Organization or any of the

25    affiliate companies that document that fact?

                                            73

1                   Donald Trump

2    A     I can try and find some for you.  I

3    don't think we did any, per se, but I think

4    that newspapers have done it showing that

5    there is a value.  And if I can find that, I

6    will give it to my attorneys to give to you.

7    Q     The genesis of the question was

8    whether you were referring to reports that

9    may be disseminated publicly or through the

10   media or whether they were internal reports?

11   A     I believe they would have been from

12   other companies that were disseminated to the

13   media.  I don't think we have done it

14   individually.

15   Q       Have you kept any statistics, either

16   internally or do you know of any statistics

17   that have been kept externally that have

18   distinguished between the value brought to a

19   project by the Trump name when you license it

20   as opposed to when you are actually the

21   builder developer?

22   A       No, I don't know that.

23   Q       Do you have any personal opinions on

24   that?

25           MR. GRIFFIN:  Object to the

                                                    74

1                    Donald Trump

2            form of the question.

3    A       I don't think it would matter.

4    Q       What do you mean?

5    A       You are saying if it is a license deal

6    or if I own it, would there be a difference

7    in value?

8    Q       Yes, let me rephrase the question as

9    opposed to asking you for your opinion.

10   Mr. Clark took you through the board and the

11   New York Times Magazine article articulating

12   among 2,006 various projects that you were

13   involved in.

14           Do you know as a matter of fact

15   whether the projects with your name licensed

16   had more or less value than the ones in which

```
17        you actually were builder developer?
18                 MR. GRIFFIN:  Object to the
19             form of the question.
20   A    No.  I don't know why it would matter
21   that much, but I don't see it, but I don't
22   know the answer to that.
23   Q    I am not sure it necessarily --
24                 MR. GRIFFIN:  Can I interrupt?
25             With all respect to the lawyers and
```

                                                    75

```
1                  Donald Trump
2             Mr. Trump, I thought there were
3             different areas, substantive areas
4             that you were going to inquire about
5             and not just followup on Dan's
6             questions.
7                  MR. TURKEL:  I am actually
8             laying predicate for discussion of the
9             specific terms of the licensing
10            agreement.  I want to make sure I
11            understand a few of these things.
12   Q    With respect to deals in which you
13   were licensing, you have identified very
14   candidly for us the different capacities in
15   ways you participated.  As we sit here today,
16   do you know whether the actual licensing
17   agreements in the non-Tampa license deals
```

18   were similar to their fee structure the Tampa

19   deal?

20   A     It was -- as I said before, every deal

21   is different.  Tampa would be different than

22   most of the other deals here.  Not different,

23   for better or worse.  The deals are just

24   different for lots of different reasons.  In

25   the Tampa deal, a percentage of the profits,

                                            76

                    Donald Trump

1

2    and really a partnership therefore, was

3    created because of the percentage of the

4    profits, at least in my mind, and that's

5    different.

6          Many of the licensing deals, it is a

7    flat fee or it is a fee per unit or whatever.

8    This was a percentage of profits, so this was

9    actually a little bit more intense deal than

10   most.

11   Q     How long have you been in the real

12   estate development business?

13   A     Since 1970.

14   Q     In that time frame, from 1970, let's

15   go until 2004, when the initial license

16   agreement was signed, how many entities have

17   you either formed or been a part of that were

18   either partnerships, limited liability

19   companies, joint ventures or corporations?

20    A    Well, many, many.  Far more than what

21    you see up here.  This would be just an

22    indication of it, but many beyond what you

23    have here.  I don't know the number.

24    Q    You understand, as a business person,

25    an experienced business person, that there is

77

1                    Donald Trump

2    a difference between a partnership and a

3    corporation; right?

4    A    Well, a corporation can be in the form

5    of a partnership, too.  You can have

6    corporate partners.

7    Q    Correct.

8    A    The question is a little bit general.

9    Q    You can have a partnership that has

10   partners in it which are corporations?

11   A    Absolutely.

12   Q    You understand those are different

13   legal types of entities, a partnership versus

14   a corporation?

15   A    Yes.

16              MR. GRIFFIN:  Objection to the

17              form of the question.

18   Q    Equally, do you understand that a

19   limited liability company is another type of

20   legal entity?

```
21              MR. GRIFFIN:  Object to the

22          form of the question.

23     A    Yes.

24     Q    How about a joint venture.  Have you

25     ever done a joint venture agreement?
```

                                                        78

```
1                   Donald Trump

2      A    Yes.

3      Q    Do you understand the joint venture to

4      be a different type of entity?

5      A    They are all going to be.

6      Q    One of the points you made is that you

7      viewed your participation in Tampa as a

8      partnership because of the fact that you were

9      receiving a portion of the profits; is that

10     right?

11              MR. GRIFFIN:  Object to the

12          form of the question.

13     A    That was my view.  That was my view.

14     Q    That was your view?

15     A    That is my view and was my view.

16     Q    What you are trying to clarify for me?

17     You hold that view today also?

18     A    That is correct.

19     Q    When Simdag -- strike that.  You have

20     talked about how you got interest in the

21     Tampa project.  You have referenced your

22     relationship with Mr. Steinbrenner and Derek
```

23    Jeter.  Did Simdag initially come to you

24    seeking the use of your name for this

25    project?

79

1                Donald Trump

2    A    I believe so.

3    Q    Do you know whether the idea to do it

4    as a licensing agreement versus a joint

5    venture, a corporation or a limited liability

6    company or general or limited partnership was

7    your idea or Simdag's?

8    A    I don't know.

9    Q    Would somebody else have handled that

10    initial discussion at the Trump Organization?

11    A    No.

12    Q    If you don't know, who would know?

13    A    Nobody.

14    Q    Explain that to me.

15             MR. GRIFFIN:  Wait.  Objection

16        to the form of the question.  Explain

17        that to me doesn't ask him.  What you

18        are trying --

19    Q    When you tell me nobody knows, I am

20    assuming somebody was initially approached by

21    Simdag or vice versa.

22    A    Right, it was so many years ago -- you

23    are talking many years, and I handled it, but

24    I don't exactly know did we call them, did

25    they call us.  I think they called us, but I

80

1                    Donald Trump

2    have had many, many different things happen

3    over the years.  While I like to pride myself

4    on having a very good memory, I can't tell

5    you if many years ago I called them or they

6    called me.  I think they called me.

7    Q        Would there be any document or record

8    of that initial contact?

9    A        No.

10   Q        If they called you, would it be your

11   recollection that you handled the

12   communication personally?

13   A        Yes.

14   Q        Do you know, as you sit here today,

15   whether the idea to do this as a licensing

16   agreement versus you being a builder

17   developer was your idea or theirs?

18   A        Well, I think it was common sense.  It

19   was a license and because we didn't have the

20   local knowledge that I discussed before, so

21   the concept of being the builder developer

22   would not have really entered into the

23   equation.

24            MR. TURKEL:  Let's go ahead and

25        mark this as Exhibit 3.

81

```
 1                    Donald Trump
 2                    (Whereupon, a copy of a license
 3                    agreement entered into between Mr.
 4                    Trump as licensor and Simdag/Robel as
 5                    licensee is marked Plaintiff's Exhibit
 6                    3 for identification as of this date.)
 7      Q      The court reporter has handed you what
 8      was marked as Exhibit 3 for this deposition.
 9      A      Correct.
10      Q      I can represent to you it is a copy of
11      the license agreement that was entered into
12      between you as licensor and Simdag/Robel as
13      licensee.  Are you familiar with that
14      document?
15      A      Yes.
16      Q      As a predicate to discussing the
17      document, who owns the Trump name as a piece
18      of property, as a piece of intellectual
19      property?
20      A      I do.
21      Q      You individually, correct?
22      A      Yes.
23      Q      Do you own all of the related service
24      marks to the name?
25      A      Yes.
```

1                    Donald Trump

2                    MR. GRIFFIN:  Object to the

3          form of the question.

4                    MR. TURKEL:  What is the

5          objection?

6                    MR. GRIFFIN:  It calls for a

7          legal conclusion?

8                    THE WITNESS:  Good point.

9     Q    I would assume you know whether it is

10    a legal conclusion or not.

11                   MR. GRIFFIN:  I assume I can

12         make an objection, too.

13    Q    I am sorry, Chris.  I was just mulling

14    that one over.  Do you recall when trademark

15    protection was sought for the Trump name and

16    related service marks?

17    A    No.

18    Q    Whose idea was it to get trademarked?

19    I will caution you, if it came from one of

20    your lawyers, don't tell me.

21    A    My lawyers.

22    Q    Is the Trump name trademarked for use

23    in products other than real estate ventures?

24    A    Yes.

25    Q    Have you used it in that fashion?

83

```
 1                    Donald Trump

 2      A     Yes.

 3      Q     Why?

 4      A     Because it's got something that people

 5      like; shirts, ties at Macy's, cufflinks.

 6      Q     Are those cufflinks you are wearing

 7      Trump cufflinks?

 8      A     Yes, they are quite nice.

 9      Q     They are handsome, yes, they are.

10      Water?

11      A     Yes, other things.  Yes, we do think

12      that it seems to be selling quite nicely.

13      Q     Do you recall, and you can just give

14      me a year, even a frame of years when you

15      started doing business with the Trump name

16      outside of the world of real estate; in other

17      words, when you began licensing to get into

18      products and other sort of items?

19      A     Probably six or seven years ago.

20      Q     Was it before or after the Apprentice?

21      A     A little bit before.

22      Q     When you say the Apprentice has

23      increased the value, we can agree that there

24      was some value to the name pre-Apprentice;

25      right?
```

                                                84


 1                    Donald Trump

2    A    That is correct.

3    Q    Certainly enough value that you could

4    use it on cufflinks or bottled water?

5    A    Yes.

6    Q    Did you ever do a licensing agreement

7    of any kind?  If you look at Exhibit 3, it is

8    dated October 27, 2004, which was right at

9    six years ago?

10   A    Okay.

11   Q    Almost a month shy of six years, prior

12   to October 27, 2004, had you done any other

13   licensing agreements with your name?

14   A    I believe so, yes.

15   Q    Do you recall which ones?

16   A    I don't know.  I think maybe Miami was

17   before this.  I am not sure.  I would have to

18   check with my lawyers and check with the

19   people as to the chronology, but yes, I

20   believe we did others prior to this.

21   Q    Would the Tampa Simdag license

22   agreement at the very least have been one of

23   the first five or 10?

24   A    One of the earlier ones, yes.

25   Q    When you say one of the earlier ones,

85

Donald Trump

1

2    within the world of real estate?

3    A      Yes, of real estate.

4    Q      I believe you discussed this with

5    Mr. Clark, but just to confirm it, as far as

6    you recall all of the license agreements have

7    been confidential?

8    A      As far as I know, they are all

9    confidential, yes.

10   Q      Let's take a look at this one.  I want

11   to go through some specific terms of this

12   with you.  In the preamble, if you would turn

13   to the first page, which says License

14   Agreement at the top, so it is going to be

15   the first page after the cover page.

16   A      Okay.

17   Q      Turn the cover page over.

18   A      Okay.

19   Q      It is on the back of your cover page.

20   I am sorry, it says License Agreement?

21   A      Correct.

22   Q      There is a recognition that this

23   agreement is entered into on October 27,

24   2004, between Donald J. Trump, worldwide

25   renowned builder and developer of real

                                              86

                        Donald Trump

1

2    estate, who enjoys the highest reputation in

3    his field among others. You are defined as

4    the licensor. Do you see that?

5      A      Yes.

6      Q      I don't mean this question to be --

7   Dan used the word heckle earlier.  Why is

8   there a recognition in there that you are a

9   worldwide renowned builder and developer.

10  Why is that put into the agreements?

11     A      Because we want them to know that we

12  have a very important reputation and we don't

13  want them to screw up.

14     Q      It is a way of putting in writing with

15  the party who you are going to license your

16  name to?

17     A      That's correct.

18     Q      That your reputation is an important

19  thing?

20     A      We want them to do a good job.

21     Q      Simdag/Robel is listed here this is

22  October 27, 2004.  How long -- strike that.

23  What period of due diligence did you undergo

24  with respect to Simdag before you agreed to

25  sign this agreement with them?

                                            87

1                  Donald Trump

2            MR. GRIFFIN:  Objection to the

3        form of the question.  Go ahead.

4      A      Due diligence is always very tough.

5   You hire people or you use your own people

6   and you go into the background of people.

7   The background of the people in the

8   partnership was quite a good background.

9   They were respected, they were really well

10  known in the Tampa area, and they really had

11  a very good reputation.  We did a fairly

12  thorough check at the time.

13      It was years ago, but we did a fairly

14  thorough check, and everybody seemed to think

15  they were quite good people.  We also then

16  checked the real estate of the location and a

17  lot of other things going into a decision

18  like this.  We felt that the people, the

19  quality of the people involved was very high.

20  Q    As you sit here today, do you have any

21  recollection as to how many projects

22  Simdag/Robel had built in the Tampa Bay area

23  as of October 27, 2004?

24  A    Well, this is a separate company or

25  group for the purpose of doing this

88

1                   Donald Trump

2   particular job, but there were people that

3   were involved with development and there were

4   people that had just very good reputations.

5   But this was set up -- I believe that name

6   was set up for specifically this job.

7   Q    That's a fair point.  Let me rephrase

8      the question.  As of October 27, 2004, I

9      would assume you knew how many condominium

10     development projects the principals of Simdag

11     had been involved in prior to this agreement?

12     A      My people did at the time, they did a

13     background check.  I don't know exactly, but

14     the people that are involved with me in this

15     capacity did a background check and they

16     found them to be a quality group.  I remember

17     the word quality used, a quality group of

18     individuals.

19     Q      Do you know whether that background

20     check was memorialized in any sort of

21     document?

22     A      I don't.  I would love to find out.  I

23     mean, I will check it for you.

24     Q      If it was memorialized in a document,

25     would it have been a Trump Organization

                                                  89

1                      Donald Trump

2      document, corporate document?

3      A      Yes, I believe so, yes.

4      Q      Who would the people have been who did

5      the due diligence?

6      A      I would have to check that.  An

7      executive or a group of executives within the

8      organization.

9      Q      If I were to describe for your lawyer

10     to perhaps produce to us any documents

11     memorializing the due diligence performed by

12     Trump individually or the Trump Organization?

13     A      Right.

14     Q      That would be sufficient for you to at

15     least do a search to see if they exist?

16     A      Absolutely.

17            MR. GRIFFIN:  Any objection

18            that I may have --

19            MR. TURKEL:  Absolutely.  I am

20            trying to find out the logistics if it

21            is producible otherwise.

22     REQUEST NOTED

23     Q      We see in the second paragraph of this

24     document that you are the sole exclusive

25     owner of the United States trademark

                                                    90

1                   Donald Trump

2      regulations identified in schedule one.

3      A      Correct.

4      Q      Which we turn back to schedule one,

5      because what is a document without its

6      schedules.  Schedule one lists trademark

7      Trump Tower with the registration number of

8      1688083.  We can agree, as we sit here today,

9      that's not the only trademark that you

10     registered; right?

11    A       That's correct.

12    Q       Certain other rights in the name

13    trademark service marked designation and

14    identification Trump.  That goes back to what

15    we were discussing earlier, which is the

16    protection of your name as a brand; right?

17    A       Right, yes.

18    Q       Let's go to what is the third whereas

19    clause, which says, "Whereas Licensee intends

20    to develop a first-class luxury residential

21    condominium building of approximately 190

22    units."  Do you see that language?

23    A       Yes, I do.

24    Q       Do you know, as you sit here today,

25    whether Simdag or the principals of Simdag

91

                    Donald Trump

1

2    had ever developed a luxury residential

3    condominium unit of that size or quality in

4    their past?

5    A       No, I don't believe so.  This was the

6    biggest thing in Tampa, so this was an

7    unusually large development.  I started

8    building very big buildings and I did a very

9    good job of it, but at some point you had to

10    start -- I don't know, they had a wonderful

11    reputation, but I don't know that they

```
12      developed anything of this -- this was a very

13      large job.

14      Q      When you had discussed with me earlier

15      that these principals enjoyed a good

16      reputation in Tampa, other than being able to

17      repeat for me that your people told you that,

18      you have no specific facts that you recall

19      today?

20      A      No, but when I met them I was very

21      impressed with them as individuals.  I went

22      to Tampa, I met with them.  I was very

23      impressed with them as individuals.

24      Q      If you go down to paragraph sub four

25      of the same whereas clause, it would read
```

92

```
1                   Donald Trump

2      that the licensee, that being Simdag/Robel,

3      "intends to design, develop, construct,

4      operate and maintain the building according

5      to the Trump standards"?

6      A      Correct.

7      Q      "As herein defined so as to maximize

8      the value of the Tower property for the

9      benefit of Licensee and Licensor," correct?

10     A      Yes.

11     Q      We can agree that you weren't going to

12     design the building; right?

13                   MR. GRIFFIN:  Object to the
```

```
14              form of the question.

15      A       Not design it per se, but make sure

16      the design was first class.

17      Q       You had the rights to review the

18      design specs?

19      A       Absolutely, and we did.

20      Q       You weren't going to pick the

21      architect, though, correct?

22      A       I think we could have, but we were

23      very impressed with what we saw.

24      Q       When it comes to the actual

25      developing, as you stated earlier, you
```

93

```
1                    Donald Trump

2       weren't going to be down at Tampa with the

3       sheetrock installers; right?

4                    MR. GRIFFIN:  Objection to the

5                    form of the question.

6       A       No, but had the building proceeded, I

7       would have been at Tampa quite a bit.

8       Q       Did you have any responsibility under

9       this license agreement for the actual

10      construction of the property other than that

11      to review Simdag's work?

12      A       That's a big thing.  We had very

13      strong review capability and requirements

14      under this agreement.  Had the job proceeded,
```

15   I would have been in Tampa quite a bit to

16   make sure it was going to go.  I or

17   representatives from my organization, but I

18   would have been there actually a lot.  This

19   was a very exciting job to me.

20   Q    As it relates to the agreement -- I

21   think you lost my question somewhere in that

22   answer.  The actual responsibility to design,

23   develop, construct and operate belonged to

24   Simdag/Robel; is that correct?

25            MR. GRIFFIN:  Object to both

                                          94

1                   Donald Trump

2        the question and the comment that

3        proceeded it.  He answered the

4        question, and it didn't get lost.  He

5        answered it.

6            MR. TURKEL:  I disagree.

7        That's why I reasked.

8    A    I would rather stay with the answer

9    that I gave because we did have a lot to do

10   with the design of this building and that's

11   the way it was.

12   Q    Did you have any contractual

13   obligation with respect to this building and

14   the design of the building beyond reviewing

15   what was submitted to you by Simdag?

16            MR. GRIFFIN:  Objection to the

```
17              form of the question.

18      A       I could have rejected what I saw and

19      then probably have gotten very much involved,

20      but we liked very much what we saw.  It was

21      the opposite.

22      Q       Turn the page and let's look at that.

23      I think it is set forth pretty clearly.

24      A       What page?

25      Q       It will say page eight on the bottom.
```

                                                    95


```
1                       Donald Trump

2       A       Eight, different page.

3       Q       You should see a sub F.

4       A       It is a different page.

5       Q       Yours may be paginated -- go to seven.

6       A       Sub F.

7       Q       Prior to commencing construction, do

8       you have that?

9       A       I have the right to review.  Are we on

10      the same document?  Why are the pages--

11      Q       I think it is paginated differently.

12              MR. GRIFFIN:  I ask your

13              indulgence, Mr. Trump and Mr. Turkel.

14              That thing has gone off twice and

15              people know that I am in an important

16              deposition.  Let me check to see who

17              is trying to reach me.
```

18      A       There it is.  Sorry, it is my fault.

19              MR. GRIFFIN:  Thank you.

20              MR. TURKEL:  Are you all right.

21              MR. GRIFFIN:  Yes.

22      Q       One of the points you made, Mr. Trump,

23      was that you had the right to reject the

24      final plans and specifications for the

25      property, correct?

96

1                       Donald Trump

2       A       That's correct.

3       Q       If you look at paragraph F, that sets

4       forth the mechanics of how that works?

5       A       Yes.

6       Q       Do you need a moment to review it or

7       are you familiar with it?

8       A       Go ahead.

9       Q       As it sets forth in paragraph F, "The

10      Licensee" -- that being Simdag -- "is

11      required to submit its final plans and specs

12      therefore or specifications to the Licensor,"

13      and that you have the 15-business-day window

14      to review those, do you see that?

15      A       Correct, yes, I do.

16      Q       As you stated, within those 15

17      business days you are allowed to deliver a

18      report to the licensee either approving those

19      final plans and specifications or identifying

20    the deficiencies, for lack of better word in

21    it; right?

22    A      Right.

23    Q      At any point in time, did you send a

24    deficiency notice to Simdag/Robel with

25    respect to the final plans and

97

1                    Donald Trump

2    specifications?

3    A      I don't believe so.  We thought they

4    were doing really good work.

5    Q      You approved what they said?

6    A      I believe that's correct.

7    Q      If you had disapproved that, you are

8    allowed to send a notice to them of their

9    deficiencies; right?

10    A      That is correct.

11    Q      After they obtained that, they are

12    going to resubmit plans to you and you can

13    approve those; right?

14    A      Change it or do something.

15    Q      Were you aware at the time or are you

16    now after essentially three of those cycles

17    of approving or disapproving Simdag at that

18    point was allowed to pull out of the

19    development?

20                    MR. GRIFFIN:  Object to the

21        form of the question.

22    A    You mean according to this document?

23    Q    Yes, sir.

24    A    Yes, there was something to that

25    effect, yes.

                                                        98

1                    Donald Trump

2    Q    Go down to paragraph H -- strike that.

3    Before we do that, look at the bottom of

4    paragraph F.  You will see a provision there

5    saying the second, I think it is the last

6    sentence saying, "Licensee shall construct or

7    cause construction of the Tower property

8    substantially in accordance with the final

9    plans and specifications approved by

10   licensor, which shall adhere to and comply

11   with the Trump standards"; right?

12   A    Yes.

13   Q    When we get down to it as far as

14   protecting your brand, the essential

15   component of this contract to you is that you

16   have the approval rights, correct?

17   A    Yes.

18   Q    And that they build it in accordance

19   with your standards?

20   A    At a high level, yes.

21   Q    When you are marketing the project,

22   certainly your expectation as you advertise

```
23        and market the project is that the buyer's

24        expected to be at that level of quality

25        associated with your name, correct?
```

                                                              99

```
1                    Donald Trump

2                    MR. GRIFFIN:  Objection to the

3             form of the question.

4        A    Right.

5        Q    If we look down to paragraph H, and

6        this just caught my eye, Simdag was going to

7        pay the licensor, Trump, basically

8        reimbursement for any trips made down to

9        Tampa, correct?

10       A    Yes.

11       Q    That was capped at, I believe there is

12       a number there, "not more than two occasions

13       in each 12 consecutive month period from the

14       date hereof to the issuance of a permanent

15       certificate of occupancy for the building";

16       right?

17       A    Yes.

18       Q    For two trips a year, they were going

19       to reimburse you, right?

20       A    That's correct.

21       Q    Why was that provision put in here?

22       A    It is very standard in any contract

23       such as this or in any hotel contract.  You
```

24    are always reimbursed if you travel.  It is a

25    very standard clause.  That's I would say,

100

1                Donald Trump

2    always, always in this kind of an agreement.

3    Q     When you are an owner of a project, in

4    other words, as you pointed out to Mr. Clark

5    earlier, the various projects that you have

6    built with either your own money or financing

7    you have obtained and you have guaranteed, do

8    you get reimbursed by your partners for

9    coming to visit the project?

10    A     Oftentimes, yes.

11    Q     If I were to ask Mr. Griffin to

12    produce documents memorializing the

13    partnerships that you were a builder or owner

14    in, we would see provisions to that?

15    A     I believe so, yes.  If I have a

16    partner and I am traveling, or likewise if

17    the other partner is traveling, they would

18    routinely put in for expenses.  Whether it is

19    in an agreement or not, they would put in for

20    their expenses or I would put in for my

21    expenses.

22    Q     Even if you were the majority owner?

23    A     Yes, if I was the majority owner.  If

24    I had 60 percent and I was traveling, and it

25    was very costly but to the benefit of the

101

                         Donald Trump

1

2      job, I put in for the expenses.  Yes, pretty

3      standard.

4      Q      Why in this particular agreement, if

5      you know, were the reimbursement obligations

6      capped at two visits every two months through

7      occupancy?

8      A      Well, because I am sure while they

9      liked us and respected us, they didn't want

10     us to travel there five times a week at great

11     expense.

12     Q      Do you recall ever submitting either

13     for your own benefit or the benefit of

14     someone within Trump Organization a

15     reimbursement report under this provision of

16     the contract?

17     A      No, it may have happened, but I don't

18     recall that.

19     Q      How many trips did you make -- there

20     was never a certificate of occupancy issued.

21     How many trips did you make to Tampa before

22     this?

23     A      I think two or three.  I would have

24     made many had it gone forward.

25     Q      Let's take a look at page nine.

102

                    Donald Trump

1

2    A    Okay.

3    Q    As a further predicate to this next

4    group of questions, we can agree you never

5    signed a personal guarantee on anything

6    relating to the Trump Tower Tampa; right?

7    A    That's correct.

8    Q    Not with a bank or any private lender,

9    correct?

10   A    No, that's correct.

11   Q    We can agree your name individually or

12   your corporation's name was not on any

13   promissory note that may have been issued to

14   finance the project?

15   A    That is correct.

16   Q    Paragraph six of page nine provides

17   the situations in which you as licensor of

18   your name shall have "the absolute right to

19   terminate the agreement and the rights

20   licensed thereunder upon 10 days prior

21   written notice."  Do you see that?

22   A    Yes, I do.

23   Q    Take a look at page 10 now.  I want to

24   concentrate on two provisions in this.  Let's

25   take a look at paragraph G first.

                                103

```
 1                    Donald Trump

 2          "The construction of the building

 3    shall not fail to commence within 18 months

 4    unless such delay shall result from strikes,

 5    lockouts or labor disputes, inability to

 6    obtain labor or materials or reasonable

 7    substitutes therefor, acts of God,

 8    governmental restrictions, regulations or

 9    controls, enemy or hostile government action,

10    civil commotion, riot or insurrection, fire

11    or other casualty or other event similar to

12    the foregoing beyond the reasonable control

13    of licensee."

14    A      Okay.

15    Q      The reason I read that is this allows

16    you, paragraph G, to pull out if they didn't

17    commence construction within 18 months for a

18    laundry list of what was defined as

19    unavoidable delays; right?

20    A      Okay.

21    Q      What it is aimed at is when you look

22    at these acts things that the builder itself,

23    Simdag, could not control, correct?

24              MR. GRIFFIN:  Objection to the

25              form of the question.
```

104

```
 1                    Donald Trump
```

2   Q      You can go ahead and answer it.

3   A      Yes, that's true.

4   Q      The building didn't commence

5   construction within 18 months; right?

6   A      No.

7   Q      Let's just -- I want to pull back from

8   the actual for a second, all right, and talk

9   about the intent of this one provision.  If I

10  am a purchaser who laid down $200,000 of

11  their deposit money to buy a unit at Trump

12  Tower Tampa?

13  A      Right.

14  Q      And I have seen the plans, I have seen

15  the silver book Mr. Clark showed, I have seen

16  what this glorious building is going to be,

17  whether that building gets built in two years

18  or three years, we know that if it doesn't

19  start construction in 18 months it may not be

20  called Trump Tower; right?

21          MR. GRIFFIN:  Object to the

22          form of the question.

23  A      Well, we would have the right to pull

24  out if we wanted to.  We didn't want to.

25  Q      Do you know whether anyone within the

105

Donald Trump

1

2   premarketing of this disclosed to the buyers

```
3      that you had this right to pull out?

4                    MR. GRIFFIN:  Object to the

5             form of the question.

6      A     No, I don't know that.

7      Q     Have you ever disclosed that when you

8      were advertising or marketing a project of

9      yours?

10                   MR. GRIFFIN:  Objection to the

11            form of the question.

12     A     I don't think it is something that

13     would be in advertising or marketing.  I

14     mean, if you were going to do advertising or

15     marketing, then every job ever built would

16     have to take agreements in many cases that

17     are many times larger and put, put every

18     single word or every single paragraph into

19     the newspaper, and I don't think that can

20     happen from a practical standpoint.

21     Q     From a contractual standpoint, you had

22     actually agreed that this entire agreement

23     was confidential, correct?

24     A     Yes.

25     Q     For you to disclose that, you would
```

106

```
1                    Donald Trump

2      have breached that confidentiality, wouldn't

3      you?

4      A     But who would ever disclose agreements
```

11/1/2011 10:34 P

5    in an advertisement?  You're advertising for

6    apartments.  That would mean -- some

7    partnership agreements are hundreds of pages

8    long.  Does that mean that every time we take

9    an ad you have to disclose the entire

10   agreement in its entirety?  I mean, I don't

11   think that would -- first of all, it has

12   never been done in the history of real

13   estate.  Second of all, I don't think it

14   would be very practical, and that's why it

15   isn't done.

16   Q     Do you know whether any other real

17   estate developers of your magnitude licensed

18   their name the way you did?

19   A     I don't know.  I am not sure, but yes,

20   I am sure they have been, but hotel companies

21   do it all the time routinely, Ritz Carlton,

22   Four Seasons, routinely.  It is something

23   that's not uncommon?  Mostly probably real

24   estate people too.  I just don't know of any,

25   but in the hotel business it is routinely

                                        107

1                    Donald Trump

2    done.

3    Q     Do you know whether it is done in the

4    condominium sales business?

5    A     I think it is, but I just can't give

6     you any examples right now.

7     Q     Take a look at paragraph I in the same

8     group of sub paragraphs.  Another basis which

9     would have allowed you to pull your name from

10    affiliation with this project and to

11    terminate this license agreement was if

12    closings for at least 70 percent of the

13    residential condominiums units in the

14    building had not occurred or were not under

15    bona fide binding purchase contracts within

16    30 months from the commencement date again,

17    excepting out unavoidable delays; right?

18    A     Yes.

19    Q     First of all, do you think Simdag

20    could have done anything to avoid the market

21    conditions at the time?

22                MR. GRIFFIN:  Object to the

23                form of the question.

24    A     Probably not.  Nobody else could in

25    the whole country, so I have to use the word

                                              108

1                   Donald Trump

2     probably, but probably not.

3     Q     With respect to the closings, do you

4     know how many units were presold at Trump

5     Tower Tampa?

6     A     No, I don't know.  I knew at the time,

7     but this is years later.  I don't know now.

8    Q       Answer this if you know.  Why do you

9    have a provision in your license agreement

10   that allows you to pull out if there is not

11   over 70 percent of sales?

12   A       Well, I think 70 percent would have

13   taken care of much of the cost of building.

14   I think that's a term that's -- that's a

15   number that's used, that percentage is used a

16   lot of times to determine pretty much the

17   cost of the building, 70 percent of sales.

18   Q       You are not paying the cost of the

19   building; right?

20   A       No, but we want to make sure that the

21   building is paid for.

22   Q       You and I can agree--

23   A       If our name is on it.

24   Q       Whether they sell 60 percent, 70, 80

25   or 90 percent, you are still going to get

                                    109

1                    Donald Trump

2    paid your license fee?

3    A       No, you are wrong.

4    Q       Why am I wrong on that?

5    A       Because I am getting a percentage of

6    profits in this case.

7    Q       There are two components to the

8    license fee, so let me rephrase it.  That's a

9    fair comment.  The flat fee portion of your

10   license fee is going to get paid regardless

11   of the amount of sales, correct?

12   A      Well, if they pay it.  You say it will

13   be paid.  I don't know that it will be paid.

14   If they pay it, it will be paid.  The

15   dominance of my fee was going to be as a

16   percentage of profits.

17   Q      You would be entitled to the flat

18   portion regardless of whether they sold

19   70 percent; right?

20   A      I believe so, yes.

21   Q      Take a look at paragraph eight,

22   discontinuation of use of the marks.  I think

23   this is somewhat axiomatic.  If you

24   terminated the agreement, they have to stop

25   using your name; right?

                                                110


1                    Donald Trump

2    A      Correct.

3    Q      You believe somebody buys their unit

4    in Trump Tower and you pull your name under

5    either paragraph G or I and they may not own

6    their unit in Trump Tower anymore; right?

7                    MR. GRIFFIN:  Objection to the

8                    form of the question.

9    A      Say it again.

10   Q      Sure, if someone bought their unit in

11      Trump Tower and they prebought it and plunked

12      down 200, signed their binding purchase

13      contract, and you decided to pull your name

14      out either under paragraph G or I when

15      commencement of construction begins, they may

16      be moving into a non-Trump tower unit.

17      A       In theory, I would have the right to

18      take my name off.  It is something I wouldn't

19      want to do.  In fact, I -- we fought like

20      hell to make sure this building could get

21      built, but unfortunately market conditions

22      didn't allow that to happen.

23      Q       We can agree at some point you sent

24      Simdag a notice of default under this

25      licensing agreement; right?

                                                111

1                    Donald Trump

2       A       Yes.

3       Q       Asked that they discontinue use of

4       your name; right?

5       A       I believe so, yes.

6       Q       Have you ever done that in any other

7       licensing agreement other than Trump Tower

8       Tampa?

9       A       Not that I can remember.  I may have,

10      but not that I can remember right now.  If I

11      do, I will let you know.

12     Q      Thank you.  If there was a document

13     memorializing that, that would be something

14     that either in-house counsel or Mr. Griffin

15     would be able to find?

16     A      It is possible.  I just can't think of

17     it right now.

18     REQUEST NOTED

19     Q      Take a look at page 11 and paragraph

20     10 that says Assignment?

21     A      Yes.

22     Q      This provision, I am going to

23     paraphrase, and if your lawyer objects I can

24     read it a little more thoroughly.  It

25     provides you the right, licensor is with the

                                          112


1                      Donald Trump

2      right to assign the license agreement to a

3      related party, which is actually defined in

4      that same paragraph; right?

5      A      Okay.

6      Q      We can agree on that?  Did you take a

7      look at it?

8      A      Yes.

9      Q      Do you know whether this agreement was

10     ever assigned?

11     A      I don't know.

12     Q      Trump Organization is a corporation

13     which is a party to this lawsuit.  Is the

14    Trump Organization under common control with

15    or owned more than 50 percent by you?

16    A    Yes.

17              MR. GRIFFIN:  Object to the

18              form of the question.

19    Q    As it relates to your licensing

20    agreements, what is the relationship between

21    you, Donald Trump individually, and the Trump

22    Organization?

23              MR. GRIFFIN:  Objection to the

24              form of the question.

25    Q    Go ahead.

                                            113

1                    Donald Trump

2    A    I own the Trump Organization.

3    Q    For instance, when you enter into a

4    licensing agreement such as Exhibit 3, you

5    obviously individually don't administer it

6    day to day?

7    A    That's correct.

8    Q    Is that delegated to the Trump

9    Organization?

10    A    Yes.

11    Q    That would be the entity that would

12    deal with the day-to-day operation of this

13    license agreement?

14    A    That's correct.

15   Q     The employees, we have seen names

16   throughout the documents.  I think Jill

17   Cremer is one of the names?

18   A     Yes.

19   Q     Various attorneys, perhaps your son,

20   when they are working on this project, the

21   Trump Tower Tampa, they were working under

22   the purview of Trump Organization?

23         MR. GRIFFIN:  Object to the

24         form of the question.

25   A     That's correct.

114

Donald Trump

1

2   Q     Let's go ahead to paragraph 15,

3   License Confidentiality.  This is the

4   confidentiality agreement that we discussed.

5   When you were negotiating the license

6   agreement, who initially suggesting that it

7   be confidential?

8   A     I think most of my agreements are

9   confidential.

10   Q     The reasons you stated earlier were to

11   prevent competitors from having your business

12   terms; is that correct?

13   A     That's correct.

14   Q     Have you ever carved out in any of

15   your license agreements an exception to the

16   confidentiality to disclose the fact that

17    your participation was merely as a licensor?

18              MR. GRIFFIN:  Object to the

19         form of the question.

20    A     I don't know.  You would have to ask

21    my lawyers.  I have so many agreements.  As I

22    told you numerous times, each agreement is

23    different and you really have to speak to my

24    lawyers.  It is possible.

25    Q     Do you know whether in any of the

                                              115

                        Donald Trump

1    license agreements you referred to earlier

2    with respect to the Trump Signature

3    properties that Mr. Clark questioned you on

4    it was disclosed in the marketing materials

5    or other public disclosures to potential

6    buyers that this is a project which Mr. Trump

7    has licensed his name to?

8    A     I don't know.  I mean, you would have

9    to look.  There would be nothing wrong with

10    our doing it.  I don't know if it was done or

11    not.

12    Q     When you say there would be nothing

13    wrong with you doing that --

14    A     No, if they put it in, it would be

15    fine.  I wouldn't have objected to them doing

16    that.  If they did it, fine.

18      Q       Would you have had an issue with it if

19   they did it in a situation where you had a

20   confidentiality agreement?

21      A       I assume they would ask us approval or

22   whatever, but that would be -- I would

23   certainly give that approval if they asked.

24      Q       I guess the specific is you can't

25   recall ever having done that?

116

1                       Donald Trump

2       A       No, I cannot.

3                       MR. GRIFFIN:  I apologize to

4               everybody.  I need to take just a

5               couple of minute break.

6                       MR. TURKEL:  We can take a few?

7                       MR. GRIFFIN:  Two minutes, I

8               apologize.

9                       THE VIDEOGRAPHER:  Going off

10              the record 12:03 p.m.

11                      (Whereupon a brief recess was

12              taken.)

13                      THE VIDEOGRAPHER:  Returning to

14              the record 12:15 p.m., beginning of

15              tape number three.

16      Q       Mr. Trump, referring you back to the

17   licensing agreement, license agreement on

18   page 15, paragraph 16B, there is a line there

19   that begins, "Notwithstanding anything to the

20      contrary contained herein including, but not

21      limited to the provisions of paragraph 3

22      hereof, Licensor shall not be responsible for

23      and shall have no liability to Licensee or to

24      any third parties for any design or

25      construction means, methods, techniques,

                                                        117

1                       Donald Trump

2       sequences and procedures or for safety

3       precautions and programs employed by or on

4       behalf of licensee with respect to the design

5       and construction of the building."

6               The paragraph goes on to state that,

7       "The licensor is not an architect, engineer,

8       et cetera, or other license professional, and

9       disavows any warranties for those activities

10      and subsequent approvals."

11              If you look at paragraph three, which

12      it refers to, that was the paragraph you and

13      I were discussing earlier which provided you,

14      I believe, those review rights?

15      A       Correct.

16      Q       I guess in sum what we can agree is

17      other than what has been carved out by those

18      review rights, you as licensor of your name

19      were not going to be responsible for any of

20      the construction means or methods, correct?

```
21    A       Correct, other than we were very

22    diligent in wanting the building to be a

23    magnificent building and built at a very high

24    standard, but I was not responsible, yes.

25    Q       Understand this, Mr. Trump.
```

                                        118


```
1                  Donald Trump

2    Underlying all of this I think is a

3    recognition by us, by you, by your attorney

4    in these pleadings everywhere that with

5    respect to the license of your name, your

6    expectation is that the project will be built

7    in the highest quality; right?

8    A       That is correct.

9    Q       I think we can agree and we have

10   agreed that under the license agreement your

11   review rights were meant to try and confirm

12   that it was built with the highest quality,

13   correct?

14   A       Correct.

15   Q       In looking at this one provision,

16   though, ultimately if you approve the plans

17   and Simdag had built a shoddy unit, that was

18   going to be their responsibility, not yours;

19   right?

20   A       That is correct.  We had no liability.

21   Q       Looking -- I want to talk about the

22   fee schedule on this because it has been the
```

23    subject of a lot of questions, schedule two.

24    The license fee, schedule two, is the method

25    and amount by which you were going to get

                                                    119

1                   Donald Trump

2     paid by Simdag for the use of your name,

3     correct?

4     A      Yes.

5     Q      To be precise, not the use of just

6     your name, not just Trump, but the Trump

7     marks, and what I'd like to call the related

8     service; right?

9     A      Correct, yes.

10    Q      One of those is -- you have a crest,

11    don't you?

12    A      Yes.

13    Q      Where is the bottle of water?  I this

14    it is on there.

15    A      That's true; right.

16    Q      It is a coat of arms, correct?

17    A      That's correct.

18    Q      That would be one of the service marks

19    that you authorized?

20    A      That is correct.

21    Q      I think also isn't there an

22    intertwining with your name and related marks

23    of the color gold?

24    A    Not that I know.

25    Q    I thought we saw that somewhere in

                                          120

1                Donald Trump

2    your trademark product?

3    A    I don't think so.

4    Q    The first paragraph of schedule two

5    requires the licensee, Simdag, to pay Donald

6    Trump, the licensor, for the license of the

7    Trump marks as herein provided, a

8    nonrefundable license fee of $2 million,

9    payable as follows, and there is a payment

10   schedule 125,000 upon execution, $125,000

11   upon approval of the plans, and then a

12   million 750 in 26 consecutively monthly

13   installments.  Do you see that?

14   A    Yes.

15   Q    In paragraph three, if they had unpaid

16   installments existing on the date of issuance

17   of the temporary certificate of occupancy,

18   you could accelerate the balance?

19   A    Right.

20   Q    In sum, by the date that the issuance

21   of the temporary certificate of occupancy

22   occurs, you are going to make $2 million if

23   they comply with their obligations; right?

24   A    If they comply, yes.

25   Q    This is nonrefundable the 2 million;

121

```
 1                    Donald Trump
 2   right?
 3   A      That's correct.
 4   Q      Basically whether the project goes or
 5   not, you can keep that money; right?
 6   A      Yes, I don't know what they paid.  I
 7   don't know what the number is, but we can get
 8   that.
 9   Q      We have talked about it --
10   A      I don't even know what it is.
11   Q      I am talking about what they agreed to
12   pay?
13   A      What they agreed to pay is one thing.
14   What they paid is another.
15   Q      I think one thing you had said earlier
16   is these amounts are arrived at ad hoc.  A
17   deal is a deal?
18   A      Right.
19   Q      The additional license fee set forth
20   below in paragraph two relates to different
21   formulas concerning the unit sales; right?
22   A      Yes.
23   Q      And to summarize it, if the average
24   gross sales of the units exceeded 300 per
25   square foot; that was a threshold; right?
```

1              Donald Trump

2    They had to be more than 300 a square foot?

3    A     Right.

4    Q     You see that in the preamble sub A?

5    A     Yes.

6    Q     "Then the licensee shall pay the

7    Licensor as an additional License fee an

8    amount equal to 5 percent of the amount by

9    which the average gross sale exceeded the 300

10   per square foot and/or less than 350 a square

11   foot"?

12   A     Correct.

13   Q     If sales and the sale prices went

14   between 300 and 350, you were going to get 5

15   percent of the difference; right?

16   A     Correct.

17   Q     Ten percent if it went between 350 and

18   400 -- or 450, I'm sorry; right?

19   A     Right.

20   Q     Twenty-five percent if gross sales

21   went above 450, correct?

22   A     Correct.

23   Q     If you turn to the next page, "That

24   additional license fee shall be computed and

25   paid on the date which is the first to occur

123

http://www.i-09-SDy-Doq/media/resources/2011/Apr/21/Trump Transcr.

                        Donald Trump

2    of the closing of 85 percent of the condo

3    units; right?

4    A       Right.

5    Q       "Or two years after the date when the

6    first residential condominium in the unit

7    closes"; right?

8    A       Right.

9    Q       Earlier in this deposition and

10   throughout you have maintained that when you

11   used the word partner, referring to your

12   participation in Trump Tower Tampa, you did

13   so because you had participation in the

14   sales?

15                   MR. GRIFFIN:  Objection to the

16           form of the question.

17   Q       Is that correct?

18   A       Correct.

19   Q       Is that a fair statement of what your

20   perspective was at the time and as is now?

21   A       Sales, or you can almost define it as

22   profit, because at a certain level that

23   becomes profit, but I have a percentage of

24   sales and or profit.

25   Q       This additional participation in

                                              124

                        Donald Trump

2    excess of your $2 million-dollar license fee

3    is referred to in this agreement as an

4    additional license fee; right?

5    A      That is correct.

6    Q      It is not referred to as your

7    partnership participation, is it?

8    A      I view it, I have always viewed it as

9    a form of partnership because we are

10   participating in sales and we are

11   participating in the profits and we are

12   participating in percentages of the amount

13   sold, so 1 always viewed that as a partner.

14   Q      So we can be clear, you signed this

15   agreement individually, correct?

16   A      Yes.

17   Q      It is not Trump Organization who

18   signed it; right?

19   A      I don't believe so, no.

20   Q      Donald J. Trump in his individual

21   capacity.  You can look at the signature page

22   to confirm if you want.

23   A      Yes.

24   Q      It is page 60?

25   A      I see it, yes.

125

1                  Donald Trump

2    Q      I am going to assume, you correct me

http://media40.trump.net/media/treasures/2011/Apr/21/Trump_Transcr.

3     if I am wrong, that you read it before you

4     signed it, did you not?

5     A     Yes.

6     Q     I am going to assume that you agreed

7     to everything that was contained in the

8     document before you signed it; right?

9     A     Certainly, my lawyers did the

10    document, but I certainly agreed to it.

11    Q     Given your experience in the business

12    world, if you didn't agree to it, I doubt you

13    would have signed it; is that fair?

14    A     Perhaps that's correct.

15    Q     When schedule two was placed in front

16    of you and you saw this money defined as an

17    additional license fee, you didn't tell them,

18    recharacterize that, I view that as my

19    partnership?

20    A     I view it as a partnership.  I didn't

21    agree with the document in great detail, but

22    I view it as a partnership because I am

23    sharing essentially as a percentage of sales,

24    so I viewed that as a partnership, but I also

25    viewed all of the other things I was doing as

126

Donald Trump

1

2     a partnership.  I was -- we were working on

3     the building, we were helping to design the

4     units.  We were putting in certain size

5      windows and were requiring certain size

6      ceiling heights.  We were doing many other

7      things.  That is really a form -- to me it is

8      a partnership.  We are working together with

9      other people.  We have licensing agreements.

10     It is much less than this, but we were

11     working very hard on this building.  I viewed

12     this as a partnership in that sense.

13     Q     Given that you viewed it that way when

14     you drafted this document, you certainly had

15     the option to enter into a formal legal

16     partnership with Simdag if you had wanted it,

17     didn't you?

18     A     I guess this was just the way we did

19     it.

20     Q     Look at page 15 at the bottom, 16E?

21     A     16 what?

22     Q     E.

23              MR. GRIFFIN:  What page, again?

24     Q     Paragraph -- page 15, miscellaneous

25     sub E?

                                                    127

1                  Donald Trump

2      A     Back to 15.

3      Q     Right.  Are you on the bottom of page

4      15?

5      A     Okay, go ahead.

6   Q      If you look at paragraph E, it

7   provides, "This Agreement contains the entire

8   agreement between the parties" --

9   A      That's correct.

10  Q      -- hereto?

11  A      Right.

12  Q      Just so I can finish, "with respect to

13  the subject matter hereof."  This was the

14  only agreement that defined your relationship

15  with Simdag, wasn't it?

16  A      I believe so, yes.

17  Q      There is not another contract out

18  there between Trump Organization and Simdag,

19  is there?

20  A      No, I don't think so.

21  Q      We can agree --

22  A      Unless there was an amendment to this

23  agreement.

24  Q      I will show you one amendment to the

25  license agreement.  However, that amendment I

                                              128

1                  Donald Trump

2   think just relates to the fee.  To wrap up

3   this line of questioning, you never formed a

4   joint venture under the laws of the State of

5   Florida and New York with Simdag, did you?

6   A      I don't know.

7   Q      You did form a general or limited

8     partnership under the laws of New York or

9     Florida with Simdag, did you?

10    A     I don't know.

11    Q     You never formed a limited liability

12    company under the laws of New York or Florida

13    with Simdag, did you?

14    A     I don't know.  You would have to ask

15    my lawyers.

16    Q     I would assume your answer is the same

17    with respect to a corporation?

18    A     Yes.

19    Q     I would assume as to all of those

20    categories of legal entities, whether it was

21    the law of New York, Florida, Delaware or any

22    other state, you have no knowledge as to

23    whether you formed a separate legal entity

24    with Simdag?

25    A     I have no knowledge of it, no.

                                              129

1                   Donald Trump

2     Q     Is it fair to say, Mr. Trump, as we

3     sit here today, that the license agreement is

4     the only document you know of which defines

5     your relationship with Simdag?

6     A     Yes.

7               MR. TURKEL:  Let's mark this as

8               Exhibit 4.

9                    (Whereupon first amendment to

10              the license agreement is marked

11              Plaintiff's Exhibit 4 for

12              identification as of this date.)

13                      MR. GRIFFIN:  Exhibit 4.

14                      MR. TURKEL:  Yes, sir the first

15              amendment to the license agreement.

16       Q      Exhibit 4, Mr. Trump, is the first

17       amendment to the license agreement.  This was

18       made March 31, 2006.  Do you see that

19       preamble?

20       A      Yes.

21       Q      What do you recall the conditions of

22       the real estate market being in Tampa,

23       specifically in the State of Florida in

24       general, in March of 2006?

25       A      I don't know.  I can't place myself in

                                                    130

1                    Donald Trump

2       that period of time.  I know they became very

3       bad shortly after that, but I can't place

4       myself in that period of time.

5       Q      You kind of have two answers in there.

6       I am asking you because you seem to have a

7       pretty good knowledge of the real estate

8       market, and when it crashed, do you know

9       whether it had yet crashed in Tampa at that

10      time?

11   A     I don't know.

12   Q     Do you recall what the purpose was to

13   this first amendment to the license

14   agreement?

15              MR. GRIFFIN:  Object to the

16         form of the question.

17   Q     Let me reask it.  It was kind of

18   sloppy.  Do you recall why this first

19   amendment was entered into?

20              MR. GRIFFIN:  Object to the

21         form of the question.

22   A     I have to look at it.  I do mention

23   the word profit.  That's probably where I am

24   also thinking about the word profit.  I don't

25   know why it was entered into, probably

                                        131

1                    Donald Trump

2    because we were doing a lot more work on this

3    project than we thought and maybe they

4    weren't paying the fees as they were supposed

5    to.

6    Q     If you look at paragraph one, this is

7    basically amending schedule two, which was

8    the document we just reviewed, which was the

9    initial fees attachment to the license

10   agreement?

11   A     Right.

12    Q    In section 1A, it says that, "Schedule

13    2 is hereby amended as follows," and Section

14    1, license fee, the amount of 2 million is

15    changed to 4 million.  We can agree that one

16    of the things the first amendment to license

17    agreement did was it upped your flat fee from

18    2 million to 4 million; right?

19    A    Correct.

20    Q    Was any additional consideration paid

21    by or offered by you individually or Trump

22    Organization to create that change in flat

23    fee?

24              MR. GRIFFIN:  Objection to the

25              form of the question.

132

1                    Donald Trump

2    A    I would have to check that and find it

3    out.  I am not exactly sure.  I know we

4    worked much harder on this development than

5    we had suspected we would.  It is possible

6    they weren't paying us the original fees so

7    this was changed.

8    Q    Why -- I mean, this may be best the

9    question.  Why if they weren't paying you

10    would the flat fee be increased?

11    A    Because, it is sort of obvious.  I

12    would actually have to ask my executives as

13    to why the amendment was made.  I really

14    wasn't involved in the amendment, although I

15    might have signed it.  Did I sign it?

16    Q    You definitely signed it.

17    A    Okay, I don't remember the amendment,

18    but I could ask my executives why it was

19    changed.

20    Q    Who would we talk to.  Which

21    executives would know that?

22    A    Perhaps Don Jr.

23    Q    Your son?

24    A    Yes, that's who I would speak to

25    initially to find out why it was changed.

                                        133

1                    Donald Trump

2    Q    If I were going to create a hierarchy

3    of Trump Organization employees who were

4    dealing with the Tampa project, would Don Jr.

5    have been at the top of that hierarchy?

6    A    I think so, yes.

7    Q    Who would have been immediately under

8    him, reporting to him?

9    A    I don't know.  You would have to ask

10    him.

11    Q    If you look down at 1B, basically how

12    this was changed was that the monthly

13    installments were upped to $129,091 a month

14    for 22 months.  That's in paragraph 1B or 1C.

15        Additionally it appears that the additional

16        license fee as it is defined in this

17        agreement was changed, and instead of being

18        tied to --

19        A        I think it was changed because of the

20        complexity of the square foot prices in the

21        other agreement, and the square foot prices

22        in the other agreement under that

23        transaction, I would have done better than

24        this.  And I believe -- now, this is just

25        subject to checking with executives, but I

134

1                         Donald Trump

2        believe that the square foot prices under the

3        agreement would have amounted to too much

4        money for them to pay, and so we went into a

5        net sales profit.  In other words, this was

6        to their benefit, but they paid a little more

7        upfront, but this agreement was to their

8        benefit.  I believe that was it, but I will

9        certainly check.

10        Q        I don't know if you have looked

11        through this as we have been discussing it or

12        if you have an independent recollection of

13        it?

14        A        I am looking through it as I am

15        discussing it.

16        Q        Why don't do you that instead of

17    taking you --

18    A      I have done it.

19    Q      You have done it?  You are a fast

20    reader, Mr. Trump.  The way this worked was

21    basically you were going to get 50 percent in

22    net sales profit as defined and they provide

23    an example?

24    A      As opposed to getting an absolute hard

25    amount over a certain amount.  This was net.

135

1                    Donald Trump

2    This would be after expenses.  This was on a

3    net basis, whereas the other was a hard and

4    fast percentage over a certain amount, $350,

5    $450.

6    Q      Correct, it eliminated the formula

7    predicated on square footage?

8    A      It is possible that that formula did

9    not work for the builders of the building,

10    and that's why they made this change.

11    Q      Mechanically they put an example in

12    paragraph two that says if the net sales

13    profit was 20 million and you had already

14    received your 4 million, you were going to

15    get 10 million less the four.  In other

16    words, they were going to net out the flat

17    fee?

18    A       Correct, which under the other

19    agreement it didn't do it.  This is

20    probably -- depending on the sales, this is

21    probably a worse deal for us.

22    Q       Worse deal in the event that the

23    project was built out and sold, but in the

24    event that it wasn't, you were making more on

25    your nonrefundable fee, correct?

136

Donald Trump

1

2    A       If they paid it.

3    Q       Of course, that's the assumption in

4    the contract, is they are going to pay what

5    they are obligated to pay?

6    A       Which, by the way, I don't think they

7    did.

8    Q       We are going to talk about that

9    because you had to sue them; right?

10    A       I did.

11    Q       On page two, if you see paragraph C

12    there right before paragraph two?

13    A       Right.

14    Q       It says, "The additional license fee

15    shall be made promptly following the date

16    when a sufficient number of the units in the

17    building have closed and the proceeds thereof

18    result in full repayment of all debt," and

19    they call that the debt repayment date.  Then

20    following to that date, "The Licensee shall

21    remit to Licensor," which is you, "50 percent

22    of the net profits."  So, very simply, once

23    they paid off their debt, you were going to

24    split the net profit?

25    A    Correct.

137

1                   Donald Trump

2    Q    Again, this money, whether it be the

3    flat fee, which is called the license fee, or

4    the percentage based fee, is referred to as

5    an additional license fee; right?

6    A    Right.

7    Q    Is that right?

8    A    Yes.

9              MR. TURKEL:  I think we are

10             good on talking about what they may

11             have paid you up to the fault of

12             default, are we not, Chris?

13             MR. GRIFFIN:  Yes, in terms of

14             confidentiality.

15    Q    Right.  He is not going to tell you

16    not to answer this question, which is do you

17    recall what Simdag paid you up to the point

18    of your lawsuit against them for defaulting

19    on the license agreement?

20    A    No, I don't know.

```
21   Q    Any idea?

22   A    No.

23   Q    Would Donald Jr. know that?

24   A    No, my accountants would know that.

25   Q    Had they paid anything?
```

                                    138


```
1                    Donald Trump

2    A     Yes, I think so, but they didn't pay

3    what they were supposed to pay.

4    Q     Those checks pursuant to the agreement

5    would have been made payable to Donald Trump

6    individually, correct?

7    A     I don't know.  I don't know who they

8    are made payable to, but I don't believe they

9    paid it.

10   Q     Are your accountants in-house -- for,

11   instance if we want to ask for those

12   documents, are they within the company's

13   control, or do I have to go to a third-party

14   accountant?

15   A     Anything I give them are within the

16   company.

17              MR. GARTEN:  Yes.

18              MR. GRIFFIN:  With full

19         reservation of any objections--

20              MR. TURKEL:  Absolutely.

21              MR. GRIFFIN:  You want to know

22         where they are located?
```

23          MR. TURKEL:  I just want to

24      know if I put in a request to

25      production to a party I will not be

                                        139

1               Donald Trump

2       told there is a third-party

3       accountant.

4               MR. GARTEN:  No, it is

5       information we can provide.

6               MR. TURKEL:  Let's look at

7       Exhibit 5.

8               (Whereupon copy of complaint is

9       marked Plaintiff's Exhibit 5 for

10      identification as of this date.)

11      Q       Exhibit 5 is a copy of a complaint

12      filed by you individually against

13      Simdag/Robel and its principals in the United

14      States District Court for the Middle District

15      of Florida.  Have you ever seen that

16      document?

17      A       Yes.

18      Q       Being as you are the individual

19      plaintiff on it, I would assume it is fair to

20      say you authorized its filings?

21      A       Yes.

22      Q       Was it shown to you prior to being

23      filed?

24    A    My lawyer showed it to me.

25    Q    Did you read it?

140

1                    Donald Trump

2    A    I looked it over.

3    Q    Take a look at paragraph eight, if you

4    could.

5    A    Yes, I have it.

6    Q    Can you read through that paragraph

7    really quickly, Mr. Trump, please?  It is not

8    that long.  It goes to the beginning of the

9    next pages.

10    A    Okay.

11    Q    Is everything in paragraph eight true

12    and correct based on your understanding of

13    your relationship with Simdag?

14    A    Yes.

15    Q    You attached the license agreement to

16    this complaint -- strike that.  Your lawyers

17    attached the license agreement to this

18    complaint as Exhibit A.  Were you aware of

19    that?

20    A    No, but it seems appropriate.

21    Q    You're suing for breach of the license

22    agreement, correct?

23    A    Yes.

24    Q    To summarize what this complaint was

25    about, it was suing for payment of the

141

                    Donald Trump

1

2    license agreement, correct?

3    A    Okay.

4    Q    Do you agree with that?

5    A    I guess, yes.

6    Q    Count one was a breach of contract and

7    the contract referred to is the license

8    agreement; right?

9    A    Yes.

10    Q    Were you aware when you filed this

11    lawsuit that the license agreement and its

12    terms were going to become a part of the

13    public record?

14    A    No, they were in default of the

15    agreement.  They didn't pay us, among other

16    things, and we had to bring a lawsuit.

17    Q    What I am asking is when you filed

18    that lawsuit, did you give any thought to the

19    fact that there were purchasers that had

20    placed deposits on your building with your

21    name on it who were going to be affected

22    negatively by the fact that it was being

23    disclosed in the public record that you were

24    just licensing that building?

25                    MR. GRIFFIN:  Object to the

142

```
 1                    Donald Trump
 2           form of the question.
 3      A     The market had already affected the
 4      purchasers.   The purchasers were affected by
 5      the market.
 6      Q     Did you go through that thought
 7      process when you filed this.   In other words,
 8      did you give any thought to the fact that it
 9      may negatively impact purchasers that had put
10      down money on it?
11      A     By this time, the building looked like
12      it was not going to happen, as were thousands
13      of other buildings in the United States.
14      Q     There were two default letters,
15      attached to this as Exhibits C and D,
16      demanding monies under the license agreement.
17      If you turn to Exhibit C and D?
18      A     Okay.
19      Q     Both of them were written by Bernard
20      Diamond on behalf of Donald J. Trump.   Who is
21      Mr. Diamond?
22      A     An attorney with the organization.
23      Q     With Trump Organization?
24      A     Yes.
25      Q     Did you authorize him to send both of
```

143

```
 1                    Donald Trump

 2    these letters, Exhibit C and D?

 3    A     Yes.

 4               MR. TURKEL:  Chris,

 5          understanding you're going to object

 6          as confidential, just to wrap up my

 7          questioning on this --

 8    Q     You ultimately resolved your case with

 9    Simdag and the principals by settling it, did

10    you not?

11               MR. GRIFFIN:  I will instruct

12          him not to answer it.  As I said

13          before, I will stipulate that the

14          lawsuit was dismissed and will

15          disclose no other information about

16          that.

17               MR. TURKEL:  Hold one moment.

18          I have some housekeeping things to do.

19          We will wrap it up, Mr. Trump.  Mark

20          this as Exhibit 6.

21               (Whereupon second amendment to

22          license agreement is marked

23          Plaintiff's Exhibit 6 for

24          identification as of this date.)

25    Q     Mr. Trump, what I am showing you is a
```

144

```
 1                    Donald Trump
```

2      document that is titled second amendment to

3      license agreement.  It was produced to us by

4      counsel in discovery.  It has a letter of

5      intent attached to it dated February 5th,

6      2007.  Nothing is executed, really, in the

7      purest sense.  I want to know whether you

8      know anything about this document.

9      A      I knew that the related group and

10     Simdag were trying to save the project by --

11     despite the bad market conditions at the

12     time, by getting together, and I fully

13     encouraged them to do that.

14     Q      Who was the related group?

15     A      It was a big real estate firm.

16     Q      Was it a private equity firm?  Were

17     they a building developer?

18     A      No, it was a builder developer with

19     equity.  They would have came in, and I think

20     they were looking to take over the position

21     of the folks developing the job, but the

22     market got worse and ultimately the deal

23     didn't happen.

24     Q      Is it fair to say this wasn't

25     executed, and I understand that -- is it fair

145

1                  Donald Trump

2      to say that any approvals that you, Donald J.

3       Trump, as licensor, needed to provide to get

4       this done were provided?

5                   MR. GRIFFIN:  Objection to the

6               form of the question.

7       A       I don't think so.  I don't think it

8       was ever really presented to me because it

9       never got done.  The market killed --

10      Q       That's what I am trying to find out.

11      Did this get to you or did someone else draft

12      it?

13      A       I had heard about it through people

14      and somebody related actually told me, they

15      asked me what I thought.  I said you should

16      try to do it, but the market ultimately

17      killed that deal and the job.

18      Q       Is it fair for me to say that both the

19      genesis for this second amendment to license

20      agreement as well as any input didn't come

21      from you?

22      A       No, it didn't come from me.  I would

23      have encouraged them to do it, but ultimately

24      it didn't get done.

25      Q       What I have left is just a document

                                        146

1                   Donald Trump

2       for to you take a look at.  We are short on

3       the video.  Then one more document.  The

4       video is already short.

5              (Whereupon privilege log is

6          marked Plaintiff's Exhibit 7 for

7          identification as of this date.)

8              (Discussion held off the

9          record.)

10    Q    Mr. Trump, Exhibit 7 is a privilege

11    log.  I don't expect you to know the content

12    of the actual log, but on the last page is a

13    list of individuals and titles that are

14    referred to as they relate to documents which

15    were withheld from production based on

16    attorney-client or other privilege or

17    immunity.

18          First off, if you could just look at

19    the actual parties that are named and just

20    confirm that the actual titles are correct;

21    for instance, where it says Bernard Diamond

22    as executive VP and general counsel, that is

23    indeed what he is.  You can do it in general

24    across the whole document and just confirm

25    it.

                                            147


                    Donald Trump

1

2    A    At the time, yes.

3    Q    Has it changed since now?  I guess it

4    really wouldn't matter.

5    A    A couple of people aren't with us.  At

```
 6    the time of the document, these would be all

 7    correct.  At the time of the signing, these

 8    would be correct.

 9    Q    Your counsel, your in-house counsel,

10    is it Garten, has confirmed that as to the

11    ones who haven't been described that we can

12    get that information, correct?

13    A    Sure.

14              MR. GRIFFIN:  Absolutely.

15    Q    Subject of course --

16              MR. GRIFFIN:  We will get you

17         that information.

18    REQUEST NOTED

19    Q    Mr. Trump, so you know, it is just so

20    we can make an assessment.

21    A    It's okay.  No problem.

22    Q    Who is Russell Flicker?

23    A    He was an executive at the Trump

24    Organization a long time ago.  He was a real

25    estate executive.  I don't think he was
```

148

```
 1              Donald Trump

 2    involved very much with this job.

 3    Q    He was provided to us as a person who

 4    possesses information regarding negotiation

 5    and execution of the agreement and subsequent

 6    events related to the Trump Tower Tampa

 7    project.
```

8    A    I don't remember him being involved in

9    this job.

10   Q    His current address he has given us

11   was being at Blackstone Group?

12   A    I think so, yes.

13   Q    This is a current address for him.

14   When he was employed by Trump Organization,

15   what was his title?

16   A    Vice president, I believe.

17   Q    Of --

18   A    I don't know.

19           MR. GARTEN:  I can give that

20           you information.

21   Q    We have just two more things to move

22   on.

23           MR. CLARK:  I have the video

24           set up already.  We will mark this as

25           Exhibit 8.

                                            149

1              Donald Trump

2              MR. GRIFFIN:  To move it along,

3         do you want to tell him what you are

4         going to ask him about it?

5              (Whereupon,  a video is marked

6         Plaintiff's Exhibit 8 for

7         identification as of this date.)

8    Q    I think I am just going to have him

```
 9        verify the veracity of the comments he made.

10                  MR. GARTEN:  What do you want

11        to ask him; if he said it?

12                  MR. CLARK:  Give me 30 seconds,

13        gentleman.  If I can't get this thing

14        to pop up--

15                  MR. TURKEL:  Are we going to

16        stipulate on the record that we

17        couldn't make the video, that we

18        couldn't publish during the depo

19        Exhibit 8?

20                  MR. GRIFFIN:  That's fine.

21                  MR. TURKEL:  We will stipulate

22        to its authenticity?

23                  MR. GRIFFIN:  Yes, that it is

24        what it purports to be.

25                  (Whereupon,  a letter written
```

                                                        150


```
 1                    Donald Trump

 2        to Wall Street Journal is marked

 3        Plaintiff's Exhibit 9 for

 4        identification as of this date.)

 5        Q    Mr. Trump, what I am showing you is a

 6        letter written to the New York Times.  I can

 7        confirm to you that it was published in the

 8        November 16, '07, New York Times?

 9        A    Okay.

10        Q    Or shortly thereafter.  Actually it is
```

11        responding to a November 16 article.

12              Do you recall writing this letter?

13     A     Yes.

14     Q     Did you write it personally?

15     A     I think so, yes.

16     Q     Is everything in that letter true and

17     correct based on what you read at the time?

18     A     About the Tampa project?

19     Q     Yes, in respect to everything,

20     actually.

21     A     I have to read the whole letter then.

22     Q     Let me correct it.  It was Wall Street

23     Journal, not the New York Times.

24              MR. GRIFFIN:  Was this produced

25              to us?

                                                151

1                  Donald Trump

2              MR. CLARK:  No.

3              MR. GRIFFIN:  For the record, I

4              will reserve my objection to any part

5              of his testimony since this document

6              was not produced to us in advance, but

7              I will not stop any questions.  Go

8              ahead.

9     A     At the time, this was successful.  The

10     world has changed since this letter was

11     written.  A lot of things in this letter --

12        things have changed.

13                At the time, it was written, yes, with

14        the understanding that the license agreement

15        that we have, I viewed that as a partnership

16        because of our developing rights, et cetera,

17        et cetera, but, generally speaking, this

18        letter would be correct at the time it was

19        written, but of course, the world took a big

20        change since this letter was written.

21        Q    I think my questions relating to the

22        document are really simple, Mr. Trump.  You

23        wrote this personally; right?

24        A    Yes.

25        Q    Nothing in this is misprinted in the

152

1                     Donald Trump

2        sense that it is an authentic reprint of what

3        you wrote?

4        A    That is correct, yes.

5        Q    That's it.

6        A    Okay.

7                    MR. GRIFFIN:  We have no

8             questions.

9                    THE VIDEOGRAPHER:  Going off

10             the record 12:51.

11                    (Time noted:  12:51 p.m.)

12

13

14                      _____
                           DONALD J. TRUMP
15

16
     Subscribed and sworn to before me
17
     this        day of        , 2010.
18

19   _____
     Notary Public
20

21

22

23

24

25

                                                    153

1

2                           INDEX

3

4
     WITNESS            EXAMINATION BY          PAGE
5
     DONALD J. TRUMP    MR. CLARK                  4
6

7                       MR. TURKEL                72

8

9

10                      EXHIBITS

11   PLAINTIFF'S
     FOR IDENTIFICATION  DESCRIPTION           PAGE
12
     1    New York Times Magazine article        4
13        dated October 2006

14   2    Silver book                           53

15   3   Copy of license agreement entered        81
              into between Mr. Trump as licensor/
16            Simdag/Robel as licensee

17   4   First amendment to the license          129
              agreement
18
     5   Copy of complaint                       139
19
     6   Second amendment to license agreement   143
20
     7   Privilege log                           146
21
     8   Video                                   149
22
     9   Letter written to Wall St. Journal      150
23

24

25

                                                        154

1

 2               INFORMATION/DOCUMENTS REQUESTED

 3       DESCRIPTION                             PAGE

 4       Production of documents memorializing due   89
         diligence performed by Trump individually/
 5       Trump Organization

 6       Production of disclosure related to        111
         notices of default under licensing agreement
 7
         Production of disclosure of noted parties  147
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

155

1

2               C E R T I F I C A T E

3        I, LORI CERRANO, hereby certify that the

4    Examination Before Trial of DONALD J. TRUMP was held

5    before me on the 20th day of September, 2010, that

6    said witness was duly sworn before the commencement

7    of the testimony; that the testimony was taken

8    stenographically by myself and then transcribed by

9    myself; that the party was represented by counsel as

10   appears herein;

11        That the within transcript is a true record

12   of the Examination Before Trial of said witness;

13        That I am not connected by blood or marriage

14   with any of the parties; that I am not interested

15   directly or indirectly in the outcome of this

16   matter; that I am not in the employ of any of the

17   counsel.

```
18            IN WITNESS WHEREOF, I have hereunto set my

19    hand this         day of              , 2010.

20

21                       - - - - - - - - - - -
                              LORI CERRANO
22

23

24

25
```

                                                    156

```
1

2                    ERRATA SHEET

3    PAGE/LINE                  CORRECTION

4    _____     _____

5    _____     _____

6    _____     _____

7    _____     _____

8    _____     _____

9    _____     _____

10   _____     _____

11   _____     _____

12   _____     _____

13   _____     _____

14   _____     _____

15   _____     _____

16   _____     _____

17   _____     _____

18   _____     _____
```

http://media40.wmrs.net/media/resources/2011/Apr/21/Trump_Transcr

19

20

21

22

23

24

25