**CORUS BANK N.A.**
**LOAN PRESENTATION**
**Stillman/Fort Lauderdale**
**Fort Lauderdale, FL**

*[signature]*

**NOTE:**   On November 14, 2005, the DLC approved a loan on this Project that did not close because of project delays and significant cost increases. This is a resubmission of the loan presentation based on the revised terms. Exhibit "A" is a comparison of the original approved loan to the revised loan. In essence, we have agreed to significantly increase our loan amount in exchange for much thicker pricing and slightly more presales.

**Date:**   October 23, 2006

**Borrower:**   SB Hotel Associates, LLC which is owned by Stillman Bayrock Merrimac, LLC ("Stillman Bayrock") which is 48.4% owned by Stillman Merrimac, LLC, 39.6% owned by Bayrock Merrimac, LLC, and 12% owned by Motwani Merrimac, LLC. Trump Lauderdale Development – No.2, LLC is a Class B member with no cash in the deal and with no profit participation in the deal (other than via the agreements discussed in detail below). Stillman Merrimac, LLC is 55% owned by Roy Stillman ("Stillman") and 45% owned by three other individuals. All ownership percentages reflect both the actual amount of cash invested as well as the resulting profit participation (i.e. there is no developer promote). See **Exhibit "B"** for a detailed organizational chart.

Bayrock Merrimac LLC, an affiliate of a New York City developer known as Bayrock Development was the original land contract purchaser and they reportedly subsequently brought in Roy Stillman, who the Bank provided one successful loan to on his Metropolitan project in Manhattan's Upper East Side, to act as the primary developer on the Project as they did not feel they had enough experience to bring the project to a successful conclusion. Stillman was the Bank's entre into their transaction.

Motwani Merrimac, LLC, the seller of the land, exercised an option in their land sales contract to purchase up to a 12% stake in the Project by contributing $360,000 in cash. According to Stillman, Trump Lauderdale Development – No.2, LLC's inclusion in the organizational chart serves the purpose of being able to say that Donald Trump is an investor in the Project rather than just a licensor and operator (see below).

**Loan Amount:**   $139,000,000.



EXHIBIT
416
3-2-12

CCVPROD0002575

**Loan Purpose:**   To provide a construction loan facility to finance a portion of the hard and soft costs of construction of a hotel condominium project (the "Building") on the parcel of land located at 551 North Ft. Lauderdale Beach Boulevard, Fort Lauderdale, FL (the "Site"). The Site, the Building and its construction are collectively referred to hereafter as the "Project". Upon completion, the Project will contain: (a) approximately 410 parking spaces; (b) approximately 14,305 sf of ground floor and basement retail space; and (c) 298 residential condominium units (the "Units") containing approximately 240,000 net sellable square feet (as measured from the interior of the glass in the exterior walls, the middle of demising walls between Units, and to the public side of any common area walls, and excluding balconies, hallways, common areas, and the structural walls and areas of exit stairs, elevator shafts and common mechanical shafts). All references to SF going forward ignore the immaterial amount of retail space.

The sources and uses of the Project are as follows:

| Sources | | | | $/RSF | | % |
|---|---|---|---|---|---|---|
| Borrower Cash Equity | $ | 3,140,000 | $ | 13 | | 1.6% |
| CBRE Mezz Loan | $ | 38,260,000 | $ | 159 | | 19.6% |
| 2nd 10% Earnest Money Deposits | $ | 14,500,000 | $ | 60 | | 7.4% |
| Corus Senior Debt | $ | 139,000,000 | $ | 579 | | 71.3% |
| **Total Sources** | **$** | **194,900,000** | **$** | **812** | | **100.0%** |

| Uses | | | | $/RSF | | % |
|---|---|---|---|---|---|---|
| Acquisition Costs | $ | 20,215,615 | $ | 84 | | 10.4% |
| Hard Costs | $ | 120,674,271 | $ | 503 | | 61.9% |
| Soft Costs | $ | 54,010,114 | $ | 225 | | 27.7% |
| **Total Uses** | **$** | **194,900,000** | **$** | **812** | | **100.0%** |

A more detailed Project budget is attached as **Exhibit "C"**.

**Loan to Sellout:**

| | Borrower Projected | | Bank Projected | | Appraiser (Gross Sellout Value) | | Appraiser (Bulk Discount Value) | |
|---|---|---|---|---|---|---|---|---|
| Residential - Gross Sellout | $ | 282,960,000 | $ | 271,858,432 | $ | 280,000,000 | | |
| Gross Sellout/Residential Sellable SF | $ | 1,179 | $ | 1,136 | $ | 1,170 | | |
| | | | | | | | | |
| Retail Gross Sellout | $ | 8,583,000 | $ | 4,291,500 | $ | 5,000,000 | | |
| Gross Sellout /Retail SF | $ | 600 | $ | 300 | $ | 350 | | |
| | | | | | | | | |
| Total Gross Sellout | $ | 291,543,000 | $ | 276,149,932 | $ | 285,000,000 | $ | 220,000,000 |
| | | | | | | | | |
| Corus Loan | $ | 139,000,000 | $ | 139,000,000 | $ | 139,000,000 | $ | 139,000,000 |
| Loan to Gross Sellout | | 48% | | 50% | | 49% | | 63% |

CCVPROD0002576

**Guaranty:** There shall be no repayment guaranty; however, Stillman shall guaranty standard "bad-act" carve-outs and completion of the Project.

**Interest Rate:** The greater of LIBOR + 3.50% or 6.50%; adjusting quarterly.

**Term:** 30 months, with one 6 month extension provided: (i) the Project is substantially complete; (ii) a certificate of occupancy has been issued by the appropriate government authority; (iii) the Borrower gives the Bank at least 30 days prior written notice of its election to exercise the Extension; (iv) the Loan is not matured or in default, and there is no condition which with the passage of time, or giving of notice, would constitute an event of default; (v) the Bank's trailing exposure is less than the product of: (a) $200; times (b) the aggregate net sellable square footage of those Units remaining as collateral for the Loan (note that at pro forma prices the Borrower would have to close on approximately 126 units, or 42% of the Project, to qualify for the extension); and (vi) the Borrower pays a fee of 0.5% of the outstanding Loan Amount plus any unfunded commitment at the time the loan Extension is requested.

**Loan Fee:** $1,390,000 (1.00%)

**Exit Fee:** $2,780,000 (2.00%), payable at $20,000 per unit closed (meaning it will be fully paid after 139 units close).

**Prepayment Charge:** None, if the Borrower repays the Loan (or a portion thereof) from proceeds realized by the sale of Units and other Project components to retail purchasers; otherwise the Bank shall charge a prepayment charge equal to two percent (2%) of the amount prepaid (including any unfunded commitment if Loan is paid in full).

**Interstate Land Sales Act:** To comply with the Interstate Land Sales Act, the Borrower has filed with HUD and as of 10/28/05 has received HUD's approval of the form of purchase contract and the Property Condition Report. Jones Day reviewed and approved the Borrower's submission to HUD, the Property Condition Report, and HUD's approval letter to the Borrower. The Bank is satisfied that the Project is fully HUD compliant.

**Hotel Project Component:** **It is important to note up-front that the Project will be marketed, sold and operated as a condominium hotel** (with the hotel being run under the Trump brand, as discussed in the next section below), a relatively new real estate concept whereby: (a) Units are sold on a fee simple basis to individual retail purchasers; and (b) those purchasers then have the right, but not the obligation, to, when not using them **(while there are currently**

CCVPROD0002577

no legal restriction (see below) on how frequently Unit purchasers may occupy their Units, it is clear that the vast majority of buyers will be using their Units as a third or fourth residence, and not as their primary home), put their Unit into a Hotel rental pool to be rented out by the hotel operator to the public.

While we will discuss the actual economics of the hotel component of the Project later (they are not of paramount importance to us, because, as evidenced by our extremely conservative LTV, we fully expect to be paid off well before hotel operations commence in earnest), **we would like to note here that, for a number of reasons, we feel that hotel condominium projects are riskier than straight forward condo projects.** First, we simply do not have much experience financing hotel condo projects (we have two others which are still under construction: Sole' in Sunny Isles Beach, FL, and the Platinum in Las Vegas, NV). Second, the purchasers in these types of projects are clearly not intending to use them as their primary residence, and they are therefore more likely to walk away from their earnest money in the event of a market downturn. Third, there is a risk that if the developer makes representations to the Unit purchasers relating to the amount of income they can expect to generate from the hotel component, that the Project could fall under SEC securities guidelines and that said purchasers could back out of their contracts or tie the Project up with lawsuits in the event those expectations are not met. While Stillman has emphatically stated that no such representations have been made, it seems at least possible that some over zealous employee or marketing agent could step over the line in the hope of making a sale.

Two additional negatives to this hotel condo Project are: Units at the Project are very small as over half the units are less than 650 square feet, (average Unit size is greater at 805 SF) and the presence of fully furnished units makes it difficult to gauge an accurate resale value.

**Legal Review of Condo/Hotel Issues:** The Bank's outside counsel, Tracy Plott from DLA Piper Rudnick Gray Cary, reviewed the Project's acquisition and condominium documents along with Florida statutes and ordinances regarding the following issues:

1. *Florida Residency:* The acquisition and condominium documents disclaim an owner's ability to establish residency at the Project. As the property is not zoned for residential use, a unit owner may not be able to claim the Unit as a principal residence. This could be a negative from a purchaser's perspective due to the lack of state income tax in Florida.

2. *Language Regarding Future Revenue Potential:* The acquisition and condominium documents require each purchaser to acknowledge that they are not to rely on any representations regarding future property

CCVPROD0002578

value or future potential revenue associated with the condominium units.

3. *Hotel/Condo Residency Restrictions*: The contract once again disclaims the ability of purchasers to continually reside in Units. While there is no ordinance specifically restricting continuous occupancy, it is clear that the property is not zoned for "residential use" and that laws could be passed in the future restricting occupancy by purchasers.

The Borrower has recorded a Declaration of Restrictions against the Project (driven, we believe by the project approval process with City of Ft. Lauderdale), which (i) specifically restricts the use of units to a "hotel use", further specifying that the "units shall not be used for residential use"; and (ii) states that "all units shall be managed by a hotel management company under a unified plan for hotel use." It should be noted that according the Borrower's attorney, other Ft. Lauderdale condo-hotel projects have similarly worded restrictions recorded against their projects. The Bank's outside counsel is currently trying to confirm this.

The Bank's outside counsel (including their securities experts) expressed concern with some of the language in the Declaration of Restrictions, as a court could be more likely to deem the condo sales to be a sale of 'securities', which would then subject such sales to securities laws (making contracts rescindable). The Bank requested that DLA Piper Rudnick perform an extensive search regarding condo sales, and under what circumstances, if any, they might be deemed to be the sale of a security. The research proved to be informative, yet inconclusive, in the opinion of the Bank's outside counsel, as well as Peter Freund (one of the Bank's in-house attorneys) and Keith Gibbons. Based on the above research and related discussions, the Bank concluded that the presence of the Declaration of Restrictions results in a marginally greater risk that purchase contracts executed with respect to the Project may be rescindable.

**All of these issues further highlight the relative novelty, and therefore uncertainties, surrounding condo hotel projects, and add a degree of risk to this deal.**

**Trump Agreements:**

<u>Branding Agreement</u>
The Project will be branded under the Donald Trump ("Trump") umbrella of properties and the Project name will be **"Trump International Hotel and Condominium"**. Under the branding agreement, Trump will receive the following: (a) $250,000 payment upfront (included in the Project budget); (b) a residential/hotel incentive, which shall be computed and

CCVPROD0002579

paid to Trump upon the date which 85% of the Units have closed, and consisting of: (i) 5% of the amount by which the average gross sales of the Units equals or exceeds $600/SF but is less than or equal to $750/SF; (ii) 10% of the amount by which the average gross sales of the Units equals or exceeds $750/SF but is less than or equal to $900/SF; and (iii) 15% of the amount by which the average gross sales of the Units exceeds $900/SF; and (c) a retail incentive consisting of: (i) 15% of the amount by which net rents equal or exceed $300 per retail square foot and all sales based rents that the Borrower may collect; or (ii) 15% of the amount by which the capitalized value of net rents equals or exceeds $300 per retail square foot. Based on the Bank's pro forma sellout the "incentive" payment to Trump would equal approximately $19,296M. Given the timing of its payment (i.e. long after we will be paid in full), *the incentive fee is not included in the Project Budget.*

Development and Services Agreement
The Borrower has entered into the Development and Services Agreement with Trump Lauderdale Development LLC, for development advisement and assistance services. As compensation for these services, the Borrower will pay Trump a fee equal to 1.5% of all hard and soft costs of the Project (including land acquisition) to be paid as follows: a) $20,000 per month for 48 months; b) 75% of the remaining fee on the date of substantial completion; and c) 25% of the remaining fee five days after final completion of the Project. **According to Stillman, this agreement was entered into by Bayrock and serves little purpose other than providing Trump with additional fee revenue because Trump and his employees have not and will not have any direct involvement in the development of the Project.**

Trump Hotel Operating Agreement:
Trump Florida Hotel Management LLC will manage the hotel component of the Project for a period of three years with one three-year extension. As compensation for these services, Trump will receive the following fees: a) an annual fee of $1,000 for each unit at the Project; and b) 40% of the adjusted gross income from the hotel.

**The Bank perceives Trump's involvement in the Project as positive for the purposes of marketing the hotel condo units and operating the hotel.**

**Use of Earnest Money:**

Borrower shall be required to use at least $14,500,000 (the "Minimum Earnest Money Investment") of second half earnest money deposits for hard costs contained in the Project budget prior to loan disbursement.

CCVPROD0002580

Notwithstanding the foregoing, the Borrower shall use all second half earnest money deposits available to it for the hard costs of construction. The Loan shall be reduced dollar for dollar for all second half earnest money deposits received by Borrower in excess of $14,500,000.

**Equity Requirement:** $3,140,000 from the members of the Borrower. All equity shall be fully disbursed prior to any Loan disbursements.

**Subordinate Debt:** $38,260,000 (excluding any interest reserve) from CB Richard Ellis Strategic Partners III, L.P ("CBRE"). CBRE's term sheet is attached as **Exhibit "D"** (Please note that the loan amount stated in Exhibit "D" was adjusted based on the actual total Project cost, as well as the usage of EMD's toward Project costs. See CBRE discussion below)

**Collateral:** First mortgage on the Project and all other customary collateral.

**Collateral Release:** Greater of: (a) 100% of net; or (b) 93% of gross until our exposure is paid down to $200/SF. Thereafter, $400/SF.

**Presale Requirement:** Prior to any Loan disbursements, the Borrower must have entered into: (a) Valid Sales Contracts for at least 166 Units comprising no less than 118,900 net sellable square feet and at an average selling price of no less than $1,050 per net sellable square foot; and (b) Related Party Contracts (as defined below) for at least 10 Units comprising no less than 8,600 net sellable square feet and at and at an average selling price of no less than $1,050 per net sellable square foot ("Presale Requirement").

The Borrower has met the Presale Requirement as detailed below. Please note that in May 2006, the Bank retained the audit firm RSM McGladrey ("RSM") to verify the Presale Requirement. RSM verified that the Borrower had 178 total Valid Sales Contracts totaling $147,555M and 129,488 square feet, thereby meeting the presale requirement.

|  | # | SF | $ |  | $/SF |  | EMD Collected |
|---|---|---|---|---|---|---|---|
| **Unrelated Parties** | 166 | 118,760 | 136,044,701 | $ | 1,146 | $ | 27,209,042 |
| **Related Parties** | 12 | 10,728 | 11,510,375 | $ | 1,073 | $ | 2,307,113 |
| **Total** | 178 | 129,488 | 147,555,076 | $ | 1,140 | $ | 29,516,155 |

See **Exhibit "E"** for a detailed Sales Summary.

**Valid Sales Contracts:** Valid Sales Contracts must satisfy all of the following: (i) the sales contract must be on a form pre-approved by the Bank; (ii) the purchase price

3/12/2008                    KRG/GG                    Stillman 06-29-07

CCVPROD0002581

(excluding any amounts allocated for parking space and any upgrades) for each Unit shall be greater than or equal to 85% of the list price for that particular Unit as detailed on the Approved Price List (notwithstanding the foregoing, the Valid Sales Contracts and Related Party Contracts, as defined below, satisfying the Presale Requirement shall have an average selling price of no less than $1,050 per net sellable square foot) ; (iii) the sales contract must be to unrelated third party purchasers; (iv) no more than two Units may be sold to a single investor or its affiliates (notwithstanding the foregoing, three arms-length purchasers shall be allowed to purchase up to 3 units each and all related party purchasers shall be allowed to purchase up to 4 units each); (v) there are no unexpired contingencies including a mortgage contingency; (vi) purchaser has deposited a non-refundable EMD of at least 20% of the gross sales price; (vii) the delivery date under the contract is no earlier than June 30, 2009; and (viii) the contract specifically states that the purchaser agrees that the seller may use earnest money deposits in excess of 10% for costs of construction and that the purchaser has no lien rights with respect to the Project and all of purchaser's rights under the contract are subordinate to the Bank's mortgage and other security interests.   The Borrower shall not enter into any contracts for the sale of units which are not Valid Sales Contracts, except that Borrower may enter into contracts subject to a commercially reasonable mortgage contingency provided such contracts will not be deemed a Valid Sales Contract until the expiration or satisfaction of the mortgage contingency.

Notwithstanding the foregoing, Borrower may enter into up to 50 contracts with purchasers who are affiliates of either Borrower and Guarantor; however, those contracts must satisfy all other conditions of a Valid Sales Contract (the "Related Party Contracts").  In addition, any units purchased by affiliates of the Guarantor will not close until the Project has been substantially completed in a lien free manner.

Finally, it is understood that Borrower has entered into a contract with the previous Site Owner to purchase a roughly 4,000 sf penthouse unit at "cost", with "cost" to be determined upon completion of construction (the "At Cost Contract").  While the Bank approves the At Cost Contract, it is understood that the At Cost Contract: (a) will not be one of the contracts comprising the Presale Requirement; and (b) will not be considered a Related Party Contract.

**Please note that the outside delivery date of 6/30/09 is reasonable, as the GMP calls for an estimated completion date of no later than 8/31/08, leaving a cushion of 10 months.**

CCVPROD0002582

*See Exhibit "F" Commitment Letter for the rest of the Loan details. (This commitment letter is dated 6/28/06 and does not reflect the changes to the project budget, mezzanine loan amount and equity)*

**CBRE Discussion:**   CBRE is a real estate investment fund sponsored by CB Richard Ellis Investors, LLC, the global investment subsidiary of CB Richard Ellis, Inc. CB Richard Ellis Investors, LLC has over $14 billion in assets under management. CBRE is a fully discretionary, internally managed investment fund with over $1.1 billion in total capitalization.

In July 2004, a CB Richard Ellis affiliate and Stillman Bayrock Merrimac formed a joint venture to acquire the Site and fund pre-development and marketing costs. Once the Bank closes on the Loan and CBRE closes on their subordinate mezzanine loan, CBRE's disbursements will replace the joint venture's interest allocated to the CB Richard Ellis affiliate. The terms of the loan are as follows:

| | |
|---|---|
| Mezz Loan Amount: | $38,260,000 |
| Interest Rate: | 9% fixed return, compounding monthly, plus contingent interest equal to 10.75% of gross sale of any portion of the Project |
| Term: | term will coincide with Bank's term |
| Commitment Fee: | 1.25% ($438M paid in June 2004) |

CBRE has fully funded Project costs as the Site is cleared and the excavation and foundation work is completed.

Assuming the Borrower's anticipated sellout of $291,543M as well as a fully outstanding balance on their loan for a term of 36 months, CBRE will earn a total profit of roughly $42,761M on their $38,260M investment in the Project.

It should be noted that the Mezz loan and the Bank's Loan together exceed 90% of the total Project costs.

**The willingness of CBRE, a financially strong and experienced real estate services company, to invest $38,260,000 in the Project (approximately 20% of Project cost) ahead of the Bank's $139,000M Loan, demonstrates their confidence in the Project and the Borrower, adding comfort to the Bank's position. It is one of the strengths of this credit.**

CCVPROD0002583

**Market Discussion:** The City of Fort Lauderdale, which is called the Venice of America, is located in the east-central portion of Broward County between Miami-Dade and Palm Beach Counties. Fort Lauderdale has seven miles of shoreline along the Atlantic Ocean and 85 miles of natural and man-made navigable waterways, making it a desirable tourist destination.

Fort Lauderdale is approximately 25 miles north of Miami and 47 miles south of Palm Beach. The Project's neighborhood is located near all transportation centers. The Hollywood/Fort Lauderdale International Airport is 2.5 miles southwest of the Project, Port Everglades is 1.5 miles southwest of the Project, and Downtown Fort Lauderdale is 2 miles west of the Project. **The Project is located along State A1A (also known as North Atlantic Boulevard), which separates the Project from the Atlantic Ocean.** The Project will be very accessible via Florida's highway system, as well as the Fort Lauderdale International Airport that is 10 miles away.

The Site and surrounding areas are undergoing a change from older low-rise motel and rental apartment buildings to luxury high-rise condos and condo/hotels. These low-rise motels, which were popular during the 1960's through 1980's for "spring break" tourists, are now being knocked down to build luxury high-rise hotels and hotel condos such as the Project. There are currently over 1,500 hotel rooms under construction, planned, or recently completed. The main focus of the Fort Lauderdale economy is tourism and the related marine industry. Fort Lauderdale has a work force of 775,000 people, a third of which are in the tourism services industry.

**General Area/ Site Discussion:**

A site plan, maps, project renderings, and photos are attached as **Exhibit "G"**. The Project is located at 551 North Atlantic Boulevard, Fort Lauderdale, Broward County, Florida. The Project's neighborhood is a strip of land between the Intra-Coastal Waterway and the Atlantic Ocean. Given the Project's waterfront location, most units will have either ocean or Intra-Coastal views. The majority of the surrounding area is used for hotels, condo-hotels, and entertainment establishments catering to tourists. The area immediately south of the Las Olas Boulevard is mainly commercial space, while areas to the north of Las Olas Boulevard are primarily multi-family condominium developments. The uses to the west of the Project are a mix of high-end luxury single family residences and town homes.

Sunrise Boulevard and Las Olas Boulevard, both upscale shopping and entertainment areas, are a half mile away from the Project. The project is

CCVPROD0002584

also within walking distance to the Broward Center for the Performing Arts, the Historic Antiques District, and the oceanfront Birch State Park.

Michael Stein and Bob Glickman visited the Site in January 2006 and found the area to be desirable for a hotel condo development based on its proximity to the Atlantic Ocean. On a separate occasion Keith Gibbons visited the Site in March 2004 and December 2006 and found the Project's layout to optimize water views of both the Intra-Coastal and the Atlantic Ocean. Mr. Gibbons also found that the area was ideal for tourism based on the location of surrounding shopping, restaurants, and boating facilities.

The Site is located in an affluent area that is starting to become a higher-end tourist destination characterized by high-end real estate, luxury shopping and gourmet restaurants. The Project is also located near other demand generators: the beach, golf courses, boating marinas, and entertainment venues.

**Overall, the location of the Site right across the street from the beach in Fort Lauderdale is "A" and is one the primary strengths of their deal.**

**Environmental Report**
E, E, and G prepared a Phase I Environmental Assessment of the Project site dated October 2003. The assessment did not reveal evidence of any unresolved environmental concerns in connection with the Project.

**Project Discussion:** The Project will consist two buildings: a) a 5 story building located on the east portion of the Site which will contain a restaurant and retail on the first floor facing A1A and hotel condo units on floors 2 through 5 ("East Building"); and b) a 24 story building on the west portion of the Site, in which hotel operations will occupy the basement, a parking garage containing 410 parking spaces will occupy floors 1 through 5, and hotel condo units will occupy floors 6 through 24 ("West Building"). Please note that the Borrower does not intend to market the parking spaces at this time. The East Building will not block any ocean views of the units of West Building because the first five floors of the West Building contain the parking garage. The rooftop of the East Building will include an open deck with a sky bridge leading to the West Building and its 6th floor recreation area. Both the East Building and West Building combined will contain approximately 240,000 sellable square feet. The average unit size is 805 square feet and the residential unit mix at the Project is as follows:

CCVPROD0002585

| BR/BA | # of Units | Saleable SF | Total SF per Unit Type | % of Total |
|-------|-----------|-------------|------------------------|------------|
| Studio | 151 | 479 to 648 SF | 92,299 | 38.1% |
| 1BR/1.5BA | 89 | 767 to 1,296 SF | 74,988 | 31.0% |
| 2BR/2BA | 54 | 997 to 1,712 SF | 64,930 | 26.8% |
| 3BR/3BA | 3 | 1,592 to 2,365 SF | 5,706 | 2.4% |
| 4BR/3BA | 1 | 4,055 SF | 4,055 | 1.7% |
| Total | 298 | | 241,978 | 100% |

The Project building and interior finishes were designed by the well-known architect, Michael Graves & Associates, in conjunction with Oscar Garcia (as discussed below).

**All units will come fully finished and furnished (the FF&E budget is $25,453 per unit).**  Units will have state of the art kitchens with stainless steel appliances, wood cabinets, and granite counter tops, as well as Italian marble floors in the kitchen and bathrooms.  Studio units will include galley kitchens but will still have ranges, microwaves, sinks and refrigerators.    All  bathrooms  will  have  high-end  fixtures  and bathtub/showers.  Ceiling heights in the units will be 9 feet, while the lobby ceiling height is 20 feet.  Most larger units will include stackable washer/dryers.  All units will have top of the line in-unit furniture, flat screen televisions, DVD players, and music systems, and luxury hotel quality linens and flatware.  Unit owners will have one lockable closet in order to keep certain items protected from hotel guests that may be renting a unit.

The Project will provide luxury amenities, including two restaurants, a full spa, a 3,000 square foot fitness center, private cabanas overlooking the ocean, 6th floor pool with sundeck, 24-hour maid service, an executive center, valet parking service, 24-hour concierge and room service, and a high-end luxury retail center.

Unlike some of the hotel condo projects which have crossed our desk, none of the Units have internal "lockouts" whereby a portion of the Unit can be rented.  However, a number of Units are connected to a second Unit allowing purchasers the option of purchasing both connecting Units and only putting one of them in the rental pool.

**The combination of Michael Graves as the designing architect and Trump as a licensor and hotel operator adds some cachet and marketability to the Project.  The Project appears to be well-designed with relatively high-end finishes.**

CCVPROD0002586

FF&E
Unit purchasers will be the owners of all furnishings in their unit. For a Unit to remain in the pool of rentable hotel condo units (as determined by the hotel management company), the Unit owner is responsible for keeping the Unit and all furnishings in a condition consistent with a luxury hotel. It is anticipated that the Unit owners will purchase insurance policies to cover their units and their interior furnishings.

Hotel Rental Agreement
The Borrower is in the process of creating the rental agreement which will define the rights and obligations of all parties as it relates to the purchaser's voluntary participation in the hotel rental pool. Stillman claims he has deliberately delayed finalizing the rental agreement to avoid potential SEC issues but that said agreement will be finalized prior to closing. In a phone conversation Stillman provided a basic description of the cash flow to all parties that will eventually be stated in the rental agreement. A diagram of the cash flow is as follows:



Gross Revenue
*LESS (Operational & Variable Costs)*
Adjusted Gross Revenue

70% to the Unit Owner      30% to the Hotel Owner

60% to Borrower      40% to Trump

Stillman claims that, in essence, all costs of running the Project, including those one would think would be allocated to Units not participating in the program are run through the Hotel component. Stillman thinks that the residual annual cash flow from the hotel component to the Borrower would exceed $2,000M. We will hold all judgment.

At the end of the day, we have no confidence in our ability to analyze or determine how the hotel rental pool component of the Project will shake out. We are relying on the fact that we will be fully paid off, as evidenced by the presales at $1,136/SF, prior to hotel operations commencing.

Sales Program
The Borrower has hired four real estate firms to market the Project Units: Coldwell Banker Residential Real Estate, Galleria Collection Marketing, Inc., Sheldon Greene & Associates, Inc., and Realty Marketing and Development Corp. The Borrower started taking reservations in February

CCVPROD0002587

2005 and has 185 contracts as of the end of July 2006 at an average contract price of $1,136 per square foot. The 113 units that have not been sold to date have an average list price per square foot of $1,198. See table below for more detail

**STILLMAN SALES SUMMARY (7/2006)**

| Sales Contracts (LESS THAN 20% DOWN) | # | SF | $ | $/SF |
|---|---|---|---|---|
| Unrelated Parties | 3 | 1,651 | 1,894,000 | $ 1,147 |
| Related Parties | 4 | 3,830 | 3,883,875 | $ 1,014 |
| Total | 7 | 5,481 | 5,777,875 | $ 1,054 |
| | | | | |
| **Sales Contracts (WITH FULL 20% DOWN)** | # | SF | $ | $/SF |
| Unrelated Parties | 166 | 118,760 | 136,044,701 | $ 1,146 |
| Related Parties | 12 | 10,728 | 11,510,375 | $ 1,073 |
| Total | 178 | 129,488 | 147,555,076 | $ 1,140 |
| | | | | |
| **Total Contracts** | # | SF | $ | $/SF |
| Unrelated Parties | 169 | 120,411 | 137,938,701 | $ 1,146 |
| Related Parties | 16 | 14,558 | 15,394,250 | $ 1,057 |
| Total | 185 | 134,969 | 153,332,951 | $ 1,136 |

Architect
Working with Michael Graves is Oscar Garcia Architects ("Oscar Garcia"). Oscar Garcia will be the architect of record on this Project and has significant high-rise experience in South Florida. Of Oscar Garcia's more significant projects are: D' Art Condominiums, a 154 unit condo in Fort Lauderdale, Biscayne Landing Tower, a 470 unit project in North Miami, and Beach Street Condominiums, a 200 unit condo in Daytona Beach.

General Contractor
The Stiles Corporation ("Stiles"), of Fort Lauderdale, has developed more than 30 million square feet of office, retail, multi-family residential, and industrial facilities, will be the GC for the Project. Stiles has successfully developed self-contained, master-planned, mixed-use business parks, build-to-suit and luxury mixed-use residential properties for a respected list of clients and tenants. Stiles Corporation has built projects in Fort Lauderdale such as Sunrise Harbor, Las Olas Centre, New River Center, Las Olas Place, Bank of America Plaza at Las Olas City Centre, 350 Las Olas Place Condo, and Republic Plaza.

Stiles Corporation and Consolidated Entities report the following financial information:

| | 12 months ending 12/31/2004 | 12 months ending 12/31/2005 |
|---|---|---|
| Assets | $ 79,912,245 | $ 85,139,257 |
| Liabilities | $ 61,038,966 | $ 66,224,736 |
| Stockholder Equity | $ 18,873,279 | $ 18,914,521 |
| | | |
| Comprehensive Income | $ 3,780,103 | $ 2,196,242 |

Based on an informal survey of Florida area inspecting consultants, Stiles is considered a respectable general contractor with long standing ties to the Fort Lauderdale community. Through the early 1980's and 1990's, Stiles acted as a developer/builder for several office buildings in Broward County near I-95.

Bonding
The Stiles contract will be fully bonded. In addition, Stiles will purchase Subguard to protect itself from any subcontractor default.

Plan and Cost Review
The Bank retained Merritt and Harris, Inc. as its construction consultant. M&H completed a plan and cost review report for the Bank but the Senior Construction Manager felt the report was incomplete and of poor quality. The Bank has chosen to hire Steve Panter of Panter Associates to conduct an additional plan and cost review. The Bank will ensure that the findings of the report are adequate and that any necessary clarification will be finalized prior to any disbursements.

Insurance
In order to circumvent very high premiums during hurricane season in Florida, the Borrower requested permission to underinsure the Project by approximately $25MM. Because the insurance coverage is stacked (several companies take a portion of the insurance coverage), this $25MM shortfall applies to the top layer of potential loss, which would occur near the end of the Project. The Bank has approved of closing the Loan despite not having full insurance coverage for the Project and allowing the Borrower to obtain the coverage once the premium market has cooled.

One issue that arose during the negotiation of the underinsurance was that the current insurers of the Project are currently unaware of increases to the budget and changes to the completion date. The updated information could potentially affect the premium owed to each insurer. An initial concern was that the insurers could void their policy claiming misrepresentation from the Borrower. To protect against this possibility, Nate McKitterick, DLA Piper's insurance expert, analyzed the actual

CCVPROD0002589

insurance policies. McKitterick found that when the Borrower reveals the budget increases and completion date changes to the insurers, the insurers would collect the amount of the additional unpaid premium owed to date rather than void the policies.

In the Bank's estimation, the Project budget includes adequate funds to fund insurance costs over the life of the Loan.

Project Budget
The total cost of the Project can be broken down as follows:

|  | $ | Per Unit | Per SF |
|---|---|---|---|
| Land | $ 20,215,615 | $ 67,838 | $ 84 |
| Hard Costs | $ 120,674,271 | $ 404,947 | $ 503 |
| Soft Costs | $ 54,010,114 | $ 181,242 | $ 225 |
| **Total Project Costs** | $ 194,900,000 | $ 654,027 | $ 812 |

Please refer to **Exhibit "C"** for a detailed budget. Even though the GMP Construction Contract has not been executed, the budget is essentially complete. The budget includes a developer fee line item of $2,000,000 (1.8% of the GMP) which is paid to Stillman at a rate of $69,000 per month until paid in full. Land of $20,215M is included in the budget at actual cost. Interest reserve of $12,800M in the budget is slightly less than the $13,654M amount predicted by the Bank's profitability model, but we believe the repayment assumption (5 months) contained therein is quite conservative.

**For-Sale Valuation/ Exposure Analysis:**  Borrower Valuation
Assuming the Bank's Loan is fully disbursed and there have not been any unit closings, the Loan exposure will be approximately $579 per residential sf and $547 per residential and retail SF. The Borrower has projected an average sales price of $1,179/sf for the residential units, and $600/sf for the retail space resulting in a total sellout of approximately $291,543M and an LTS on the subject loan of 48%. Commissions and closing costs are estimated at 7%, which would result in a net sellout of $271,135M. The exposure analysis, based on the Borrower's estimates, is attached as **Exhibit "H"** and suggests that the Loan would be paid off after the sale and closing of approximately 214 units or 72% of the residential portion of the Project. It is important to note that because of the step down in the collateral release of Units (as described above) the Borrower will "cash out" approximately $54,896M before the Bank is paid in full.

CCVPROD0002590

## Appraiser's Valuation

The Bank received an appraisal from Appraisal First, Inc.("Appraiser") dated November 8, 2005. The Appraiser valued the Project as follows: an "as is" market value of $50,000M; a "bulk wholesale value" of $220,000M; and a "gross retail sellout value" of $285,000M.

The Appraiser used four land sales in the area to value the Site. The most relevant land sale is listed below:

| Location | Project | Land Comp |
|---|---|---|
| | 551 N. Fort Lauderdale Beach Blvd | 700 N. Fort Lauderdale Beach Blvd |
| Sale Date | Oct-04 | Aug-05 |
| Sale Price | $        20,000,000 | $        20,600,000 |
| Size (SF) | 79,897 | 48,824 |
| Price/SF | $             250.32 | $             421.92 |

The best land comp provided by the Appraiser is just north of the Project. Since the comparable was purchased in August 2005 and is very close to the project with similar zoning and density restrictions, this comp represents the best market value of the Site. The appraiser used this comp to arrive at a land valuation of $34MM, which is $14MM above what it was purchased for in October 2004 and what it is valued at in the Project Budget.

In addition to having the Borrower's unit reservations, the Appraiser used sales at four Fort Lauderdale condo/hotels. Below is chart comparing these projects:

| Name | Trump International Hotel & Tower | W Hotel - Fort Lauderdale | The Atlantic | Q Club | St. Regis |
|---|---|---|---|---|---|
| Stories | 24 | 19 (2 towers) | 16 | 25 | 23 |
| Units | 298 | 517 | 124 | 333 | 233 |
| Completion Date | Early 2007 | Early 2007 | June 2004 | Mid 2006 | Early 2006 |
| Residences | None | 171 | 124 | None | 67 |
| Avg Unit SF | 805 | 1200 | 900 | 868 | 3056 |
| $/SF Range | $800 to $1,908 | $889 to $$1,316 | $597 to $978 | $415 to $1,196 | $415 to 1,079 |
| Avg Price | $        1,164 | $        1,100 | $          568 | $        979 | $        722 |
| # Sold | 181 | 171 Reserved | 124 | 306 | 62 |

The comparables above are each located in close proximity to the Project. In fact the Atlantic is located immediately North of the Project, and Bob Glickman and Michael Stein toured it in late 2004. While it is not a

CCVPROD0002591

horrible looking building, we feel that the Project will be superior to the Atlantic in all respects. Each is classified as five star quality facilities with direct views of the Atlantic Ocean.

The Appraiser used recent actual sales contract amounts at the Atlantic and the St. Regis to value those Projects. In March 2006 the Bank called the St. Regis sales office and determined that only four units remained unsold and the asking prices were between $1,100 and $1,200 per square foot. Below is chart of comparable unit sales the Appraiser used to value the Project:

| Type | Project | Size | Floor | Date of Contract | Price | Price/SF |
|------|---------|------|-------|------------------|-------|----------|
| Studio | The Atlantic | 490 | 12 | N/A | $629,000 | $1,284 |
| Studio | The Atlantic | 581 | 6 | July 2005 | $560,000 | $964 |
| Studio | The Atlantic | 804 | 7 | Sept 2005 | $655,000 | $814 |
| Studio | The Atlantic | 580 | 7 | Not available | $680,000 | $1,172 |
| 2BR | The Atlantic | 1,414 | 6 | Not available | $1,100,000 | $778 |
| 2BR | The Atlantic | 1,414 | 11 | Not available | $1,500,000 | $1,061 |
| 1BR | The Atlantic | 1,024 | 12 | Not available | $1,200,000 | $1,172 |
| 3BR | St. Regis | 2,937 | 18 | Not available | $2,950,000 | $1,004 |
| 3BR | St. Regis | 2,697 | 20 | Not available | $3,175,000 | $1,177 |
| PH (1BR) | The Atlantic | 1,400 | 16 | Not available | $1,995,000 | $1,425 |
| PH (3BR) | St. Regis | 2,988 | 22 | Not available | $3,865,000 | $1,294 |

The Appraiser also used the reservations provided by the Borrower as another data point to value the Project. The reservations are sorted by unit type as follows:

| Unit Type | # Units | # Reserved | % Reserved | SF Reserved | $ Reserved | $/SF |
|-----------|---------|------------|------------|-------------|------------|------|
| Studio | 151 | 142 | 94% | 86,460 | $ 97,317,460 | $1,126 |
| 1BR | 89 | 78 | 88% | 64,483 | $ 70,050,190 | $1,086 |
| 2BR | 50 | 41 | 82% | 49,628 | $ 62,504,200 | $1,259 |
| 3BR | 7 | 2 | 29% | 3,341 | $ 4,798,750 | $1,436 |
| 4BR* | 1 | 0 | 0% | - | $ - | N/A |
| Total | 298 | 263 | 88% | 203,912 | $234,670,600 | $1,151 |

*Unit 2403, a 4BR, 4,000 SF penthouse, will be purchased "at cost" from the previous site owner.

Based on these sources, the Appraiser derived a value of $1,150/SF for studios, one bedrooms, and two bedrooms, and $1,400/SF for penthouse units. The Appraiser projected an average sales price on the residential portion of the Project of $1,170/SF or $280,000M, and $300/sf for the retail space, resulting in a total sellout of approximately $285MM.

CCVPROD0002592

Commissions and closing costs are estimated at 7%, which would result in a net sellout of $265MM. The exposure analysis, based on the Appraiser's estimates, is attached as **Exhibit "I"** and suggests that the Loan would be paid off after the sale and closing of approximately 213 units or 71% of the residential portion of the Project.

Bank Valuation
The Bank's valuation of the Project is heavily influenced by the pre-sale data at the Project. The Borrower began taking reservations in October 2004 and to date has achieved sold approximately 62% of the Project (185 units) at an average sales price of $1,136/SF. The Borrower must achieve a presale requirement of 166 Valid Sales Contracts consisting of 118,900 square feet and 10 Related Party Contracts consisting of 8,600, at a an average price per square foot of $1,050.

Given the sales data, the Bank has projected an average sales price of $1,136/sf for the residential units, $300/sf for the retail space, (please note that given their relatively minor significance in the grand scheme of things, the Bank did not perform a thorough analysis of retail values in Fort Lauderdale; instead we just conservatively applied significant discounts to the Borrower's and appraiser's estimates) resulting in a total sellout of approximately $272,640M. Commissions and closing costs are estimated at 7%, which would result in a net sellout of $257,546M. The exposure analysis, based on the Bank's estimates, is attached as **Exhibit "J"** and suggests that the Loan would be paid off after the sale and closing of approximately 215 units, or 72% of the residential portion of the Project. (The Bank would be paid off much quicker if we did not allow the Borrower to cash out some money once we are paid down to $200/SF.)

**Profit Projection:**   Assuming all of the units sold at the Borrower Expected price of $1,179/sf for the residential units, and $600/sf for the commercial space, commissions and closing costs are 4%, the Borrower's profit would be $15,857M, after paying for all expenses and costs of funding, the Bank's Exit Fee, accrued interest on the CBRE mezz Loan, and the Trump fee. Assuming the Bank's expected sellout, all else equal, the Borrower would profit by $7,299M. Please refer to the profit projections attached as **Exhibit "K"** for further detail.

**This is still a profitable transaction, but not nearly as profitable to the Borrower as before the huge cost increases. Luckily, even if the Borrower loses out, it looks like the Mezzanine Lender will have a significant amount of principal and interest to protect in all but the most disastrous downturn.**

CCVPROD0002593

**Guarantor/Sponsorship Discussion:**

<u>Roy Stillman</u>

Stillman is a member of The Stillman Organization, a family owned real estate development company. This will be the Bank's second transaction with Roy Stillman.   In September 2002, the Bank closed on Stillman/Upper East Side, a $63,050M loan for the construction of a 30-story condo building known as the Metropolitan with 94 residential units containing 170,000 square feet.  This project was both on time and under budget, and paid off in May 2004.   Please note that we estimate that Stillman (50% owner) and his partners made a roughly $40,000M profit on a $3,000M equity investment on the Metropolitan. **The fact that Stillman performed so well on a previous transaction with the Bank gives us an added degree of confidence in his ability to complete and sellout the Project.**  Prior to the Stillman/Upper East Side project, Stillman had built several small condo developments and office buildings in the greater New York area.

<u>Stillman Financial Position</u>

Attached as **Exhibit "L"**, please find a copy of Stillman's certified personal financial statement dated October 4, 2005.

Stillman claimed a net worth of $37,850M on total assets of $41,550M. His assets were listed as follows:  $1,750M in cash, $9,000M in personal effects, $450M in automobiles, $4,000M in his residence in New York, $7,000M in his residence in South Beach, FL, and $19,350M in various investment properties in Florida and New York.  Stillman also provided the Bank with statements from his personal checking accounts dated August 19, 2005. One account evidenced an average daily balance of $4,360M while another account evidenced an account balance of $43M. No contingent liabilities were reported on his Personal Financial Statement dated October 4, 2005.

Stillman provided the Bank with copies of his 2002, 2003, 2004 and 2005 federal tax returns, (select pages attached as **Exhibit "M"**). Once Stillman files his 2006 return, the Bank will be provided with a copy.  Please see the chart below for a summary of Stillman's tax returns:

| | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Taxable Interest | $4,601 | $4,805 | $1,077 | $40,336 |
| Business Income | $0 | $30,544 | ($1,239,265) | $0 |
| Schedule E Income | ($340,689) | ($15,517) | $22,577,805 | $1,379,070 |
| NOL Carryover | ($193,045) | ($546,444) | ($543,851) | $0 |
| AGI | ($540,514) | ($542,101) | $20,500,647 | $1,416,503 |

During 2002 and 2003, Stillman was in the process of developing the Bank-financed Stillman/Upper East Side project and his profits from said transaction are reflected on his 2004 tax return.

**Conclusion**
**The Bank considers Stillman's financial strength to be fair. While he claims a net worth of $37,850M, most of that amount is tied up in real estate investments. Given this fact, Stillman's presence as a completion guarantor is not worth very much. However, the Bank benefits from the presence of CBRE as the mezzanine lender on this Project, as well as the profit inherent in the reservations/presales.**

**Loan Rating/ Bank Profitability Discussion:**

Per the Loss Given Default ("LGD") calculation attached as **Exhibit "N"**, a stress to approximately 52% of the Bank's expected valuation (this is obviously a larger discount than we normally apply, but we want to be very conservative given our concerns regarding the hotel condo nature of the Project) was applied, which would suggest that the project's sellout was $132MM or $549/SF. Since the loan is non-recourse for payment, no additional value is added from a guaranty. In the event of a default and this liquidation value, the Bank would incur a loss of 19.4% (which was rounded to 20%). If the probability of default ("POD") is set equal to the LGD for the Primary Loan, then the Loan would be assigned a 4.0 rating for the Primary Loan.

The CRE Profitability Model is attached as **Exhibit "O"**. The months to maximum funding was set at 23 months, additional months at maximum Project funding was set at 1 month and the months to repay all sources was set to 5 months such that the calculated term of the Loan would be 29 months. Under these assumptions, the required ROAE threshold of 17.01% is surpassed by 6.51% and the "All-in-Spread" requirement of 4.25% is surpassed by 2.40%.

3/12/2008                    KRG/GG                    Stillman 06-29-07

CCVPROD0002595

**Relationship Exposure**
**Analysis:**        This is the only loan the Bank has with the Borrower.

**Loan Source:**     Keith Gibbons generated this Loan through his relationship with Roy Stillman, a customer of the Bank.

**Structural Weakness**
**Analysis:**        This Loan does not have any structural weaknesses.

**Board Exceptions:**   This Loan does not have any Board Exceptions.

**Patriot Act**
**Compliance:**      The following entities were checked against the OFAC list and were not listed:
- Roy Stillman
- The Stillman Organization
- Donald Trump
- SB Hotel Associates LLC
- Stillman Bayrock Merrimac LLC

**CRA Benefit:**     This Loan does not have a community development purpose, as it does not provide affordable housing.

**BSA/AML Rating:**  Low-Risk.

**Conclusion:**      The risks and weaknesses of this Loan are as follows:

1) **Non-recourse loan.**
2) **Condo-hotel nature of the Project for reasons described herein.**

Fortunately, these negatives are more than offset by the following strengths:

1) **Strong third-party Mezz Lender with $38,260M in the Project ahead of us. Our LTS is conservative at 51%.**
2) **Experienced development team.**
3) **Presale requirement of roughly 60% of the Project at $1,050/SF. To date, the Borrower reports 185 Valid Sales Contracts at $1,136/SF implying a <u>VERY</u> conservative LTS of 51%.**
4) **Great location right off the beach on the prime strip in Fort Lauderdale.**

Based on the above, it is recommended that this Loan be approved as stated above and assigned the following initial ratings:

CCVPROD0002596

**Primary Loan**

| | |
|---|---|
| POD Rating: | 20% |
| LGD Rating: | 20% |
| Alpha Rating: | P |
| Numeric Rating: | 4.0 |

| | |
|---|---|
| **Supervising Officer:** | Bob Glickman |
| **Lead Officer:** | Keith R. Gibbons |
| **Supporting Loan Officer:** | George Guattare |

**Exhibits:**

| | |
|---|---|
| A. | Loan Comparison |
| B. | Ownership Structure |
| C. | Project Budget |
| D. | CBRE Term Sheet |
| E. | Sales Summary |
| F. | Commitment Letter |
| G. | Site Plan, Maps, Project Renderings, and Photos |
| H. | Exposure Analysis – Borrower |
| I. | Exposure Analysis – Appraiser |
| J. | Exposure Analysis – Bank |
| K. | Profit Projection |
| L. | Stillman Personal Financial Statement |
| M. | Stillman's 2002, 2003, 2004 and 2005 Federal Tax Returns |
| N. | Loss Given Default |
| O. | CRE Profitability Model |

CCVPROD0002597